Exhibit 4

**Expert Report of Destiny Peery**
**re Rejon Taylor case**
**May 13, 2019**

## I.     Qualifications & Background

I hold a PhD in social psychology from Northwestern University. My fields of expertise within social psychology include racial identity, racial categorization and perceptions of race, and stereotyping, prejudice, and discrimination, including implicit bias. In addition, I also specialize in applying these social psychological constructs to legal doctrine and practice, including anti-discrimination law and criminal law. I also hold a JD from Northwestern University Law School, and I am currently an Associate Professor of Law at Northwestern University Pritzker School of Law, where I have been a research faculty member since 2014. I was promoted to Associate Professor of Law at Northwestern University Pritzker School of Law in 2017 after serving three years as an Assistant Professor from 2014 to 2017. Prior to my faculty position at Northwestern Law School, I was a Visiting Assistant Professor at Duke Law School from 2012 to 2014. I teach Criminal Law; Anti-Discrimination Law; Social Science as Evidence; and Race, Social Science, and Law.

I have published empirical, experimental research on racial perception and categorization and racial biases in peer-reviewed psychology journals, and I have conducted research reviews that have been published both in peer-reviewed psychology journals and law journals. I have also published popular media pieces on implicit bias in outlets including Reuters and Huffington Post. Within the last couple of years, I have given talks and/or conducted trainings on implicit bias, cognitive biases, and stereotyping, bias, and discrimination for the following groups of law practitioners, among others: 7th Circuit Bar Association; American Bar Association Business Law Section; Chicago Lawyers' Committee for Civil Rights Under Law; Cook County Juvenile Court Clinic; Defense Research Institute (DRI, a civil defense bar association); and the Northwestern University Center for Public Safety (conducts training for law enforcement). A full CV/resume can be found in Appendix A of this report.

I have previously served as an expert in two federal employment discrimination cases in the Northern District of Illinois, *Martin, Truesdell, and Tejada v. F.E. Moran Inc.* and *Downing v. Abbott Laboratories*. In these cases, I reviewed case documents, prepared expert reports on topics such as racial and gender stereotyping and bias, gave a deposition, and testified in court.

The expert opinions expressed here are the product of my experience, analysis, and application of that expertise to the materials listed in Part VI. Works cited to support my analysis are listed in Part VII. If new or additional relevant information becomes available, I may supplement or modify this report and/or my opinions. My billing rate for these services is $250.00 per hour for document review and report preparation up to 20 hours. My compensation is not conditioned upon, or in any way affected by, the opinions I express or upon any outcome in the instant matter.

Exhibit 4

## II.     Assignment and Methodology

The goal of my analysis and this report is to use my professional background and experience to identify social psychological principles from the empirical research literature that bear on the question of whether social psychological theories of stereotyping, bias, and dehumanization are relevant to determining the impact the government's language had on the jury's guilty verdict and sentence of death in Rejon Taylor's federal death penalty trial. My analysis will also include a discussion of the potential impact of the "racist redneck" comment on the jurors with respect to their subsequent determinations at the sentencing phase of the trial.

In Part III, I offer basic definitions of concepts important to understanding the observations and conclusions in this report, specifically stereotyping, bias, and dehumanization. In Part IV, I offer my opinions on the research on stereotyping, bias, and dehumanization that I recognize as related to this case, including research on how stereotyping, bias, and dehumanization can affect jury decision making in criminal cases involving young Black men, particularly, where possible, in capital sentencing decisions. The social science literature that I draw on is sampled from peer-reviewed, scientific studies of stereotyping, prejudice, and discrimination. Some of the work cited has been conducted with respect to stereotyping and bias situations involving criminal trials and sentencing, but some of the studies also draw on basic social psychological study of how stereotyping and prejudice affect people in all settings. The sampling of studies cited here draw primarily on social psychological perspectives given my background as a social psychologist, and the research on stereotyping and bias has been a core area of study for many decades in this field. Many other social science fields also have literatures that are just as developed as that of social psychology, including sociology, criminology, and other sub-areas of the field of psychology. Taken together, across multiple fields, including but not limited to social psychology, there is an established body of scientific research that is well-accepted within and between social scientific scholarly and practitioner communities. In Part V, I offer a discussion of particular aspects of the record in Rejon Taylor's case that are consistent with how stereotyping, bias, and dehumanization can manifest, particularly during the government's opening and closing statements for both phases of trial. In Part VI, I provide a list of the documents reviewed in preparation of this report. In Part VII, I list the sources of the research citations in the report. Finally, in Appendix A, I offer my CV/Resume, including my list of publications and public speaking engagements, including academic conferences and other research presentations, as additional background on my qualifications (as summarized in Part I).

## III.     Stereotypes & Bias: Basic Definitions

A **stereotype** is a thought or belief, often reflecting widely adopted and endorsed thoughts and beliefs, about the characteristics of and behaviors of types of individuals or groups.[1] Stereotypes can be prescriptive or descriptive.[2] When stereotypes are prescriptive, they tell people how they should think and behave or what characteristics they should manifest if they are a certain type of person or from a particular group. When stereotypes are descriptive, they tell us what people think, how people behave, and what characteristics people have when they are a certain type of

---

[1] *See e.g.,* McCarty, Yzerbyt, & Spears, 2002.
[2] *See e.g.,* Gill, 2004.

Exhibit 4

person or a member of a particular group. In other words, stereotypes are generalizations of what certain types of people and groups are like or should be like. While they may at times describe an individual member of a particular type or group, they are often inaccurately applied to all members of a group, and they are often not particularly predictive when applied to individuals.[3] **Stereotyping** refers to applying stereotypes to others.

**Biases**, most simply, are considered preferences for or against something, including people, groups, and objects. Biases can be positive or negative in valence, meaning we have positive biases toward things we like and negative biases against things we don't like. Biases can also exist in multiple forms. Biases that are conscious and deliberate are considered the most reflective of endorsed attitudes and beliefs, and they can be and often are reported on self-report questionnaires, surveys, etc.[4] Overt, explicit biases that are often considered "old-fashioned" prejudice, which includes willingness to state dislike for racial groups or women, to see some racial groups or genders as superior or inferior to other racial groups or genders and state those beliefs, to use racial epithets or sexist language, to explicitly rely upon stereotypes when describing groups, etc. Overt, explicit biases are related to more overt, blatant forms of stereotyping, prejudice, and discrimination.[5] Biases can also (often but not always) be more subtle and nonconscious, meaning that people may not be but can be aware of their presence and/or the extent of their biases.[6] The biases may or may not reflect endorsed attitudes or beliefs, and they are often argued to reflect cultural stereotypes and attitudes. Particularly for more controversial biases like race and gender biases, they can seem to exist contrary to people's self-reported explicit attitudes and beliefs.[7] Subtle, possibly nonconscious biases are measured formally by speeded categorization tasks that measure how quickly one can associate different attitude objects, like racial groups, with stereotypes and/or positive and negative evaluations.[8] The faster the responses, the stronger the mental associations.[9] In other words, the more quickly someone can pair "Black" and "bad," the more likely they are to think negatively of and stereotype Black people and the more likely they are to exhibit bias toward Black people in the form of prejudice and discrimination,[10] particularly in more subtle, less overt or blatant ways, including negative evaluations, experiencing discomfort around members of these groups, etc.[11] Subtle, nonconscious forms of bias can reflect both implicit stereotyping, that is relatively nonconscious, spontaneous activation of stereotypes, or implicit evaluation, relatively nonconscious, spontaneous activation of positive and negative evaluations of an individual or group.[12]

## IV.    Research on Stereotyping, Bias, & Dehumanization

---

[3] *See e.g.,* Hall & Goh, 2017.
[4] *See e.g.,* Greenwald & Krieger, 2006.
[5] *See e.g.,* Amodio & Devine, 2006.
[6] *See e.g.,* Greenwald & Banaji, 1995.
[7] *See e.g.,* Devine, 1989.
[8] The first and most common test or measure is the Implicit Association Test (IAT) introduced by Greenwald, McGhee, & Schwartz, 1998.
[9] Greenwald, McGhee, & Schwartz, 1998.
[10] *See e.g.,* Greenwald, Poehlman, Uhlmann, & Banaji, 2009; Jost, Rudman, Blair, Carney, Dasgupta, Glaser, & Hardin, 2009.
[11] *See e.g.,* Amodio & Devine, 2006.
[12] Greenwald & Banaji, 1995.

Exhibit 4

## A. Stereotypes of Black Men

Common, culturally-held Black stereotypes,[13] both historically and now, include that Black people (and especially Black men and boys) are lazy, poor, ignorant, stupid, uneducated, incompetent, loud, aggressive, threatening,[14] dangerous, violent, deviant,[15] and criminal[16] predators.[17] Research has shown that these stereotypes, even those related to criminality and violence, attach to Black boys as young as 4 or 5 years of age.[18]

<u>Stereotypes of Young Black Men</u>

While we could expect that all stereotypes of Black men or Black people would be applied across people identified as Black, regardless of age, gender, or other characteristics, research has consistently highlighted the particular salience of stereotypes, particularly those involving deviance and criminality, for young Black men. Young Black men, especially those accused of or found to have committed criminal offenses capture a large part of the imagination of stereotyping of Black men in general. Thus young Black men are especially likely to be portrayed by the media and stereotyped by the general population as "deviant, dangerous, and dysfunctional."[19] Further, young Black men are often stereotyped as possessing a particular competence for crime even if they're deemed incompetent elsewhere, as possessing innate, animalistic tendencies with respect to committing crime, and even as having rather singular focuses on engaging in criminal or deviant activities.[20] Research has shown that the strong association between criminality and young Black men in particular and the creation of the "criminalblackman"[21] or a deep association between "young Black male" and "criminal predator"[22] is a particularly strong and enduring stereotype of young Black men.

These associations between young Black men and criminality are argued to have really cemented during the era of the "super predator," which sparked fears of young Black and brown men in particular. In 1996, Hillary Clinton, now infamously, described these young Black and brown "super predators" as violent, threatening, and lacking conscience and empathy. Further, these young Black male criminal predators were understood to be dispositionally violent, lacking in moral character, impulsive, savvy and manipulative, and lacking impulse control and remorse.[23] They have come to represent the most extreme examples of Black criminality, and the criminal justice responses to this population have also become more extreme. Research has shown that when people more strongly believe the super predator stereotype, they are more supportive of stronger sentencing for criminal offenses, including life without parole, and this was especially

---

[13] *See e.g.,* Devine, 1989; Devine & Elliott, 1995.
[14] *See e.g.,* Chiricos & Eschholz, 2002.
[15] *See e.g.,* Gibbs, 1988.
[16] *See e.g.,* Massey, 1993.
[17] *See e.g.,* Welch, 2007.
[18] Todd, Thiem, & Neel, 2016.
[19] Gibbs, 1988.
[20] *See e.g.,* Daly, 1994, p. 263.
[21] Russell, 2002.
[22] *See e.g.,* Welch, 2007.
[23] *See e.g.,* Haberman, 2014.

Exhibit 4

true when the described offender was said to have murdered a stranger compared to a relative.[24] In another set of studies, it was found that mock jurors who sat through a murder "trial" were significantly more likely to render a guilty verdict if the prosecuting attorney had invoked the super predator association during his opening and closing statements (as read in transcript form by the mock jurors).[25] This effect was shown to occur regardless of the jurors pre-existing beliefs and despite the fact that the jury instructions reminded the mock jurors that opening and closing arguments are not evidence and that they should be not be given undue weight in their decision-making.[26]

## B. Biases & Disparities in Criminal Trials and Sentencing of Young Black Men

Research on actual criminal justice system outcomes has also focused on the effects of being young, Black, and male on aspects of the criminal justice process from arrest to post-conviction. Of particular relevance here is research focused on the effects on sentencing. Research has examined the interaction between age, race, and gender in sentencing, consistently finding that young Black males are sentenced the most harshly compared to all other combinations of defendant characteristics.[27] By this point, there are many studies covering multiple decades and many jurisdictions demonstrating this basic pattern of disparity.

The sentencing disparities that have been demonstrated tend to be attributed to the effect of racial biases and stereotypes related to Black men and young Black men in particular. In other words, the available research tends to control for variables like prior criminal histories, offense severity, and other crucial characteristics of the case at hand and still find effects based on race, age, and gender. Thus research consistently points to the role of racial stereotyping and biases as explanations for how, even after controlling for variation between cases, the effect of young Black men being punished more harshly persists.

In addition to looking at disparities in the aggregate, research has shown that individual people generally use stereotypes and pre-existing associations when judging a defendant's actions and making sentencing decisions. For example, research has shown that people are more likely to report an offense like shoplifting to the authorities if the alleged offender fits the reporter's profile of a shoplifter, they recommend harsher sentences for stereotypical defendants, and they believe that the offense was more likely to result from the underlying disposition or inherent characteristics of the alleged defendant's character consistent with stereotypes rather than circumstances or external explanations (i.e., mitigating circumstances).[28] In addition to research participants, there is large body of research generally demonstrating that jurors and juries also make decisions that are affected by stereotypes and bias, many examples of which are cited in the discussion below.

As mentioned before, there has been a lot research done over the last 40 years to examine disparities in capital cases and sentencing, particularly based on race. I present only a few

---

[24] Greene, Duke, & Woody, 2017.

[25] Haegerich, Salerno, & Bottoms, 2013.

[26] *Id.*

[27] *See e.g.*, Steffensmeier, Ulmer, & Kramer, 1998.

[28] *See e.g.*, Steffensmeier, 1976.

Exhibit 4

relevant examples of this work below, with an emphasis on that research speaks to perceptions and evaluations of young Black male defendants, particularly in capital cases.

In a well-known paper entitled "Looking Deathworthy,"[29] researchers wanted to capture the connection between stereotypicality of the defendants, that is how much they fit the stereotypes of Black men, and capital sentencing outcomes. They focused on stereotypicality of appearance to examine whether Black men who were more stereotypically Black-looking (e.g., darker skin, wider nose, fuller lips) were more likely to receive the death penalty than men with less stereotypical appearances. One reason for looking at this question in this way is that, in line with the discussion above about decision-makers being affected by the stereotype match between the defendant and a crime, previous research has consistently shown that stereotypes are more likely to be applied to group members who look more like a prototypical member of the group, and judgments of those individuals are more in line with stereotypes of the group. In "Looking Deathworthy," researchers found that for actual defendants in death-eligible cases, the defendants who both killed a White person and who looked more stereotypically Black were more likely to receive the death penalty after controlling for many case variable that otherwise could affect sentencing. Black features have been shown to activate Black stereotypes, including or especially stereotypes about criminality,[30] and activation of Black stereotypes often leads to harsher punishment decisions.

## Juror Biases Can Affect Guilt and Sentencing Determinations in Capital Cases

Research through the Capital Jury Project, a multistate study of a large sample of actual capital case jurors who had served through the penalty phase of a death penalty trial, examined impacts of juror characteristics on outcomes in capital cases. In one study, using a sample of capital jurors from 14 states, researchers found that when a capital jury had 5 or more White men on the jury, the jury was more than twice as likely to sentence a Black defendant who killed a White person to death than when there were 4 or fewer White men (71% versus 30%).[31] Follow-up research found evidence that White men, in particular, may view capital cases through a racialized lens, and in one mock jury study,[32] they were more likely than other jurors to view a Black defendant as having a depraved disposition, as less redeemable, as more cold-hearted and remorseless, as more dangerous, and as someone who was more likely to re-offend. White male jurors were also more likely than other jurors to discount mitigating evidence offered by a Black defendant, and they were more punitive than not only other jurors, but particularly toward Black defendants.[33] Related research found that even when evaluating the same facts and evidence presented in the same way, White participants in the study were significantly more likely to give a death sentence to a Black defendant if the victim was White.[34] Further, it was found that these White participants weighed aggravating circumstances more heavily and were reluctant to attach significance to mitigating circumstances for Black defendants compared to White defendants.

---

[29] Eberhardt, Davies, Purdie-Vaughns, & Johnson, 2006.
[30] Eberhardt, Goff, Purdie, & Davies, 2004.
[31] Bowers, Steiner, & Sandys, 2001.
[32] Lynch & Haney, 2011.
[33] *Id.*
[34] Haney, 2004; Sweeney & Haney, 1992.

Exhibit 4

The participants also invoked stereotype-consistent explanation for their verdict decisions, including citing negative qualities of the Black defendant.[35]

In addition, to the potential effects of individual juror biases in the process, the death-qualification process itself has been implicated when considering the potential for bias on a capital jury.[36] It has been argued that the death-qualification process actually increases the likelihood that biased jurors will be seated, which leads to increases in racially discriminatory sentences from those juries. Research has shown that death-qualified juries come into their service with a host of biases that are especially likely to disadvantage Black defendants. Death-qualified jurors and juries have been found to be more conviction prone than ordinary jurors.[37] They've also been found to be more likely to show race-of-defendant and race-victim effects than ordinary jurors and juries. Death-qualified juries are more demographically homogenous, thus less representative of the communities from which they're drawn and more likely to be disproportionately White.[38] Death-qualified jurors are more likely to believe that discrimination against Blacks is no longer problem.[39] Further, research suggests that death-qualified jurors are more likely to harbor stronger racial biases than excluded jurors.[40] Thus, by selecting death-qualified jurors, one is also potentially selecting jurors that are more likely to racially-stereotype Black defendants.

## D. Stereotypes & Dehumanization

Research on dehumanization commonly defines dehumanization as a process by which individuals or groups of people (such as racial groups) are denied "full humanness,"[41] including denials of human feelings (e.g., love, remorse, or otherwise more complex human emotions) and full human cognitive capacity. Over time social science understandings of dehumanization have come to understand that the process of seeing others as less human operates on a spectrum, with lessor variations of dehumanization covering situations where full humanness is not denied, but people still discount the humanity of those social groups perceived as other. For example, infrahumanization is considered a relatively more subtle and possibly implicit form of dehumanization whereby social groups to which one doesn't belong are not afforded the same level of humanness afforded to one's own social groups. This can manifest in denial of complex human emotions (also called secondary emotions) that are considered distinctly human, such as remorse.[42] Forms of dehumanization also distinguish between dehumanization that occurs through associating social groups, such as racial groups, with animals that have more base feelings (e.g., they can experience relatively straightforward emotions like anger, excitement) and more basic cognitive capacities (e.g., they have impulsive, instinctual decision-making rather than engaging in deliberative thinking) and objectification, which leads people to see others as inanimate objects lacking human characteristics.

---

[35] *Id.*

[36] *See e.g.,* Haney, 1984; Levinson, Smith, & Young, 2014.

[37] *See e.g.,* Haney, 1984; Thompson, Cowan, Ellsworth, & Harrington, 1984; Young, 2004.

[38] *See e.g.,* Bowers, Steiner, & Sandys, 2001; Levinson, Smith, & Young, 2014.

[39] *See e.g., id.*

[40] *See e.g., id.*

[41] *See e.g.,* Haslam, 2006, at p. 252.

[42] *See e.g.,* Leyens, Paladino, Rodriguez-Torres, Vaes, Demoulin, Rodriguez-Perez, & Gaunt, 2000.

Exhibit 4

Scholars have started to tease apart the distinction between dehumanization and bias and prejudice. While stereotyping and bias may explain why someone might pick one job candidate over another, it is usually not enough to explain more extreme forms of intergroup segregation and discrimination, including mass incarceration, and capital punishment.[43] Dehumanization has come to fill the gap between bias and stereotyping and the more extreme exclusions and mistreatments of social outgroups, to help explain how people come to systematically treat some social groups in ways that subject them to more violence and punishment than other social groups, even when both are engaged in the same behaviors. Many more people would endorse beliefs about particular attributes or characteristics of social groups in the form of stereotypes while refusing to say that members of that social group are less (or not) human. So while many studies have found that dehumanization and stereotyping, bias, and prejudice are related,[44] they have also consistently shown that dehumanization operates as its own phenomenon, and it should not be simply considered an extreme form of bias or stereotyping.[45]

Further, some have argued that bias or prejudice almost requires that one at least admit the humanity of another in order to make judgments about their relative intelligence, competence to engage in certain distinctly human behaviors, etc.[46] And in many, if not most, cases, disliking some social group is not the same thing as believing the members of that group are less or not human.[47] Further, there is evidence that stereotyping and prejudice often evoke brain responses that are specifically implicated in the processing of information about other humans, but not animals or objects. During dehumanization, the brain behaves more like it is processing information about animals or objects than people. And research has shown that social groups that people hold deep prejudices against may fail to activate those parts of the brain that are used process information about people, providing evidence of dehumanization.[48] And the consequences of dehumanization, compared to bias or prejudice alone, are distinctly more extreme, and they include greater likelihood of using or excusing violence against and punishment of dehumanized individuals and groups and denials of their distinctly human emotional and psychological experiences. In other words, dehumanization and violence are interrelated,[49] and empirical evidence shows that dehumanization increases aggressive behaviors[50] and discrimination[51] toward those perceived as outgroups (i.e., groups to which one does not belong), in part by making mistreatment of those individuals and social groups morally less problematic and less likely to evoke guilt.

Dehumanizing language and situations have been identified across many fields, and the extreme examples of dehumanization seen during the Holocaust and slavery are often provided as prototypical examples of circumstances where dehumanizing language and behaviors were operating, particularly dehumanization by comparison to animals (e.g., Nazis referred to Jews as

---

[43] *See e.g.,* Goff, Jackson, Di Leone, Culotta, & DiTomasso, 2014.
[44] *See e.g.,* Kteily, Bruneau, Waytz, & Cotterill, 2015.
[45] *See e.g., id.*; Wilde, Martin, Goff, 2014.
[46] Wilde, Martin, & Goff, 2014.
[47] *Id.*
[48] Harris & Fiske, 2006.
[49] *See e.g.,* Delgado, Rodriguez-Perez, Vaes, Leyens, & Betancor, 2009.
[50] *See e.g.,* Kteily, Bruneau, Waytz, & Cotterill, 2015.
[51] *See e.g.,* Goff, Eberhardt, Williams, & Jackson, 2008.

Exhibit 4

rats and vermin and proponents of slavery compared Black people to apes).[52] Research on both more everyday and/or subtle forms of dehumanizing language and behaviors has helped conceptualize how to identify dehumanization in less extreme, more commonplace circumstances. Thus research has also demonstrated how language plays a role in portraying women as sexual objects, athletes as nothing more than statistics, and inmates as numbers.[53] Further, it has examined the ways that doctors may dehumanize their patients and how people generally perceive national outgroups outside of times of conflict.[54] And importantly, the "everyday" versions are not driven by ongoing major conflicts or war, although the language of dehumanization often resembles that of those extreme prominent historical examples. Black people are still often described in animalistic terms and are denied complex human emotional and psychological lives, especially in contexts involving the criminal justice system. Some examples of studies demonstrating the consequences of dehumanization are discussed below.

A classic paper on aggression and dehumanization found that when a social group had been described in dehumanizing terms (e.g., as animalistic and rotten rather than perceptive and understanding) in the lead up to the study, participants in the study delivered what they believed were significantly stronger electrical shocks to members of those dehumanized social groups when they answered questions incorrectly during the study interaction.[55] This paper further found that participants were more likely to engage in aggression toward the dehumanized group when they were engaged in what they believed was a group decision-making process versus where they were told they were individually responsible for the decision, showing that dehumanization coupled with a reduced sense of personal responsibility leads to the greatest aggression directed at dehumanized individuals and groups.[56]

Additional research shows the extent to which one dehumanizes a group predicts violence and willingness to harm or allow others to harm a dehumanized social group. For example, in one study, the more a sample of Christians dehumanized Muslims, the more likely they were to self-report a willingness to torture Muslim prisoners-of-war.[57] Further, the dehumanization was shown to be explained, in part, by a perceived threat posed by Muslims. In other words, when the Christian participants perceived Muslims as more threatening, they dehumanized Muslims to a greater extent, and they reported more willingness to subject Muslims to torture.

As another example, research has shown that the dehumanization of Black people via comparisons to animals leads people to see and remember Black people differently and to endorse more violence against Black criminal suspects.[58] In this study, the researchers note the historical connection made between Black people in the United States and animals, particularly apes, and considers the contemporary legacy of those animalistic, dehumanizing associations. They note that apes, in particular, are often considered less evolved and more savage versions of humans, and the association between Black people and apes supported stereotypes of Black

---

[52] *See e.g.,* Kteily, Bruneau, Waytz, & Cotterill, 2015 at 1.
[53] *See e.g., id.*
[54] *See e.g., id.*
[55] Bandura, Underwood, & Fromson, 1975.
[56] *Id.*
[57] Viki, Osgood, & Phillips, 2013.
[58] Goff, Eberhardt, Williams, & Jackson , 2008.

Exhibit 4

people as innately lazy, aggressive, and in need of social control.[59] Further, an analysis of news coverage of defendants in capital cases shows that dehumanizing, animalistic language, including comparisons to apes, was more commonly used to report on cases involving Black defendants, and the cases where this language was used more had an increased likelihood of ending in execution. Finally, a large survey from 2016 showed a pattern of White Americans dehumanizing Black Americans, with more than one third of Whites in a nationally-representative sample agreeing that Blacks are well-described by terms such as "savage," "barbaric," and "lacking self-restraint, like animals." 38% of Whites responded that Blacks were "less evolved" than Whites. Among the respondents that dehumanized Blacks, they were more likely to support punitive criminal justice legislation, such as three strikes laws, regardless of characteristics like political affiliation and racial stereotyping.[60]

### E. Stereotype Threat and the Consequences of Being Called a Racist

Research has shown that many people, especially White people in the US, subscribe to colorblindness, an approach to addressing race by de-emphasizing racial differences and disparities.[61] Subscribing to colorblindness often contributes to anxiety over acknowledging race and its effects, as well as increases anxiety about being identified as prejudiced or racist. This anxiety can manifest in a refusal to acknowledge race, and beliefs that people who do mention race, even when relevant and innocuous, are engaging in racist behavior.[62] Further, the well-established phenomenon of stereotype threat, which speaks to situations where people who are concerned about being perceived in stereotypical ways experience declines in self-esteem, decision-making, and domain-relevant performance,[63] also applies to White people. The primary stereotype that many White people feel threatened by is stereotype that they're racist.[64] And consistent with classic stereotype threat effects, research has shown that many White people experience the negative effects of stereotype threat when interacting with people of different races[65] or otherwise engaging in activities where their racial attitudes might be salient or relevant.[66] More specifically, when experiencing stereotype threat, White people concerned about appearing biased are less able to exert control over their thinking and behavior, and thus, they are often more likely to behave and make decisions in ways that are biased in the very ways they are concerned about.[67] For example, research has shown that when White people are concerned about appearing biased, they may often stronger negative racial associations,[68] and they often have less positive interactions with people of different races and are more likely to engage in behavior perceived as biased by people of different races.[69]

---

[59] *Id.* at p. 293.
[60] Kteily & Bruneau, 2017
[61] *See e.g.,* Peery, 2011
[62] Apfelbaum, Sommers, & Norton, 2008
[63] *See e.g.,* Steele & Aronson, 1995; Steele, 1997
[64] *See e.g.,* Frantz, Cuddy, Burnett, Ray, & Hart, 2004
[65] *See e.g.,* Richeson & Trawalter, 2005; Shelton, 2003; Shelton, Richeson, Salvatore, & Trawalter, 2005
[65] 814 F.3d 340 (2016)
[66] *See e.g.,* Frantz, Cuddy, Burnett, Ray, & Hart 2004
[67] *See e.g., id.*
[68] *See e.g., id.*
[69] *See e.g.,* Shelton, Richeson, Salvatore, & Trawalter, 2005

Exhibit 4

Research has also shown that Whites have increasingly come to believe that anti-White bias is a bigger societal challenge than anti-Black bias.[70] There is a well-developed literature that examines the consequences of facing discrimination and bias directed at one's group.[71] Given that many Whites believe they are more likely to face discrimination or that the discrimination and bias they face is of more consequence than that directed at other racial groups, including Blacks, it could be expected that they may experience many of the same effects of facing discrimination typically studied in minority status groups. These effects included decreased self-esteem, detriments to mental well-being, and interference with decision-making such as stereotype threat. Feeling discriminated against can also produce negative reactions to the persons or groups seen as holding the biases or engaging in the discrimination.

## V.    Why is the Research Potentially Helpful for This Case?

While my assignment in this report was not to opine on the specific relevance or interpretation of any individual facts in the case, I am able and willing in my capacity here to comment on aspects of this particular case that are consistent with what we could expect to see if stereotypes, bias, and dehumanization were present and operating in a particular context. I will discuss a few of these connections between the research evidence and the particular record in this case below.

Dehumanizing Language

Even in the 2016 Sixth Circuit decision on appeal,[72] the court acknowledges that the Government compared Rejon Taylor to "predatory figures" during trial,[73] and they referred specifically to language used by the Government during trial, including the following directly-quoted phrases: "remorseless and relentless hunter," "dangerous because he's a chameleon," and "[it's] the obligation [of the jury] to be the sheep dog that protects the sheep, and even sometimes the wolves, from the wolf." While the Sixth Circuit ultimately dismissed their concerns about this language, they conceded that the Government's language was "close to the edge" of what was appropriate.[74] As part of this discussion, the Sixth Circuit acknowledges that Mr. Taylor was compared to animals and referred to in animalistic terms by the Government.

A closer examination of opening and closing arguments at both phases of the Mr. Taylor trial reveal more specific details of the Government's use of references that compared Mr. Taylor to animals, use of animalistic language to refer to Mr. Taylor and his actions, and well as other dehumanizing language, such as language that denies the capacity for complex human emotions, including remorse.

Over the course of the Government's opening and closing at trial and opening and closing at the sentencing phase, they refer to Mr. Taylor "stalking" (or some variant, including "hunting") the victim at least 10 times, which could be considered an animalistic way to describe behavior also often referred to in ways that don't invoke predatory, animal-like behavior, such as casing,

---

[70] Norton & Sommers, 2011.

[71] See e.g., Brenda Major's extensive work on stigma; Crocker & Major, 1989; Major & O'Brien, 2005.

[72] United States v. Rejon Taylor, 814 F.3d 340 (6th Cir. 2016), at 365.

[73] Id..

[74] Id. at 366.

Exhibit 4

particularly in the context of burglary. They compare Mr. Taylor to the monster in *Dr. Jekyll & Mr. Hyde.*[75] They explicitly humanize the victim, Mr. Luck, even referring to him as a "human,"[76] while at various points telling the jury that Mr. Taylor is a "chameleon,"[77] "wolf,"[78] "his reaction was not what you would expect of an ordinary human being,"[79] and even referring to Mr. Taylor using the inanimate term "what" rather than "who."[80]

As discussed above, more subtle dehumanization often takes the form of denials of distinctly human emotions. Remorse would easily be categorized as a distinctly human emotion, as it requires more than a basic emotional response that some animals might also experience, instead requiring emotions that only humans experience, like guilt, concern for others, a sense of morality or right/wrong, etc.[81] As discussed above, infrahumanization, or the denial of complex human emotions and psychological experiences to social outgroups, is a form of dehumanization. And while remorse is a relevant consideration when sentencing a defendant, the Government thoroughly bombarded the jury with the idea that Mr. Taylor was remorseless. In the Government's closing at the sentencing phase alone, they mentioned a lack of remorse at least 15 times. Coupled with the references to animals and animalistic behaviors that were also prevalent, this could be viewed as another form of dehumanization at play because it emphasizes the Government's view that Mr. Taylor lacks what the Government considered an "ordinary human" response.

Language Consistent with the Super Predator Stereotype of Young Black Men

In addition to the dehumanizing language, and perhaps even more prevalent in the Government's statements, the Government used language throughout their opening and closing statements that is consistent with stereotypes of Black men and young Black men in particular. While never explicitly invoking the "super predator" stereotype in exactly those words, the super predator stereotype, as described above, depicts young Black men as the following: dispositionally violent, lacking in moral character, impulsive, savvy and manipulative, and lacking impulse control and remorse.[82]

---

[75] *Transcript of Government's Closing [Sentencing Phase]* at p. 38, line 8; p. 39, lines 6 – 13.

[76] *Transcript of Government's Opening [Sentencing Phase]* at p. 42, line 25.

[77] *Transcript of Government's Closing [Sentencing Phase]* at p. 35, line 9; p. 38, line 1.

[78] The Government speaking to the jury, "You are the ones with obligation to be the sheep dog that protects the sheep, and sometimes even the wolves, from the wolf." *Transcript of the Government's Closing [Sentencing Phase]* at p. 40, lines 2 – 4. A closer look at this statement in particular suggests not only that Mr. Taylor is being identified as "the wolf," but that the other wolves being referred to are likely to be Mr. Matthews and Mr. Marshall (also young Black men), and they're contrasted with the protective sheep dog, which is referring to the nearly all-White jury, and the innocent and unsuspecting sheep, who in terms of imagery are likely to literally be imagined as white in color, thus suggesting unnamed White people. These are subtle stereotypical references that rely on stereotypes of both Black and White people, but also comparisons to the nature of wolves versus dogs and sheep to suggest the dangerous and sneaky nature of Taylor as the wolf compared to everyone else in this situation. Also, note the similar references to Black and Hispanic teenagers as wolves, or a "wolf pack," that was a central feature of the media's description of the alleged perpetrators in the Central Park Five jogger case out of New York City in the late 1980s. This case is considered one of the prototypical examples of the "super predator" stereotype in action.

[79] *Transcript of Government's Closing [Sentencing Phase]* at p. 34, lines 12 – 13.

[80] "What you see is not who showed up at Mr. Luck's house…What showed up…is something entirely different." Transcript of Government's Closing [Sentencing Phase] at p. 24, lines 4 – 10.

[81] *See e.g.,* Leyens, Paladino, Rodriguez-Torres, Vaes, Demoulin, Rodriguez-Perez, & Gaunt, 2000, at p. 192.

[82] *See e.g.,* Haberman, 2014.

Exhibit 4

Given that the Government acknowledged Mr. Taylor's youth, including his slight stature and boyish appearance, it is specifically the super predator stereotype of young Black men that seems most connected to the language the Government then used to describe Mr. Taylor beyond or contrary to his youthful appearance. The super predator stereotype relies on the purported contrast between the youthful and innocent-seeming appearance of young Black men and their supposed deviant, rotten dispositions. And the Government provided such a contrast to the jury, not only emphasizing the distinction between Mr. Taylor's appearance and who "he really is," but also painting Mr. Taylor as particularly predatory in the context of an older White businessman.

The Government argues throughout its opening and closing statements at trial and sentencing that the jury should view Mr. Taylor as criminally savvy and enduringly manipulative. Throughout these statements, but particularly in the Government's closing at sentencing, they describe Mr. Taylor as manipulating, tricking, scheming, and in related ways, at least 20 times. They specifically refer to the fact that his appearance contributes to his ability to manipulate, trick, and scheme others. The super predator stereotype relies on the idea that young Black men are a special breed of criminal that is particularly wired toward savvy and manipulative criminal behavior, which is consistent with the Government's language.

The Government's focus on their belief in Mr. Taylor's lack of remorse, while potentially evidence of dehumanization as described above, also fits the super predator stereotype that emphasizes that young Black men are dispositionally violent and lack both moral character and the capacity for remorse. By repeatedly stating that Mr. Taylor not only lacked remorse but also suggesting that he lacked the capacity for remorse, the Government was invoking, whether intentional or not, the super predator stereotype. And as discussed previously, research has shown that when prosecutors invoke the super predator stereotype during their opening and closing statements, this can impact jurors' subsequent decision-making in ways that disadvantage young Black male defendants.[83]

Potential Sources of Juror/Jury Bias

Beyond the research discussed above about how juror biases may affect capital cases in general, it is important to note a couple of specific dynamics potentially at play in the *Taylor* case.

*Jury Composition*

The trial jury in the *Taylor* case was mostly White, with 11 White jurors of 12.[84] This particular jury composition is relevant because research shows that death-qualified White jurors are distinct from other jurors.[85] For example, they hold more negative racial stereotypes and biases than ordinary non-capital jurors and non-death-eligible jurors.[86] The *Taylor* case jury also had 5 men

---

[83] Haegerich, Salerno, & Bottoms, 2013.
[84] According to the juror information sheet I was provided.
[85] *See e.g.,* Haney, 2004; Sweeney & Haney, 1992.
[86] *See e.g.,* Levinson, Smith, & Young, 2014; Young, 2004.

Exhibit 4

among the 12 jurors,[87] and, as previously discussed, research has shown that having 5 or more White men on a capital jury significantly increases the likelihood of death sentence for Black defendants (especially when they kill White people).[88] This has been found to be related to White men having more racial biases that color the way they process information about the case and that disadvantage Black defendants compared White women jurors or racial/ethnic minority jurors.[89]

*Government's Use of Dehumanizing and Stereotypical Language Can Affect Jurors*

As discussed briefly above, research has shown that a prosecutor's use of dehumanizing and stereotypical language can affect jurors and their decision-making.[90] Not only do the pattern of differences between death-qualified White jurors suggest that they may already hold stronger negative stereotypes of young Black men and engage in dehumanization of Black defendants, but research has shown that the more jurors hold pre-existing "super predator" stereotypes, the more likely they are to find a defendant guilty.[91] Further, if prosecutors activate these stereotypes during trial, such as by using language consistent with the super predator stereotype during opening and closing statements, jurors were also more likely to find a defendant guilty regardless of their personal pre-existing beliefs. In other words, we would not need to know the personal racial attitudes of the jurors, only the language of the prosecutors, to theorize about the potential salience of stereotypes during jury deliberations. In addition, when the researchers compared pre-existing beliefs to those activated by prosecutors, they found the jury deliberation exacerbated the effects of the attorney-activated beliefs, making those stereotypes more likely to have an influence in situations where the prosecutor connected them to the case.

Taken together, given the consistent use of dehumanizing and stereotypical language by the Government during opening and closing statements in particular and the existing patterns of baseline differences in death-qualified juries, it could be reasonably expected that both dehumanization and super predator stereotypes were activated in the jurors, particularly prior to sentencing. This then makes it more likely that dehumanization and stereotyping affected the subsequent decisions made by the jury.

*Juror Responses to the "Racist Redneck" Comment*

Through reading the 2016 Sixth Circuit decision, I became aware of the situation that occurred between the guilt and sentencing phases of the *Taylor* case that involved a statement allegedly made by the defendant in a phone call referring to the jurors as "racist rednecks." While it is beyond the scope of this report to discuss this situation in great detail, there are a couple of points related to my preceding discussion here that are worth mentioning.

First, the trial court accepted the jurors' statements that they were not bothered by the remark and that the remark would not affect their decision-making with respect to the sentencing

---

[87] According to the juror information sheet I was provided.
[88] Bowers, Steiner, & Sandys, 2001.
[89] *See e.g.*, Lynch & Haney, 2011.
[90] Haegerich, Salerno, & Bottoms, 2013.
[91] *Id.*

Exhibit 4

determination. While courts often assume that jurors can make and keep such promises, social science research suggests that it is not quite as simple as that,[92] particularly when it comes to potentially threatening information[93] and particularly information that involves intergroup interactions and judgments.[94] Not only does decades of research establish that people's behaviors and decisions are regularly influenced by information in ways they do not fully appreciate,[95] but information that is threatening in nature is especially likely to influence decisions whether one wants it to or not.[96] As discussed above, the research on stereotype threat is also relevant here, as it explains how concern about being perceived as racist can lead to biased decision-making.

Second, Juror 1 asked questions about juror safety, expressed fear about the defendant or his friends, and said she and her husband were considering getting a weapon immediately after the judge asked her about her knowledge of the statement. This would not suggest that she was unbothered by the remark and instead highlights that the "racist redneck" remark likely contributed to her fear of the defendant and his friends. As mentioned above, research has shown that feeling threatened heightens many kinds of biases, including racial biases. Intergroup threat, such as in situations involving people of different races, has also been shown to increase dehumanization,[97] stereotyping and bias.[98] Finally, the way she expressed her fear, which was unprompted by the judge's discrete questions, is consistent with stereotypes of young Black men as criminal, dangerous, and threatening.

Third, given that Juror 1 was the jury foreperson on the case, it is relevant to consider her special role on the jury and in affecting the jury's sentencing decision. Research on the influence of jury forepersons provides evidence that a foreperson often has enhanced influence on jury decisions relative to other jurors by virtue of their role as the foreperson.[99] Thus, given a foreperson's enhanced influence over the jury deliberations and decisions, a potentially biased foreperson should be of particular concern.

**Conclusion:**

Taken together, the record in this case, particularly the Government's opening and closing statements, provides many examples of Government language that is consistent with the research on the content of stereotypes about young Black men, particularly the "super predator" stereotype, and dehumanization. Further, a review of the existing research on the effects of being called "racist" also raises questions about the handling of the "racist redneck" statement with jurors. At minimum, more inquiry and more explicit and consistent effort to elicit commitments to be fair and impartial from all jurors, particularly the foreperson, seems necessary to address

---

[92] *See e.g.,* Devine, 2001. "Even those who consciously renounce prejudice have been shown to have implicit or automatic biases that conflict with their nonprejudiced values that may disadvantage the targets of those biases" at p. 757.

[93] *See e.g.,* Ito, Larsen, Smith, & Cacioppo, 1998.

[94] *See e.g.,* Stephan & Stephan, 1985.

[95] *See e.g.,* Nisbett & Wilson, 1977.

[96] *See e.g.,* Rozin & Royzman, 2001.

[97] *See e.g.,* Viki, Osgood, & Phillips, 2013.

[98] *See e.g.,* Fiske, 2002.

[99] *See e.g.,* Devine, Clayton, Dunford, Seying, & Pryce, 2001; Foley & Pigott, 1997.

Exhibit 4

the threat posed by such a comment directed at the jurors by a defendant they hadn't yet sentenced.

## VI. CASE MATERIALS RELIED UPON IN FORMULATING OPINIONS

1. Excerpts from Appellant Rejon Taylor's Opening Brief (2013), On Appeal from the United States District Court for the Eastern District of Tennessee No. 1:04-CR-160-1
2. *US v Taylor*, 814 F.3d 240 (6th Cir. 2016)
3. Transcript of Government's Opening Statements [Guilt/Innocence Phase]
4. Transcript of Government's Closing Arguments [Guilt/Innocence Phase]
5. Transcript of Government's Opening Statements [Sentencing Phase]
6. Transcript of Government's Closing Arguments [Sentencing Phase]
7. Juror Information Chart

## VII. RESEARCH CITED

1. Amodio, D. M., & Devine, P. G. (2006). Stereotyping and evaluation in implicit race bias: Evidence for independent constructs and unique effects on behavior. *Journal of Personality and Social Psychology*, 91(4), 652 – 661.
2. Apfelbaum, E. P., Sommers, S.R., & Norton, M. I. (2008). Seeing race and seeming racist? Evaluating strategic colorblindness in social interaction. *Journal of Personality and Social Psychology*, 95(4), 918 – 932.
3. Bandura, A., Underwood, B., & Fromson, M. E. (1975). Disinhibition of aggression through diffusion of responsibility and dehumanization of victims. *Journal of Research in Personality*, 9, 253 – 269.
4. Bowers, W. J., Steiner, B. D., & Sandys, M. (2001). Death sentencing in Black and White: An empirical analysis of the role of jurors' race and jury racial composition. *University of Pennsylvania Journal of Constitutional Law*, 3, 171 – 274.
5. Chiricos, T., & Eschholz, S. (2002). The racial and ethnic typification of crime and the criminal typification of race and ethnicity in local television news. *Journal of Research in Crime and Delinquency*, 39, 400 – 420.
6. Crocker, J., & Major, B. (1989). Social stigma and self-esteem: The self-protective properties of stigma. *Psychological Review*, 96, 608 – 630.
7. Delgado, N., Rodriguez-Perez, A., Vaes, J., Leyens, J. P., & Betancor, V. (2009). Priming effects of violence on infrahumanization. *Group Processes & Intergroup Relations*, 12(6), 699 – 714.
8. Devine, D. J., Clayton, L. D., Dunford, B. B., Seying, R., & Pryce, J. (2001). Jury decision making: 45 years of empirical evidence on deliberating groups. *Psychology, Public Policy, and Law*, 7(3), 622 – 727.
9. Devine, P. G. (1989). Stereotypes and prejudice: Their automatic and controlled components. *Journal of Personality and Social Psychology*, 56(1), 5 – 18.
10. Devine, P. G. (2001). Implicit prejudice and stereotyping: How automatic are they? [Introduction to the Special Section]. *Journal of Personality and Social Psychology*, 81(5), 757 – 759.

Exhibit 4

11. Devine, P. G., & Elliot, A. J. (1995). Are racial stereotypes really fading? The Princeton trilogy revisited. *Personality and Social Psychology Bulletin*, 21(11), 1139 – 1150.

12. Dilulio, J. (1995, November 27). The coming of the super-predators. *The Weekly Standard*. Retrieved from https://www.weeklystandard.com/john-j-dilulio-jr/the-coming-of-the-super-predators

13. Eberhardt, J. L., Davies, P. G., Purdie-Vaughns, V. J., & Johnson, S. L. (2006). Looking deathworthy: Perceived stereotypicality of Black defendants predicts capital-sentencing outcomes. *Psychological Science,* 17(5), 383 – 386.

14. Eberhardt, J. L., Goff, P. A., Purdie, V. J., & Davies, P.G. (2004). Seeing Black: Race, crime, and visual processing. *Journal of Personality and Social Psychology*, 87, 876 – 893.

15. Fiske, S. T. (2002). What we know now about bias and intergroup conflict, the problem of the century. *Current Directions in Psychological Science*, 11(4), 123 – 128.

16. Foley, L. A., & Pigott, M. A. (1997). The influence of forepersons and nonforepersons on mock jury decisions. *American Journal of Forensic Psychology*, 15(4), 5 – 17.

17. Frantz, C. M, Cuddy, A. J. C., Burnett, M., Ray, H., & Hart, A. (2004). A threat in the computer: The race implicit association test as a stereotype threat experience. *Personality and Social Psychology Bulletin*, 30, 1611 – 1624.

18. Gibbs, J. T. (1988). *Young, black, and male in America: An endangered species.* Auburn House Publishing: New York.

19. Gill, M. J. (2004). When information does not deter stereotyping: Prescriptive stereotyping can foster bias under conditions that deter descriptive stereotyping. *Journal of Experimental Social Psychology*, 40, 619 – 632.

20. Goff, P. A., Eberhardt, J. L., Williams, M. J., & Jackson, M. C. (2008). Not yet human: Implicit knowledge, historical dehumanization, and contemporary consequences. *Journal of Personality and Social Psychology*, 94(2), 292 – 306.

21. Goff, P.A., Jackson, M. C., Di Leone, B. A. L., Culotta, C. M., & DiTomasso, N. A. (2014). The essence of innocence: Consequences of dehumanizing Black children. *Journal of Personality and Social Psychology*, 106(4), 526 – 545.

22. Greene, E., Duke, L., & Woody, W. D. (2017). Stereotypes influence beliefs about transfer and sentencing of juvenile offenders. Psychology, Crime, & Law, 23, 841 – 858.

23. Greenwald, A. G., & Banaji, M. (1995). Implicit social cognition: Attitudes, self-esteem, and stereotypes. *Psychological Review*, 102, 4 – 27.

24. Greenwald, A. G., & Krieger, L. H. (2006). Implicit bias: Scientific foundations. *California Law Review*, 94(4), 945 – 968.

25. Greenwald, A. G., McGhee, D. E., & Schwartz, J. L. K. (1998). Measuring individual differences in implicit cognition: The implicit association test. *Journal of Personality and Social Psychology*, 74(6), 1464 – 1480.

26. Greenwald, A. G., Poehlman, T. A., Uhlmann, E. L., & Banaji, M. R. (2009). Understanding and using the implicit association test: III. Meta-analysis of predictive validity. *Journal of Personality and Social Psychology*, 97(1), 17 – 41.

Exhibit 4

27. Haegerich, T. M., Salerno, J. M., & Bottoms, B. L. (2013). Are the effects of juvenile offender stereotypes maximized or minimized by jury deliberation? *Psychology, Public Policy, and Law*, 19(1), 81 – 97.

28. Hall, J. A., & Goh, J. X. (2017). Studying stereotype accuracy from an integrative social-personality perspective. *Social and Personality Psychology Compass*, 11 (11).

29. Haney, C. (1984). On the selection of capital juries: The biasing effects of the death-qualification process. *Law and Human Behavior*, 8, 121 – 132.

30. Haney, C. (2004). Condemning the other in death penalty trials: Biographical racism, structural mitigation, and the empathic divide. *DePaul Law Review*, 53(4), 1557 – 1590.

31. Harris, L.T. & Fiske, S. T. (2006). Dehumanizing the lowest of the low: Neuroimaging responses to extreme out-groups. *Psychological Science*, 17, 847 – 853.

32. Haslam, N. (2006). Dehumanization: An integrative review. *Personality and Social Psychology Review*, 10(3), 252 – 264.

33. Ito, T. A., Larsen, J. T, Smith, N. K., & Cacioppo, J. T. (1998). Negative information weighs more heavily on the brain: The negativity bias in evaluative categorizations. *Journal of Personality and Social Psychology*, 75(4), 887 – 900.

34. Jost, J. T., Rudman, L. A., Blair, I. V., Carney, D. R., Dasgupta, N., Glaser, J., & Hardin, C. D. (2009). The existence of implicit bias is beyond a reasonable doubt: A refutation of ideological and methodological objections and executive summary of ten studies no manager should ignore. *Research in Organizational Behavior*, 29, 39 – 69.

35. Kteily, N. S., & Bruneau, E. (2017). Darker demons of our nature: The need to (re)focus attention on blatant forms of dehumanization. *Current Directions in Psychological Science*, 1 – 8.

36. Kteily, N. S., Bruneau, E., Waytz, A., & Cotterill, S. (2015). The ascent of man: Theoretical and empirical evidence for blatant dehumanization. *Journal of Personality and Social Psychology*, 109(5), 901 – 931.

37. Levinson, J. D., Smith, R. J., & Young, D. M. (2014). Devaluing death: An empirical study of implicit racial bias on jury-eligible citizens in six death penalty states. *New York University Law Review*, 89, 513 – 581.

38. Leyens, J. P., Paladino, M. P., Rodriguez, R. T., Vaes, J., Demoulin, S., Rodriguez, A. P., & Gaunt, R. (2000). The emotional side of prejudice: The attribution of secondary emotions to ingroups and outgroups. *Personality and Social Psychology Review*, 4(2), 186 – 197.

39. Lynch, M. & Haney, C. (2011). Mapping the racial bias of the White male capital juror: Jury composition and the "empathic divide." *Law & Society Review*, 45(1), 69 – 102.

40. Major. B., & O'Brien, L. T. (2005). The social psychology of stigma. *Annual Review of Psychology*, 56, 393 – 421.

41. McCarty, C., Yzerbyt, V. Y., & Spears, R. (2002). Social, cultural, and cognitive factors in stereotype formation. In McGarty, C., Yzerbyt, V. Y., & Spears, R. (Eds.), *Stereotypes as explanation: The formation of meaningful beliefs about social groups* (pp. 1 – 15). Cambridge: Cambridge University Press.

Exhibit 4

42. Nisbett, R., & Wilson, T. D. (1977). Telling more than we can know: Verbal reports on mental processes. *Psychological Review*, 84(3), 231 – 259.
43. Norton, M. I. & Sommers, S. R. (2011). Whites see racism as a zero-sum game that they're now losing. Perspectives on Psychological Science, 6(3), 215 – 218.
44. Peery. D. (2011). The colorblind ideal in a race conscious reality: The case for a new legal ideal for race relations. *Northwestern University Journal of Law and Social Policy*, 6, 474 – 495
45. Richeson, J. A., & Trawalter, S. (2005). Why do interracial interactions impair executive function? A resource depletion account. *Journal of Personality and Social Psychology*, 88(6), 934 – 947.
46. Rozin, P., & Royzman, E. B. (2001). Negativity bias, negativity dominance, and contagion. *Personality and Social Psychology Review*, 5(4), 296 – 320.
47. Russell, K. K. (2002). The racial hoax as crime: The law as affirmation. In S. L. Gabbidon, H. T. Greene, & V. D. Young (Eds.), African American classics in criminology and criminal justice (pp. 349 – 376). Thousand Oaks, CA: Sage.
48. Shelton, J. N. (2003). Interpersonal concerns in social encounters between majority and minority group members. *Group Processes and Intergroup Relations*, 6, 171 – 185.
49. Shelton, J. N., Richeson, J. A., Salvatore, J., & Trawalter, S. (2005) Ironic effects of racial bias during interracial interactions. *Psychological Science*, 16(5), 397 – 405.
50. Steele, C. M. (1997). A threat in the air: How stereotypes shape intellectual identity and performance. *American Psychologist*, 52, 613 – 629.
51. Steele, C. M., & Aronson, J. (1995). Stereotype threat and intellectual test performance of African Americans. *Journal of Personality and Social Psychology*, 69, 787 – 811.
52. Steffensmeier, D. (1976). Advocates of law and order: Villains or guardians of justice. *Criminal Justice and Behavior*, 3, 273 – 285.
53. Steffensmeier, D., Ulmer, J., & Kramer, J. (1998). The interaction of race, gender, and age in criminal sentencing: The punishment cost of being young, black, and male. *Criminology*, 36(4), 763 – 797.
54. Stephan, W.G., & Stephan. C. W. (1985). Intergroup anxiety. *Journal of Social Issues*, 41(3), 157 – 175.
55. Sweeney, L. T., & Haney, C. (1992). The influence of race on sentencing: A meta-analytic review of experimental studies. *Behavioral Sciences & the Law*, 10, 179 – 195.
56. Thompson, W. C., Cowan, C. L., Ellsworth, P. C., & Harrington, J. C. (1984). Death penalty attitudes and conviction proneness. *Law and Human Behavior*, 8, 95 – 113.
57. Todd, A. R., Thiem, K. C., & Neel, R. (2016). Does seeing faces of young Black boys facilitate the identification of threatening stimuli? *Psychological Science*, 27(3), 384 – 393.
58. Viki, G. T., Osgood, D., & Phillips, S. (2013). Dehumanization and self-reported proclivity to torture prisoners of war. *Journal of Experimental Social Psychology*, 49(3), 325 – 328.

Exhibit 4

59. Welch, K. (2007) Black criminal stereotypes and racial profiling. *Journal of Contemporary Criminal Justice*, 23(3), 276 – 288.
60. Wilde, V. K., Martin, K. D., & Goff, P. A. (2014). Dehumanization as a distinct form of prejudice. *TPM – Testing, Psychometrics, and Methodology in Applied Psychology*, 21(3), 301 -307.
61. Young, R. L. (2004). Guilty until proven innocent: Conviction orientation, racial attitudes, and support for capital punishment. *Deviant Behavior*, 25(2), 151 – 167.

Exhibit 4

## <u>APPENDIX A. Expert CV/Resume</u>

**Destiny Peery**
Associate Professor
Northwestern University Pritzker School of Law
375 E Chicago Ave, Chicago, IL 60611
Phone: 312-503-8449 (office)
Email: destiny.peery@law.northwestern.edu

| ACADEMIC APPOINTMENTS |
|---|

| | |
|---|---|
| 2017 – | **Associate Professor, Northwestern University Pritzker School of Law** |
| 2014 –2017 | **Assistant Professor, Northwestern University Pritzker School of Law** |
| | Department of Psychology (courtesy) 2014 - present |
| | Institute for Policy Research (affiliated) 2016 - present |
| | Center for Public Safety (adjunct) 2016 - 2018 |

*Awards & Honors*

| | |
|---|---|
| 2019 | Childres Teaching Award (Highest Law School Teaching Award) |
| 2018 | Student Bar Association Faculty Appreciation Award |
| 2016 | Outstanding Professor in a Small Class |
| 2016 | Student Bar Association Faculty Appreciation Award |

**2012 – 2014   Visiting Assistant Professor, Duke University Law School**

| EDUCATION |
|---|

| | | |
|---|---|---|
| PhD | 2012 | Social Psychology, Northwestern University |
| JD | 2012 | Northwestern University |
| MA | 2008 | Social Psychology, Northwestern University |
| BA | 2005 | Psychology, University of Minnesota, *summa cum laude* |

| PUBLICATIONS (*indicates peer-review) |
|---|

Peery, **D**. (2017). Redefining race: Assessing the consequences of the law's failure to define race. *Cardozo Law Review*, 38, 101 – 162.

*Carter, E.R., **Peery, D.**, Richeson, J.A., & Murphy, M.C. (2015). Does cognitive depletion shape bias detection for minority group members? *Social Cognition*, 33, 241 – 254, available at http://indiana.edu/~mcmlab/CarterPeeryRichesonMurphy%20%282015%29.pdf

Bodenhausen, G. V., Kang, S. K., & **Peery, D.** (2012). Social categorization and perception of social groups. In S. Fiske & C. N. Macrae (Eds.), *SAGE handbook of social cognition*. Thousand Oaks, CA: Sage.

Peery, **D.** (2011). The colorblind ideal in a race conscious reality: The case for a new legal ideal for race relations. *Northwestern University Journal of Law and Social Policy, 6*, 474 – 495, available at http://www.law.northwestern.edu/journals/njlsp/v6/n2/12/12Peery.pdf.

*Peery, **D.**, & Richeson, J. A. (2010). Broadening horizons: Considerations for creating a more complete science of diversity. *Psychological Inquiry, 21*, 146 – 152.

*Diamond, S. S., **Peery, D.**, Dolan, F., & Dolan, E. (2009). Achieving diversity on the jury: Jury

Exhibit 4

size and the peremptory challenge. *Journal of Empirical Legal Studies, 6,* 425 –    449.

\***Peery, D.,** & Bodenhausen, G. V. (2009). Ambiguity and ambivalence in the voting booth and beyond: A social-psychological perspective on racial attitudes and behavior in the Obama era. *Du Bois Review, 6,* 71 – 82.

\*Bodenhausen, G. V., & **Peery, D.** (2009). Social categorization and stereotyping in vivo: the VUCA challenge. *Social and Personality Psychology Compass, 3(2),* 133 – 151.

\***Peery, D.,** & Bodenhausen, G.V. (2008). Black + White = Black: Hypodescent in reflexive categorization of racially ambiguous faces. *Psychological Science, 19(10),* 973 – 977

## SELECTED PRESENTATIONS

### *Chaired Academic Conference Symposia*

**Peery, D.** (Chair). (2017, October). *A fear of too much justice? Equal protection and the social sciences 30 years after McCleskey v. Kemp.* Symposium conducted for the Northwestern University Law Review, Chicago, IL.

**Peery, D.** (Chair). (2011, January). *Rational basis or legal bias? Psychological perspectives at the intersection of race, policy and law.* Symposium conducted at the annual meeting of the Society for Personality and Social Psychology, San Antonio, TX.

Bodenhausen, G. V., & **Peery, D.** (Chairs). (2008, February). *What are you? Emerging empirical perspectives on multiracialism.* Symposium conducted at the annual meeting of the Society for Personality and Social Psychology, Albuquerque, NM.

### *Selected Academic Conference Presentations*

**Peery, D.** (2016, January). *Bridging the law & psychology gap: Making social psychological theory relevant to legal practitioners.* Talk presented in Wiener, R. L.& C. Willis – Esqueda (Chrs.) Social Psychology and Law Preconference. Annual meeting of the Society for Personality and Social Psychology, San Diego, CA.

**Peery, D.** (2015, August). *Beyond ancestry: Examining multiple cues in racial perception and categorization.* Talk presented in Obasogie, O.K. (Chr.) Re-thinking measures of race from an empirical/critical race theory perspective (with a spotlight on implicit bias). Annual meeting of the American Sociological Association, Chicago, IL.

**Peery, D.** (2015, May). *Because of race: Beyond the explicit/implicit divide.* Talk presented in Quintanilla, V. & Diamond. S. S. (Chr.) New developments in law and psychological science. Annual meeting of the Law and Society Association, Seattle, WA.

**Peery, D.** (2015, May). *Because of race & perceptions of causality: Social science and law perspectives.* Paper presented at the Culp Colloquium, Duke University Law School, Durham, NC.

**Peery, D.** (2014, May). *Is one drop enough?* Talk presented at the annual meeting of the Association for Psychological Science, San Francisco, CA.

**Peery, D.,** & Bodenhausen. G. V. (2011, January). *Oh, that's nothing! Lay perceptions of legal discrimination depend on group membership.* Paper presented in Peery, D. (Chr.) Rational basis or legal bias? Psychological perspectives at the intersection of race, policy and law. Annual meeting of the Society for Personality and Social Psychology, San Antonio, TX.

**Peery, D.,** & Bodenhausen, G. V. (2010, June). *Effects of socio-cultural information on racial categorization of ambiguous targets.* Paper presented in Remedios, J. D. (Chr.)

Exhibit 4

Marginalizing multiracials: What constitutes prejudice and how do targets adapt?Biennial meeting of the Society for the Psychological Study of Social Issues, New Orleans, LA.

**Peery, D.** (2010, May). *Slavery, Miscegenation and Multiracialism: How the Law Has Shaped Racial Categories*. Paper presented at the annual meeting of the Law and Society Association, Chicago, IL.

**Peery, D.,** & Bodenhausen, G. V. (2008, June). *Hypodescent and the one-drop rule in reflexive racial categorization.* Paper presented at biennial meeting of the Society for the Psychological Study of Social Issues, Chicago, IL.

**Peery, D.,** & Bodenhausen, G. V. (2008, February). *Black + White = Black: Hypodescent in reflexive categorization of racially ambiguous faces.* Paper presented in Bodenhausen, G. V., & Peery, D. (Chrs.) What are you? Emerging empirical perspectives on multiracialism. Annual meeting of the Society for Personality and Social Psychology, Albuquerque, NM.

**Peery, D.,** & Bodenhausen, G. V. (2007, July). *Beyond black and white: Categorization of biracial faces.* Paper presented at the annual CIC/SROP Conference, Purdue University, West Lafayette, IN.

## *Selected Invited Presentations*

On Anti-Discrimination Law; Stereotyping, Discrimination, and Prejudice
**American Bar Foundation**, Research Series (Mar 2017)
**University of Florida Levin College of Law**, Faculty Workshop (Mar 2017)
**Northwestern University Institute for Policy Research** (Feb 2017)
**Case Western Reserve University Law School** (Nov 2016)
**Duke University Law School**, Law, Economics, and Politics Seminar (Nov 2016)
**Duke University Law School**, Culp Colloquium (May 2016)
**University of Pennsylvania Law School**, Law, Economics and Psychology Seminar (Mar 2016)
**John Marshall Law School**, Faculty Scholarship Roundtable Series (Feb 2016)
**Indiana University Maurer School of Law**, Law & Psychology Working Group (Oct 2013)
**Northwestern University Law School**, Legal Scholars Workshop (Oct 2013)
**University of Chicago**, Political Psychology Workshop (Feb 2012)


On Implicit Bias
**Cook County (IL) Public Defender** (August 2019)
**Cook County (IL) State's Attorney** (June 2019)
**National Association of Women Lawyers**, Annual Meeting (Sept 2017)
**Black Women Lawyer Association**, Annual Meeting (Mar 2017)
**Northwestern University Center for Public Safety**, Policing Workshop (Apr, Aug, Nov 2016)
**Chicago Foundation of Women**, Chicago, IL (Oct 2016)
**Northwestern University Police Department** (Aug 2016)
**Northwestern University Pritzker School of Law**, Office of Alumni Relations and Development's *Law Alumni Club of Women's Networking Lunch* (Jun 2016)
**7th Circuit Bar Association** Annual Meeting, Chicago, IL (May 2016)
**Cook County Juvenile Court Clinic**, Chicago, IL (Feb 2016)
**Northwestern University Pritzker School of Law**, Journal of Law and Social Policy Symposium (Nov 2015)

**Chicago Lawyer's Committee for Civil Rights** [conference in conjunction w/ Chicago Urban League, 7th Circuit Bar Association] (Oct 2015)
**Rainbow PUSH Coalition & Citizenship Education Fund** Conference (June 2015)
**Northwestern University**, Northwestern Alumni Association's *Day at Northwestern* (Apr 2015)

On Racial Categorization & Perception
**Duke University** Social Psychology Brown Bag Series (Apr 2013)
**University of North Carolina** Social Psychology Brown Bag Series (Apr 2013)
**University of Cologne (Germany)**, Social Cognition Brown Bag Series (Feb 2013)
**University of Texas El Paso**, Department of Psychology, Departmental Colloquium (Feb 2012)
**University of California, Irvine**, Department of Psychology and Social Behavior, Departmental Colloquium (Feb 2012)
**Rutgers University**, Department of Psychology, Diversity Science Colloquium (Jan 2012)
**Northwestern University Law School**, MLK JR. Dream Week Panel (Jan 2011)

---

## SELECTED MEDIA

| | |
|---|---|
| 2017, Sept | *Suburban police take on challenge of implicit bias* [interview]<br>Daily Herald (September 5, 2017), available at http://<br>http://www.dailyherald.com/news/20170905/suburban-police-take-on-challenge-of-implicit-bias |
| 2016, Nov | Law Enforcement and Implicit Bias [podcast]<br>Planet Lex, Legal Talk Network (November 16, 2016), available at http://<br>https://legaltalknetwork.com/podcasts/planet-lex-northwestern-pritzker-school-law-podcast/2016/11/law-enforcement-implicit-bias/ |
| 2016, June | *Why the Department of Justice wants to force its 28000 employees to confront unconscious racial biases* [interview]<br>Los Angeles Times (June 27, 2016), available at http://<br>http://www.latimes.com/nation/la-na-doj-implicit-bias-20160627-snap-story.html |
| 2016, Mar | *Implicit bias training for police may help, but it's not enough* [op-ed]<br>Huffington Post (March 14, 2016), available at<br>http://www.huffingtonpost.com/destiny-peery/implicit-bias-training-fo_b_9464564.html |
| 2016, Feb | *At the Oscars, a force stronger than explicit racism explains the lack of Black Nominees* [op-ed]<br>Reuters.com (February 26, 2016), available at<br>http://blogs.reuters.com/great-debate/2016/02/25/at-the-oscars-a-stronger-force-than-blatant-racism-explains-lack-of-black-nominees/ |
| 2016, Feb | *First Black judge's retirement leaves further diversity gap in Lake County* [interview]<br>Chicago Tribune (Feb 26, 2016), available at<br>http://www.chicagotribune.com/suburbs/lake-county-news-sun/news/ct-lns-lake-county-judges-st-0227-20160226-story.html |
| 2008, Oct | *Black, White, or Multiracial Identity* [interview]<br>Chicago Public Radio (WBEZ 81.5) (October 15, 2008), available at:<br>http://www.wbez.org/episode-segments/black-white-or-multiracial-identity |

Exhibit 4

Exhibit 4

| LAW SCHOOL TEACHING & MENTORING |
|---|

***Professor***

| | |
|---|---|
| 2016 – | *Anti -Discrimination Law*, Northwestern University Pritzker School of Law |
| 2015 – | *Criminal Law*, Northwestern University Pritzker School of Law |
| 2015 – | *Senior Research, Law Scholars, Law Journal Note Supervisor*, Northwestern University Pritzker School of Law (multiple students) |
| 2014 – | *Race, Social Science, and the Law*, Northwestern University Pritzker School of Law |
| 2016 – 2017 | *International Team Project*, Northwestern University Pritzker School of Law (2016 - Dominican Republic, 2017 - Cuba) |
| 2014 | *Topics in Legal Psychology*, Duke University Law School |
| 2013 | *Social Science Evidence in the Law*, Duke University Law School |

| PROFESSIONAL SERVICE |
|---|

| | |
|---|---|
| 2018 – 2019 | Program Committee, Law & Society Association |
| 2017 – 2019 | Board of Trustees, Law & Society Association [elected] |
| 2016 – 2018 | Provost's Advisory Council on Women Faculty, Northwestern University |
| 2015 – 2018 | Provost's Faculty Diversity & Excellence Committee, Northwestern University |
| 2015 – 2017 | Provost's Mentoring Council, Northwestern University |
| 2016 | Director of Diversity, Education, and Outreach Hiring Committee, Northwestern University Law School |
| 2015 – 2016 | Faculty Advisory Committee, Northwestern University Law School |
| 2015 – 2016 | Program Committee, Law & Society Association |
| 2012 – 2013 | Student Scholarship Workshop Series, Duke University Law School |

**Selected Law School Community Service**: events for Northwestern Alumni Association (e.g., Day at Northwestern); Office of Alumni Relations & Development (e.g., Alumni Club of Chicago Women's Luncheon; Office of Admissions (e.g., Diverse Admit Day, Admit Weekend), Student Groups (e.g., Black Law Student Association, Diversity Coalition, Student Bar Association); Student Services (e.g., Orientation, Diverse Student Orientation)

**Ad-hoc Reviewer (Peer-Reviewed Journals and Grants)**: *Analyses of Social Issues and Public Policy (ASAP); Cognition; Group Processes and Intergroup Relations (GPIR); Law and Social Inquiry (LSI); Journal of Experimental Social Psychology (JESP); Journal of Personality and Social Psychology (JPSP); National Science Foundation Law and Social Science (NSF -LSS) Program; Personality and Social Psychology Bulletin (PSPB); Psychological Science; Social Justice Research (SJR); Social Psychological and Personality Science (SPPS)*

_____
Destiny Peery, JD/PhD

Dated:  May 13, 2019