Exhibit 6

## DECLARATION OF HOWELL CLEMENTS

I, Howell Clements, a resident of Hamilton County, Tennessee, being of lawful age declare as follows:

1. I was counsel for Rejon Taylor in his capital murder trial in Federal District court for the Eastern District of Tennessee. In my law practice of over fifty years, I have done a little bit of everything. The money I have made in my career came from personal injury cases. I am originally from Grundy County. Much of my business came from there. I have tried at least 100 jury trials. Most of these cases were tried in state court. I tried at least four state capital trials.

2. Magistrate Judge Bill Carter appointed me to represent Rejon Taylor in October 2004. Mr. Taylor's lead counsel was Bill Ortwein. Lee Ortwein, Bill's son, was also appointed as an associate counsel. Our entire team shared the responsibility of visiting with Rejon while other tasks were assigned individually. Bill, as lead counsel, gave the assignments. He handled the budget.

3. When I began meeting with Mr. Taylor, he had been incarcerated for about a year. In one early meeting with Rejon, he told me (and Leslie Cory who was with me) that he had ten tablets of God's revelations. He reflected that sometimes God "hides himself" and Rejon had to pray for as much as five hours to find God or hear from God.

4. I was present on October 26, 2004 at Rejon's initial appearance with Magistrate Carter. Rejon told the judge that Rejon did not want to have counsel appointed. The transcript of the proceeding reflects that which occurred on the record; that which occurred off the record was Bill and me trying to talk Rejon and his family into letting us help Rejon. We knew that despite their strong faith, Rejon needed counsel. We ultimately prevailed that day, and Rejon acquiesced in our appointment, but we definitely did not get through to him.

5. The following day, Bill, Lee, Rich Heinsman, and I met with Rejon at the Hamilton County jail. Mr. Heinsman was Rejon's lawyer in state court. During that visit, Rejon again talked about the "revelation" he had received from God: his circumstance was only a trial and God had great things in store for him when he got out. He said that God had not given him a word about us (Bill, Lee, and me) the night before and that he was not even listening to Bill, because what Bill said was not important. Rejon told us that Friday was to be the day the biggest turn around in history would begin. He said he was already dead and alive only in the spirit. Rejon expressed that he knew that

Exhibit 6

the government could not convict him because they did not have "papers" on him This was irrational given the evidence the government had already gathered against Rejon and his codefendants, indicating that they were involved in the crime.

6. I met with Rejon alone for the first time in November 2004. He told me that he wanted to know the questions we would be asking at the detention hearing that week, because he wanted to ask God about them. He said he would be fasting prior to the hearing. According to Rejon, God had told Rejon that God wanted him set free – that all the evidence against him would disappear.

7. For a while in late 2004, Rejon refused to speak with us, and when he did, he said nothing about the crime or his case. There were times when Rejon declined to see us altogether. Leslie Cory began helping with Rejon's case around this time, first as Bill's assistant researching legal questions, and later in a more formal capacity.

8. In November I spoke with Mrs. Taylor regarding the need for Rejon to meet and communicate with us. I learned Rejon was upset because of something Roy Cooper had said about Roy needing to earn his money. I asked Mrs. Taylor to encourage Rejon to resume meeting with the team.

9. In December 2004, we had an organizational meeting at Ortwein and Ortwein. It was decided that Leslie Cory should begin meeting with Rejon and the next day I took her to the jail to introduce her.

10. As time went on, Rejon began to talk to us, but mostly about religion. He said that he was depending solely on God. I have come across clients who find God in the jailhouse but whose faith does not seem sincere. Rejon was different. He knew too much about the Bible to be insincere. He had a knowledge of scripture before he had been arrested. He remembered and could recall scripture verses verbatim.

11. In January 2005, I visited Rejon with Leslie. Rejon told us about a wonderful religious experience he had had a couple days prior to our visit. He said it occurred while he was fasting and that since that time all he wanted to do was worship. He described feeling like a bird on the side of a waterfall on a bush. He professed great happiness; said he was the happiest he had ever been, though he related that other inmates were throwing shoes at him to stop him from praying. Rejon said he considered the other inmates' actions to be persecution and loved what they were doing as it was persecution for "my name's sake." I considered this whole thing highly odd and worried that Rejon was losing his marbles.

_Mc_  2

Exhibit 6

12. In our January meeting, we decided that Rejon had to be evaluated. The team discussed how Rejon had acted at the detention hearing, looking around and smiling as if his life were not on the line. We all agreed that his affect and the things he said simply were too bizarre to ignore. Bill had decided we would use David Solovey as our mental health expert, as they had worked together a number of times. Bill assigned each of us to write Dr. Solovey a memo regarding our initial impressions of Rejon. I told Dr. Solovey that Rejon had related that he was willing to work with his state counsel because God had "cleared" talking to that lawyer, but that before Rejon would consider talking with us, he said he would have to consult God. I explained that Rejon told us that the evidence against him would disappear regardless of what we said, so we did not need to worry about him and that he was not worried. Later, after a conference with the Lord, Rejon said he would submit to us and would do what we needed him to do. I told Solovey that Rejon had related that he might receive the death penalty just as Jesus received the death penalty. I explained that I was worried that Rejon's thinking was delusional.

13. In March 2005, I reviewed the, then, new Rule 12.2 and drafted a memo for the team regarding the protections available to us with regard to the development of mental health evidence.

14. In March 2005, Bill suggested that I attend the federal resource counsel's continuing legal education program on mitigation in Salt Lake City. Bill also obtained a copy of a disc of educational materials from a seminar in New Orleans; I reviewed those materials. I attended the Second National Seminar on the Development and Integration of Mitigation Evidence in Salt Lake City in April 2005.

15. From May through June 2005, I worked on a comparison of Rejon's co-defendants' statements, attempting to identify all the conflicting information.

16. In May I met with Rejon and he related that he was to be released by God in July 2005. During this meeting, Leslie responded to Rejon's comment that this was the best time of his life, saying that putting things the way Rejon did sounded like he was unconcerned about what happened to Mr. Luck. Rejon abruptly left the room. Leslie left, and then Rejon came back into the visitation gallery. He had tears running down his face. He was trembling. I asked if he wanted me to hold his hand; he nodded slightly. I held his hand briefly and told him that even Peter and Paul had differing views of the law of God. I reminded him that Leslie was a good woman and tried to reassure him that his team had his best interest at heart. Rejon told me to tell Leslie that he was sorry.

Exhibit 6

17. In June 2005, the team began to discuss how to prepare Rejon for the possibility of a plea offer. We were concerned that Rejon was largely guided by his mother and brother. We met with United States Attorney Mattice on July 28, 2005 and he indicated that if Rejon would accept a life sentence that he believed that we could conclude the case. Bill told Mattice that Rejon had psychosocial difficulties and that getting him to take the offer might require some time. I did not participate in any discussions with Reba or John regarding this offer before it was conveyed to Rejon; I do not believe we followed through on our plans to involve Rejon's mother and brother in the presentation of the offer to Rejon.

18. In August 2005, Bill Ortwein and Roy Cooper initially explained the life without parole offer to Rejon. Rejon indicated he needed more time to think. Bill and I went over to visit about a week later to see if he had made a decision or had any questions. Rejon indicated he needed more time.

19. Even before the escape attempt, I was concerned about Reba Taylor as a potential witness. She was so proud of her sons — even in the face of their frailties. She did not seem to regard John's drug dealing as a problem, rather she was proud of his success. I did not however, think about this attitude as a potential symptom of mental illness or of distorted perceptions of reality that might indicate psychosis.

20. In September 2005, after Rejon told Bill that humans cannot do anything and that everything is up to God. Rejon told Bill that Rejon realized that the team could not do anything for him, that what would happen was up to God. He continued to say that God was going to do something to deliver him and that he would be fine. He indicated that he was standing on "the rock" until/unless told by God to do something else. He persisted in his refusal to consider the life offer, including telling us in November 2005 that God had not told him to enter a plea so he could not. Bill and I discussed what on earth to do. We were confounded by his belief that God would save him and his determination not to plead until God told him to do so. We debated whether a further mental evaluation was warranted and discussed how to handle.

21. In September 2005, all the lawyers and Roy Cooper went to Atlanta to meet with Rejon's extended family. In that meeting it became clear that the only people who were going to influence Rejon's decision about a plea were his mother and his brother.

22. In October 2005, I began working on the Grand Jury composition issue filling a request for discovery.

_HK_ 4

Exhibit 6

23. Also, from October into November 2005, the team was very focused on our presentation to the local AUSAs regarding whether death should be sought/authorized in the case. The local United States Attorney, Sandy Mattice, had been confirmed to the federal bench, so we had some unknowns to deal with; we did not know who would have authority to make the decision about death authorization. We obtained documents regarding Rejon's exemplary behavior in jail and got statements from religious volunteers. It was decided that I would be in charge of the oral presentation.

24. There were some things that totally surprised me in Rejon's case. When we went to Washington on April 15, 2006, Rejon had attempted to escape from the Hamilton County Jail the day before, April 14, 2006. We had no idea.

25. After the escape, we were stunned and irritated both. Bill had done most of the presentation and I did the closing, if you want to call it that. At some point in the meeting, I think before I did the closing, Lee passed me a note saying Rejon had tried to escape. It did not sink in for awhile; I thought Lee was talking about something in the past and it did not make sense. At some point before my closing, I figured out what the note Lee had passed me meant. I had my presentation planned, but at that point I knew there was only a remote chance for success.

26. In June 2006, it fell to Roy Cooper and me to tell Rejon that the government had decided to seek death. I told Rejon that we would continue to try to work out some deal for him.

27. Judge Collier gave us all the money that we requested. The Sixth Circuit gave us problems. The Sixth Circuit cut our money significantly and tried to deny even more. They denied us money for our jury expert which we badly needed.

28. After the death notice, we divided into teams. Roy and Lee were to work on facts while Leslie and I were to work on legal motions. Bill oversaw both teams and was working on budget issues. I wrote a major portion of the jury questionnaire, led the grand jury investigation, and assisted in parts of the proportionality research. My law partner, Paul Cross, assisted our team in the grand jury investigation. Paul did the math and I wrote the motions. Paul was able to work out and explain the math to me. We had to take depositions to support our position that the Grand Jury was not representative of the county. The superseding indictment meant that we had to do it all over again.

HC

Exhibit 6

29. After the government indicated at a status conference that they would be relying on future dangerousness, I began working with Dr. Mark Cunningham to get him on board as our expert in future dangerousness.

30. After the death notice, we decided to take a different approach with Rejon. Bill determined that he would focus Rejon on the facts of the crime. Our meetings became more business-like and we did not let Rejon talk to us about things he wanted to discuss as we once had. Instead, we set the agenda for topics to discuss and stuck to it. For most of 2006 and 2007 Bill and Roy did the primary visiting with Rejon. The thinking was that Leslie and my softer method had not worked and that we should try the tougher approach, keeping Rejon focused on all the bad facts in his case that indicated he should take the plea.

31. In May 2005, our team contacted Dr. Martha Loring of Atlanta about the possibility of being a consultant for us regarding the development of mitigation in our case. At the time we contacted her, we were primarily interested in her expertise with domestic violence/battered women, believing that was relevant to the relationship between Rejon's parents. In December 2006, the Sixth circuit approved our hiring Dr. Loring. I liked Ms. Loring, but she was a nut. Roy found Ms. Loring. Ms. Loring repeatedly said that she was not qualified to diagnose some issue in Rejon because her doctorate was in sociology. I do not recall reviewing Ms. Loring's notes from interviews that she conducted with Rejon's family.

32. I worked on the bill of particulars, issues regarding future dangerousness and constitutionality of the federal death penalty statute.

33. Rejon's mother did not think that we could lose at trial because there was no DNA evidence. Bill told her about the palm print and other convincing evidence but that did not seem to faze her. I liked the family. They seemed fine to me. Rejon's brother, John, was a drug dealer, but he seemed fine. I knew that Rejon's father was in prison. They were a normal, middle-class, Black family.

34. I assisted in choosing jurors during jury selection. I cross-examined the first witness, from the Chattanooga police department. I crossed examined the African American female officer from Atlanta. I gave the closing argument in the guilt/innocence phase of Rejon's trial.

35. At trial, his codefendant, Sir Jack Matthews, completely stunned us. He spoke about the victim and Rejon having had a sexual relationship. Matthews spoke about the victim having possessed photos of children in his safe. None of this made any sense to me.

RC        6

Exhibit 6

36. Rejon's allocution was tepid. Leslie had put a lot of time into going over that statement with him. Before the trial, it sounded pretty good. I told Rejon that he could not be nonchalant while giving that statement. I told him that he needed to show emotion and remorse and that if he did not, it was suicide. It did not go as planned.

37. I did not do anything more in Rejon's case following the verdict except confer with Leslie Cory about the motion for new trial.

The foregoing is true and correct to the best of my information and belief and knowledge at eighty-three years old and executed under penalty of perjury under the laws of the United States of America on April 24, 2019.

 

 

_____
Howell Clements