Exhibit 7

## DECLARATION OF RICHARD HEINSMAN

I, Richard Heinsman, a resident of Chattanooga, Hamilton County, Tennessee, being of lawful age declare as follows:

1. I have been licensed to practice law in Tennessee since 1993. I have represent death eligible defendants since 1997. I have represented 7 clients in state capital cases in four Tennessee jurisdictions.

2. In 2003, Rejon Taylor's family contacted me to represent him in his state murder charges in Hamilton County, Tennessee. I set a forty-thousand dollar fee for representation including a jury trial, but tiered the fee agreement and was eventually retained for initial appearances, contesting the state's motion for a blood/DNA sample, and a bond motion.

3. Once it became clear that Mr. Taylor's case would likely involve federal prosecution, I notified his mother that our fee arrangement would change.

4. Mr. Taylor's family was subsequently unable to secure the money to pay a full retainer, but I accepted appointment of Mr. Taylor's state case once the court determined that Mr. Taylor was indigent.

5. The state prosecution remained pending until the federal conviction, but all parties and the court knew that there would be no state prosecution if there were a federal conviction.

6. The federal courts did not appoint me to represent Mr. Taylor, but Mr. Taylor's federal counsel invited me to participate as a member of the legal team — albeit in a derivative capacity. They agreed to pay me an hourly fee for work I did on the case.

7. I was present for the initial appearance in federal court in October 2004 when Mr. Taylor informed the court that he did not need appointed counsel because God had told him he did not need a lawyer. Mr. Taylor told the court that the court could not understand what Mr. Taylor had to tell the court because the court would have had to be born again to understand.

8. My substantive legal work on Mr. Taylor's case was limited to contesting the state's entitlement to a blood/DNA sample, a motion for a "complete report indicating precisely which [fingerprint] matches were found in addition to the conclusory report already received," and a bond motion.



Exhibit 7

9. In the course of my representation, I visited with Mr. Taylor at least six times in the Hamilton County jail as well as speaking with him at various court appearances. Jail records indicate that I spent at least six hours with Mr. Taylor.

10. In my visits with Mr. Taylor, I noted many symptoms that, because of my training, I recognized to be symptoms of mental illness and/or brain dysfunction. Specifically I noted that Mr. Taylor was hyper-religious, possibly delusional, grandiose, and exhibited symptoms that could have been psychosis or dissociation. I was concerned that his brain was impaired.

11. When I say that Mr. Taylor was hyper-religious, I am recalling conversations we had wherein he explained that he believed his incarceration was somehow similar to the experiences and suffering of the Apostle John — that his arrest and confinement were analogous to John's exile to Patmos. He also expressed that he was unconcerned about his case or possible conviction; he believed and trusted that God would deliver him.

12. In an October visit, Mr. Taylor expressed that God had great things in store for him when he got out. He expressed reservation about his federal lawyers because God had not given him any word about them. He explained he had experienced a "revelation" in custody, that his current circumstances were "only a trial" and that he was to be patient because God had told him all would be ok.

13. Mr. Taylor's affect was also inappropriate. I noted that he smiled and giggled and reported that he was "great" when asked. He was unreasonably happy and peaceful relative to his surroundings. Between 2003 and 2008, the Hamilton County jail was a dangerous and poorly run place: beyond the regular arduousness of any penal facility, lawyers and defendants knew that the staff at Hamilton County did not run the prison well or securely. I practice in several jurisdictions, and, based on the reports of my clients, they regarded that jail as a hard place to be incarcerated relative to other county jails and state prisons. Thus, in that context, Mr. Taylor's cheerfulness and serenity were striking and did not make sense.

14. My notes reflect my concern that Mr. Taylor was not thinking or responding rationally to his charges or surroundings in 2003-2004.

15. Prior to November 2004, I considered myself part of Mr. Taylor's defense. I was not federal counsel and not formally part of their team, but I was sharing

2

Exhibit 7

information with his federal counsel. I shared my observations of and reflections about Mr. Taylor with those attorneys.

16. In November 2004, I typed up notes of a client visit with Mr. Taylor and had my assistant forward them by fax to Bill Ortwein's office for the defense team. That fax was mistakenly sent to Bill Ortwein's cousin, Bill Ortwein, a sign maker. The wrong Bill Ortwein then gave the memo to the police who subsequently delivered it to the U.S. Attorney's office. After that happened, I determined that I needed to stop attempting to be part of Mr. Taylor's defense team. I was worried that my role as auxiliary or support counsel would, again, result in some mishap that might compromise Mr. Taylor's defense. I bowed out.

17. When Mr. Taylor was convicted by the federal government in September 2008, the state court charges were dismissed and I wrote Mr. Taylor a letter indicating that my representation was at an end.

18. I did not follow Mr. Taylor's case closely after the mishap with the client memorandum.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United State of America on April 23, 2019.

Richard Heinsman