Exhibit 9

# DECLARATION OF MARK D. CUNNINGHAM

I, **Mark D. Cunningham**, a resident of Seattle, Washington being of lawful age declare as follows:

1) I am a psychologist, licensed in Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Louisiana, Nevada, New York [inactive], Oregon, Pennsylvania, Tennessee, Texas, and Washington. I received my Bachelor of Arts from Abilene Christian University and both a Master of Science and a Doctor of Philosophy in Clinical Psychology from Oklahoma State University. I completed a pre-doctoral internship in clinical psychology at the National Naval Medical Center in Bethesda, Maryland and completed further post-doctoral work in a National Institute of Mental Health sponsored training program at Yale University School of Medicine in New Haven, Connecticut. I am board certified in both clinical and forensic psychology by the American Board of Professional Psychology.

2) In 2006, the defense team for Rejon Taylor contacted me to inquire about conducting a forensic violence risk assessment for prison (i.e., future dangerousness) in preparation for Mr. Taylor's capital sentencing hearing. I reviewed materials the team provided me and conducted my risk assessment based upon that information. Later, the team provided me additional materials from the team's interviews with Mr. Taylor's relatives. Then, on February 28 and 29, 2008, I interviewed those family members. I testified as an expert witness at Mr. Taylor's capital sentencing proceeding in October 2008.

3) I have only one independent memory of my involvement in Rejon Taylor's case but have reviewed my time records and file for the preparation of this declaration. The sole independent memory I have of my participation in the case is that Judge Collier initially questioned my qualification an expert in violence risk assessment for prison (i.e., future dangerousness). The defense team asked me to collect affidavits from professionals who were familiar with my work describing and verifying my expertise. Those declarations established that I was one of the world's foremost authorities on violence risk assessment for prison. When the court ultimately recognized my qualification as an expert, the court then deemed my testimony on future dangerousness irrelevant.

4) Rejon Taylor's trial team initially contracted me solely to do a risk assessment of Mr. Taylor's likelihood of serious violence if confined for life in federal prison. Counsel did not ask me to interview Mr. Taylor. Although it is not my place to question the priorities or choices of counsel, my preference

*MDC*

1

Exhibit 9

has always been to personally interview the defendant. I may observe impairments or deficits during an interview that members of the legal team have failed to recognize because they generally do not have forensic psychology training. Further, a defendant is often the only source of certain sensitive life history facts.

5) When I get involved in a case, I see my role as specific and defined by the referral question. I do not become a part of the defense team. My role is dictated by what counsel asks for and is limited by the information counsel provides me. I do not regard it as my role or job to tell counsel what counsel should be investigating. I regard my role as to provide a forensic, psychological analysis of the materials provided to me by counsel. In this case, the trial team initially only asked me to provide a risk assessment for prison.

6) In this case, my role morphed very close in time to the trial date. In January 2008, the team indicated that, in addition to the risk assessment, they wanted me to present Mr. Taylor's social history to the jury. At the time of this request, the trial was set for April 2008. Ultimately the trial date was changed to August 2008.

7) When the team changed my task to include conducting an assessment of Mr. Taylor's personal development, I still remained in my lane. By "staying in my lane" I mean that I do not, for instance, tell attorney that the information provided to me is too thin. In this case, I asked counsel for more information, but the team did not provide it. I worked to apply my model to the limited social history information the team provided me; I did not speculate as to why the team did not provide me with additional social history information, nor did I regard it as appropriate for me to tell the attorneys that their case would be stronger with more social history information.

8) When a defense team asks me to testify to mitigation facts involving a client's social history, I sometimes conduct trauma assessments during social history interviews of a client's family. Whether I do so or not and how effective my interviews are is limited by the time/condition parameters that defense counsel determines. In terms of mitigation development and presentation, ideally the defense team has already interviewed the witnesses multiple times so that the witnesses have already disclosed the pertinent trauma history to the team prior to my interview and their disclosure to me is thus a repeat. This is my preferred method because many witnesses will not disclose trauma during a single interview.

9) Before I ever interview a family member, I request the team to provide me with summaries of past interviews of that person. I do this so that I will have

2

Exhibit 9

a sense of what the witnesses will say. In some instances, I read those summaries aloud to a witness to confirm the content and so that they do not repeat the same information. If I find that a summary provided by counsel is fraught with errors, I know that I cannot rely on the other summaries counsel provides. If I find that the summaries are generally accurate for the people with whom I meet, I know that I can rely on others without having to meet each social history witness. As I engage in interviews, I am trying to identify adverse developmental factors. In court, I present a generational history of those factors.

10) It is not unusual for me to spend between ninety to one hundred and thirty hours or more when I am contracted to work on cases to present both a social history and risk assessment for prison. Fifty hours is the low end of the time it takes me to complete a risk assessment for prison. However, fifty hours is not enough time for me to do both a risk assessment and to prepare to present a social history. If I am hired to conduct the risk assessment and present social history, I contract to work for between ninety (90) - and one hundred and thirty (130) hours. In the Rejon Taylor case, I billed counsel for one hundred and two point fifty-five (102.55) hours. That total included travel time for three trips to Atlanta, time for consultation with counsel and preparation of my presentation. Included in my billing were fewer than forty-five hours of assessment and record review to present Mr. Taylor's risk of prison violence and social history information.

11) Mitigation can include positive testimony about a client but should not be limited to the good things that people have to say. Mitigation, effectively investigated and presented at trial, will illustrate the formative damaging environment in which a client is reared and will include facts about a client's resilience or positive behaviors. This was my understanding of mitigation at the time of Rejon Taylor's trial. Had Mr. Taylor's lawyers requested to consult with me on this issue, I would have explained my understanding to counsel.

12) In Mr. Taylor's case, I traveled to Atlanta to interview family members in February 2008. Based on my review of my time records, I was given little time with the eleven witnesses with whom I met. During those interviews, I spent the limited time I had mostly verifying the information that the defense team gave me. In some interviews, I spent my time with the witness reading a summary of information that the defense team had already provided me and asked them to verify the facts. It would have been uncommon for me to schedule so many interviews to take place in one day. Normally for that many people, I could schedule interviews to take place over four or five days. It is unusual for me to only spend two hours with a defendant's mother. The mother is usually the best historian. I try to spend

*MDC*

3

Exhibit 9

as much time with her as I can. Based on the short time the defense team allotted and the timing of the back-to-back interviews, it is my belief that Mr. Taylor's attorneys organized and directed the eleven interviews I conducted in this case. I did the best I could with the information provided under the circumstances that the Mr. Taylor's team created.

13) When I prepare to testify, I send counsel my PowerPoint slides and together, we work on how best to present the information in the slides. In cases where the attorneys do not understand how to present my information, I create a script for the attorney who conducts my direct examination. In some instances, I have to remind attorneys to ask questions as if they thought of the questions and then also as if they are interested in my answers. In this case, I created a script that attorney Lee Ortwein used during my direct examination.

14) In 2019 I reviewed Dr. Solovey's file, including the MacArthur Competence Assessment Tool – Criminal Adjudication (MacCat-Ca) Dr. Solovey administered to Mr. Taylor in 2005. During my consultation with Mr. Taylor's trial team from 2006 to 2008, the trial team did not provide me that data. I was only provided Dr. Solovey's report. I did not speak to Dr. Solovey at any point.

15) Dr. Solovey reported that Mr. Taylor was delusional. Suffering from a delusional disorder in general does not necessarily make someone incompetent. However, if the delusion directly involves the person's case, it can impair competency and the ability to assist counsel. If a defendant exhibits delusions, it can indicate a psychological disorder that the defense team must investigate.

16) In 2006, I was reviewing literature regarding political and religious delusions and the ways in which those delusions manifest and impact the actions and competency of criminal defendants. I could have provided my expertise on the subject of religious delusions and the interplay of such delusions and competency to Mr. Taylor's trial team had they asked.

17) If I had known Rejon Taylor gave the answers Dr. Solovey recorded on the MacArthur, I would have told counsel that these responses compellingly pointed to their client being incompetent to assist in his defense. Based on the data from the MacArthur assessment, Mr. Taylor may have known who the judge was and who his attorneys were but was unable to participate in his defense in a rational way. As a trained forensic psychologist, I concluded that Dr. Solovey's interpretation of his ratings was faulty. In the section of Dr. Solovey's report covering Mr. Taylor's appreciation of his legal situation, an ability critical to aiding/assisting counsel and making important case

4

Exhibit 9

decisions, Dr. Solovey erroneously reported that Mr. Taylor showed no impairment – a finding that was completely contrary to the data that Dr. Solovey obtained. After reviewing the raw data from the MacArthur and learning that Mr. Taylor was experiencing religious delusions leading up to and during his trial, there are grave concerns Mr. Taylor was incapable of making informed decisions regarding his case.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States of America on May 8, 2019.


Mark. D. Cunningham, Ph.D., ABPP