Exhibit 10

## DECLARATION OF MARTI LORING

I, Marti Loring, a resident of DeKalb County, Georgia, being of lawful age declare as follows:

1. I am the Director of the Center for Mental Health and Human Development in Atlanta, GA, I have a PhD in sociology from Emory University in Atlanta, Georgia and have been a licensed clinical social worker since 1990.

2. In 2005, Howell Clements contacted me to ask if I would consult with the defense team for Rejon Taylor's case. I eventually contracted with the team and began providing my expert services in December 2006.

3. I have been told that the team initially contacted me because of my expertise in domestic violence with an idea that I would provide expertise on how to explore the issues of domestic violence between Rejon's parents. I do not recall my consultation having been framed in that way; I recall our initial conversations and my memory is that from the beginning the team made clear that the consultation was because they were aware that the ABA Guidelines required the participation of a "mitigation specialist" and they wanted me on board to cover that role. I did not ultimately provide expert assistance, except possibly tangentially, as to the domestic violence between Rejon's parents. I had to fight the team to gain access to Rejon's parents, because the team did not consider the parents to be part of my assignment.

4. I do not know how the defense team became aware of me. I do recall Mr. Cooper calling me about the case, I specifically recall his informal way of addressing me. He called and said something like, "Hey girl" to begin the call. I paused, wondering who on earth was addressing me in such a way. I had met Mr. Cooper, but I did not know him well prior to Rejon's case.

5. When the team first contacted me in May 2005, I met with Howell Clements and Roy Cooper. This meeting occurred in my home office in Atlanta where I generally held such consultations. My initial impression was that mitigation as I understood the term/concept was not particularly important to the team, that not only was Mr. Cooper in charge of the entire investigation – for both phases of the trial – but that he was largely in charge of determining the scope of that which was to be investigated. I met with Mr. Cooper in my office again in November of 2006.

6. In June of 2006, I provided the team an initial estimate of the expense for my time as a consultant. At that time, my fee was $120.00 per hour. I am aware that a thorough mitigation investigation requires hundreds of hours of witness interviews. However, because the team was seeking a mitigation specialist, I believed that they already had someone doing the mitigation investigation and that my job would be to assist the team to understand the mitigation information

_ML_

1

Exhibit 10

obtained in that investigation. I advised the team that my initial estimate of time/expense for my work would likely not be sufficient for all my work and that I did not expect to be compensated beyond my initial estimate. I made it clear that I would not let financial considerations keep me from fulfilling my duty of professional care even if that required me to work without compensation.

7. Though I was not directly privy to the team's work to gain approval for my services, I generally understood that the team had to request authorization from the District Court and from the Sixth Circuit to obtain approval to contract with me. That process took some time. My actual work on the case did not begin until December 2006.

8. At the time I was hired, the team already possessed a short mitigation timeline of events in Rejon Taylor's life from which the team was working. I believe the timeline had been composed by Investigator Roy Cooper. As far as I know, no substantial information was developed to add to that timeline after I joined the team. It was my understanding that the team considered the mitigation investigation complete and that the timeline reflected the documents and information from which I was to work – along with whatever I might glean from my interviews with Mr. Taylor and the family members identified by Mr. Cooper.

9. As my work on the case progressed and my relationship with the team –particularly with Mr. Cooper – developed, I became aware that Mr. Cooper was afraid of my work. He said that the mitigation work I was doing was "too soft." Mr. Cooper's focus was on making sure Rejon accepted the consequence of his actions. Mr. Cooper seemed to perceive mitigation as an excuse rather than an important, constitutionally protected part of the capital defense process. Mr. Cooper insisted on managing my communication with the lawyers. He resented it when I called the lawyers directly. He wanted me to always communicate with the team through him. I had to invent excuses to talk to counsel directly. Additionally, Mr. Cooper controlled my access to Rejon; he insisted that he make all the appointments for my visits at the Hamilton County jail for me. Mr. Cooper thereby controlled the amount of time I had with Rejon and whether Mr. Cooper as also present for the interview. Because I was not allowed to evaluate Rejon in my usual manner — that is, I would normally evaluate a client over multiple interviews consisting of many hours wherein I have opportunity to obtain a full history and observe the client's trauma and psychosocial symptoms, in accord with professional standards — my assessment was incomplete.

10. In December 2006, I met with Rejon's mother and grandmother. I recall the experience as particularly frustrating as I was attempting to gain rapport with obviously critical witnesses, but Mr. Cooper not only insisted on attending the meeting, but on controlling it. Mr. Cooper impeded my efforts in a number of ways: he talked about himself and his accomplishments, he physically indicated impatience (foot tapping, hand gestures), and sometimes verbally expressed impatience with my process. He would overtly say, "let's go."

*mL*

2

Exhibit 10

11. It is my normal practice when meeting with a potential witness to attempt to connect one-on-one in compliance with prevailing professional norms for mitigation investigation. Mr. Cooper's presence was, therefore, distracting and less than ideal. His overt impatience with my practice of allowing trust to build and a real relationship to develop was detrimental to my efforts. I recall that while Roy was speaking with another family member, I managed to position myself and Mrs. Taylor such that we were able to speak more privately for just a few minutes. I really had to struggle to work around Mr. Cooper to begin doing my job. This meeting with Mrs. Taylor was, based on my training, only an initial contact. We did not begin to discuss difficult topics or any family secrets; it would not have been appropriate to do so either in the initial meeting or with Mr. Cooper present.

12. In December 2006, I met with Stephanie Belcher, the woman identified by the Government as the surviving partner of the victim in the case, Guy Luck. I was able to meet with Ms. Belcher because we had a mutual acquaintance, Susan Wardell, who made the introduction. On this first meeting, Ms. Belcher was very interested in my work as a mitigation specialist. She had some training in social work and was interested in learning about the intersection of our fields. Ms. Belcher indicated she had some reservations about the death penalty and that she had made her feelings on the subject known to AUSA Neff. My time sheet reflects that this initial meeting took two hours.

13. In January 2007, I attended a team meeting at Ortwein and Ortwein in Chattanooga. Following that meeting, Mr. Ortwein and Mr. Cooper took me to the Hamilton County Jail to meet with Rejon. I also met with Dr. Solovey.

14. On January 10, 2007, I met with Rejon at the Hamilton County Jail for one and a half hours. We were observed by a guard through glass for the entirety of the visit.

15. My initial impressions of Rejon were that he was cheerful and cooperative, but that his affect was not appropriate to the place. I noted that he giggled frequently. He reported, and I later observed, that he does not respond well to novel or unexpected stimuli. We discussed that guards in the jail had told him he was "crazy" for providing commissary for his co-defendants, who everyone knew would be testifying against him. Rejon expressed that he loved his friends, no matter whether they testified against him or not.

16. I later learned that Mr. Cooper had requested that the Hamilton County guards monitor my visits with Rejon. Roy told me this was necessary because Rejon was dangerous. Not only was this ridiculous as Rejon was nothing but lovely and gentle with and to me, it was an insulting override of my professional judgment.

ML

3

Exhibit 10

17. On February 2, 2007, I met with Rejon a second time at the Hamilton County jail for one hour. Mr. Cooper was with Rejon and me for the entirety of that interview. It is my general practice to meet with clients for a longer period of time – both for efficiency/cost effectiveness and because a longer visit allows me to monitor the client for signs and symptoms of trauma, mental illness, and brain impairment. However on this day, I kept the visit brief and the discussion general, because of Mr. Cooper's presence.

18. Mr. Cooper's interaction with Rejon distressed me. I found his manner of speaking to Rejon shocking. Mr. Cooper said you need to take this offer; there's a man dead and you need to take this deal. He spoke authoritatively and was demanding. I attempted to model good client interaction for Mr. Cooper. I told Rejon I imagined that he was finding his situation to be overwhelming. I recall Rejon nodding as I spoke.

19. Mr. Cooper made it difficult for me to interview Rejon. When I returned to the jail for my next interview, the guards told me that Mr. Cooper had told them that I would not be returning.

20. On February 7, 2007, I interviewed Rejon for 2 hours, alone. During that visit we discussed that Rejon had been unprepared for my visit the week prior and that, as a result, the visit had unnerved him. He has strong reactions when unexpected things occur. He related that he does not respond well when things happen to him or someone approaches him unexpectedly. In response to my questioning, Rejon related that he had always been this way, attributing this characteristic to his experiences as a child, overhearing his parents fighting in the room next to his bedroom. Rejon also related a time in which he was nearly hit by car. He reported having flashbacks of these incidents. I noted that Rejon became agitated during this discussion; I felt the subject matter was causing him distress and determined that I should not push him for more information at that time as I was still attempting to establish a relationship of trust. I planned to circle back to this discussion in subsequent visits with Rejon, but was unable to do so because of the team's instructions.

21. After I provided the team a memo of my observations of my time with Rejon on February 7, the team instructed me to focus my efforts on discussions with Stephanie Belcher.

22. On February 24, 2007, I accompanied Mr. Cooper to a family group interview at one of the businesses owned by Rejon's brother, John Taylor Jr. in Atlanta. Mr. Cooper and I interviewed several family members that day, including aunts, an uncle, and several cousins. At the time I understood that my task was to evaluate each of these family members to assess their capability to be an effective mitigation witness for Rejon. I was not attempting to gain new or more information from them – that was not the point of these interviews, rather this was an assessment of their prospective performance as witnesses. At the time of this

*ML*

4

Exhibit 10

meeting, I did not regard it as my job to question the attorneys' leadership as to the effectiveness of this use of my time, nor did I have input into their decision that I should not be allowed to develop relationships with these potential witnesses to attempt to gain more information.

23. I repeatedly observed that Mr. Cooper had a problematic attitude toward Rejon. Mr. Cooper seemed to believe that Rejon needed to be brought down to a more humble posture. Mr. Cooper expressed his belief that Rejon should just be sorry for his actions and take the punishment Mr. Cooper believed Rejon deserved. Mr. Cooper failed to appreciate any of the factors that could have been complicating their relationship: that is, he failed to perceive how his own attitudes toward this young Black man reflected his sense of social hierarchy or how Rejon's mental health might complicate Rejon's ability to accept what he had done.

24. I attempted to educate Mr. Cooper regarding the effect of trauma such as Rejon had suffered. I related to the team how Rejon had responded when I tried to talk with him about Ms. Belcher's suffering at the loss of her partner. I explained that his response was a trauma response and the antithesis of narcissism.

25. Mr. Cooper also repeatedly expressed annoyance at Rejon's religious beliefs. Mr. Cooper explained to me that Rejon was not accepting the government's offer out of conviction that God would deliver him. Mr. Cooper was incredulous, questioning why Rejon would focus on God when it was, in fact, Mr. Cooper who could get Rejon a deal. I attempted to explain to Mr. Cooper that Rejon's religiosity likely stemmed from mental impairment or the trauma of the violence he had witnessed as a child. I told Mr. Cooper that Rejon's beliefs could also reflect delusions.

26. On March 7, 2007, I met with Bill Ortwein and a French interpreter in an attempt to contact Guy Luck's sister in France to determine whether she wished for Rejon to face capital punishment. We were unable to reach her.

27. I met with Stephanie Belcher on April 18, 2007.

28. I met with Rejon again at the Hamilton County jail on May 3, 2007 for almost two hours

29. Also on May 3, 2007, I introduced Roy Cooper to Stephanie Belcher at the Violette Restaurant in Decatur Georgia. Ms. Belcher told Mr. Cooper about her relationship with Gaston Heros, aka Guy Luck, including details about their relationship. Ms. Belcher provided Mr. Cooper with the contact information for Mr. Luck's sister in France. Ms. Belcher related that at that point she believed that life without parole would be a greater punishment than the death penalty and was leaning toward that being the appropriate punishment.

ML

5

Exhibit 10

30. I visited Rejon again on May 18, 2007, for about an hour and twenty minutes. We discussed his memories of his parents fighting in the room next to where he slept as a preteen. His responses indicated a strong panic response and I reported to the team that I believed he suffered from PTSD from those events. I also met with his mother and sister on that day. I asked Mrs. Taylor about Rejon's reaction to surprising events and she related information that indicated to me that Rejon had a high startle response as a child. Rejon's sister Tameka visibly tensed when asked about the domestic violence between her mother and Rejon's father; she had tears in her eyes as she spoke of the violence she witnessed, including an attack on her mother where her mother was cut above her eye requiring stitches. I included these details in my report to the team.

31. On June 20, 2007, I again met with Bill Ortwein and an interpreter in an attempt to contact Mr. Luck's sister in France. We were, again, unsuccessful. I also attended the June 20, 2007 team meeting.

32. I saw Stephanie Belcher again on August 22, 2007 for approximately one hour.

33. On September 18, 2007, Ms. Belcher again met with Mr. Cooper and me at the Violette Restaurant.

34. On October 12, 2007, I attended a team meeting that included the federal resource counsel Kevin McNally. I was not clear on Mr. McNally's role or authority. At the team meeting it was discussed that the team needed to finish the social history and send that information to McNally for him to do the mitigation work up. In that meeting I related to the family that Rejon's mother, Reba was dissociative – much like Rejon.

35. On October 24, 2007, I sent the team a mitigation memorandum regarding post-traumatic stress disorder. I related the information I obtained from Rejon, his brother, his sister, and his uncle (all witnesses identified to me by Roy Cooper) that supported my belief that Rejon suffered from PTSD. I recommended that the team retain an expert in trauma to assist in developing this evidence. I provided the team with a referral to a trauma expert in Atlanta. As far as I know, the team did not follow up on my recommendation.

36. On October 30, 2007, I emailed Bill Ortwein regarding a conversation with Stephanie Belcher wherein Ms. Belcher said she would not sign an affidavit that she opposed the death penalty for Rejon. I recommended that the team obtain a victim outreach person, specifically Pamela Leonard, to work with Stephanie as Stephanie had many questions about the process. I indicated to the team that I was aware that Ms. Leonard was available to assist capital teams free of charge.

37. On November 10, 2007, I sent the team my assessment of the witnesses Roy Cooper had provided for me to interview on February 24, 2007. In that memo, I reflected to the team that additional interviews were needed, particularly of

mL

6

Exhibit 10

Rejon's sister Tameka Shepard and his grandmother Eva Williams regarding the violence in the family.

38. From my participation in several team meetings, I observed that the team had a limited view or understanding of what mitigation was. Leslie Cory, the sole woman on the team, seemed eager to learn about mitigation, but it was clear from the team dynamics that she had no power or knowledge to translate that eagerness into a strategy and action.

39. In December 2007, I attended a team meeting. At the meeting it was discussed that in order for Dr. Solovey to provide an accurate and complete assessment of Rejon, he needed a reliable social history. The team assigned me to write that. I explained that I needed contact with Mr. Taylor's father, Johnny Taylor before I could complete that task. At that meeting Roy agreed to take me to visit Mr. Taylor. I told the team that it appeared that Dr. Solovey did not have any expertise in the kind of trauma I believed to be present in this case. I referred the team to several psychiatric experts with trauma experience.

40. Despite the team's request that I complete the social history, I did not do so, because the team later told me to focus solely on Stephanie Belcher.

41. In February of 2008, I again had contact with Stephanie Belcher. In fact, virtually all my work in 2008 for the team was communicating Ms. Belcher. It became clear that the team no longer wished for me to assist in any other way. I contacted Ms. Belcher in April, June, and July 2008.

42. On July 7, 2008, I interviewed Johnny Taylor Sr. by phone. Mr. Taylor was incarcerated at Hancock State Prison – Mr. Cooper had told me that he was certain we would never get any helpful information out of Mr. Taylor, Sr. Mr. Cooper also made clear that if I went to interview Mr. Taylor in person, Mr. Cooper would accompany me. Because Mr. Cooper's presence curtailed my ability to interview previous social history witnesses, I opted to interview Mr. Taylor by phone even though this was not in accordance with prevailing standards.

43. Mr. Taylor indicated that Rejon was a jumpy and quiet as a child; he described him as "nervous." He variously described Rejon as "dominated," "controlled," and "clinging" to his mother. Mr. Taylor related that in the time Rejon lived with both parents, he witnessed them arguing violently — at the least hearing their conflict through the walls. Mr. Taylor remembered a time where he said something aggressive toward Rejon and Rejon seemed fearful of his father and started crying. Mr. Taylor described his older son as "the aggressive brother" and related that there was an incident when John pulled a gun on Rejon and Rejon seemed scared.

ML

7

Exhibit 10

45. Though I continued to be in touch with Ms. Belcher throughout 2008, I was not aware of the resetting of the trial date nor of the trial when it actually happened. I am aware that the file reflects that the team intended to contact me to request me to attend the trial with Ms. Belcher, I would have been glad to do that for the team, however I do not recall even knowing when the trial took place. I heard after the fact that it was over and was frustrated that the team had not even contacted me to let me know it was happening.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States of America on April 27, 2019.

Marti Loring, LCSW, PhD

ML

9