IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

REJON TAYLOR,                                )
                                             )
            Petitioner,                      )
                                             )
      v.                                     )      No. 1:19-CV-147-CLC-CHS
                                             )
UNITED STATES OF AMERICA,                    )
                                             )
            Respondent.                      )

---

## AMENDED MOTION FOR COLLATERAL RELIEF TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR A NEW TRIAL

---

**Table of Contents**

Preliminary Statement ........................................................................................ 2

Introduction ...................................................................................................... 5

    I.       Grounds for Relief.............................................................................. 8

        A. in investigation, preparation, and presentation at his trial..….......... 11
        B. Mr. Taylor was incompetent to stand trial in violation of the Fifth and Sixth Amendments to the United States constitution, and counsel were ineffective for failing to investigate, develop, and present proof of his incompetence ........................................................................................ 8

        In violation of the Sixth Amendment, Mr. Taylor's trial counsel were ineffective
        1. Defense Counsel's Conduct Prior to, During, and After Trial Was Deficient and Unreasonable According to the Prevailing Professional Norms Under Strickland v. Washington, 466 US 668 (1984), and Resulted in Prejudice as There is a Reasonable Probability That But For Counsel's Errors, the Outcome of Mr. Taylor's Trial Would Have Been Different in Violation of his Fifth and Sixth Amendment Rights. ...................................................................................... 11
           a. Red flags of neurological and developmental impairment, and symptoms of psychosis.................................................................. 11
           b. Assembling a Defense Team ........................................................ 12
           c. Developing the Attorney-Client Relationship ........................... 14
           d. Developing Evidence .................................................................... 14
           e. Preparing for Trial....................................................................... 16
           f. Jury Selection .............................................................................. 16
           g. First Phase of Trial....................................................................... 18
           h. What the Jury Did Not Hear....................................................... 19
           i. Motion for New Trial ................................................................... 20

        2. Failure to Conduct Adequate Jury Selection.................................. 21
           a. Trial Counsel Failed to Utilize Jury Selection to Identify Bias and to Remove Jurors Who Demonstrated Bias.............................. 22
           b. Due to Defense Counsel's Ineffective Assistance, the Jury That Convicted Mr. Taylor Contained Jurors Who Harbored Racial Bias........................................................................................... 24

c. The Circumstances of Mr. Taylor's Case Warranted Probing Questions from Defense Counsel to Identify and Eradicate Racial Bias from the Jury Pool.............................................................. 27

d. Defense Counsel's Failures During Voir Dire Subjected Mr. Taylor to a Biased Jury Incapable of Serving Impartially ........ 31

3. Failure to Investigate and Present Mr. Taylor's Neurological and Mental Impairments...................................................................... 31

4. Failure to Object to the Government's Repeated Reference to Mr. Taylor "Stalking" the Victim, a Distinct Uncharged Crime............ 36

5. Mr. Taylor Received Ineffective Assistance of Counsel in Violation of the Sixth Amendment (Other Guilt Phase Issues).......................... 40

a. Trial Counsel's Errors with Respect to Sir Jack Matthews....... 40

b. Ineffective Assistance of Counsel with Respect to the cross Examination of Joey Marshall ...................................................... 42

c. Trial Counsel Failed to Object to Mr. Taylor's Absence During a Critical Stage of the Trial (Fifth and Sixth Amendment Violations) ...................................................................................... 43

6. Cumulative Prejudicial Effect ............................................................ 44

C. In violation of Mr. Taylor's right to a fair and impartial jury, the jury that convicted him was biased and engaged in misconduct. ................. 45

1. In Violation of Mr. Taylor's Right to an Impartial Jury, the Jury that Convicted Mr. Taylor was Racially Biased ...................................... 46

2. In Violation of Mr. Taylor's Sixth Amendment Rights to a Fair Trial Before an Impartial Jury, the Jurors Who Presided Over His Case Engaged in Misconduct.................................................................. 48

D. In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government used improper language to describe him. ......................... 51

1. The Government Repeatedly Used Racially Coded, Dehumanizing Language to Refer to Mr. Taylor as a Stalker Throughout Trial ... 52

2. The Government's Language was Flagrant Enough to Warrant Reversal....................................................................................... 53

ii

    a. The Government's Remarks Misled the Jury and Prejudiced Mr. Taylor ........................................................................ 54

    i. The Depiction of Black Men as Inherently Violent and Dangerous Is an Enduring Racial Stereotype That Has the Potential to Exert a Unique Power Over Jurors ........................ 54

    ii. The Stereotype of the Young Black Male as Violent and Criminal is Deeply Entrenched in American History and Culture ........................................................................................... 55

    iii. Stereotypes of Black Men as Violent and Dangerous Has Patent Effect on Perceptions and Judgment ............................. 56

    b. The Government's remarks were recurring and extensive ........ 58

    c. The Government deliberately used this language to stoke racial fears and appeal to racial biases of jurors ................................. 59

    d. The Government's evidence of premediated first-degree murder was weak ............................................................................... 59

E. Trial counsel's failure to object to improper language violated Mr. Taylor's Sixth Amendment right to constitutionally adequate counsel ..................................................................................................... 60

    1. Defense Counsel Was Required to Object to the Government's Racially Inflammatory Language ..................................................... 61

    2. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Constituted Deficient Performance ......... 62

    3. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Prejudiced Mr. Taylor .............................. 63

F. The Government violated Mr. Taylor's right to a constitutionally adequate trial by impermissibly excusing Black jurors for non-race-neutral-reasons ................................................................................ 64

G. Mr. Taylor's rights to a fair trial under the Fifth and Sixth Amendments were violated by prosecutorial misconduct in closing argument and counsel were ineffective for failing to object ......................................... 65

H. Women and Black people were unconstitutionally underrepresented on the grand jury that indicted Mr. Taylor in violation of the Fifth and Sixth Amendments to the United States Constitution ......................... 67

I.  In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government suppressed material exculpatory evidence in violation of *Brady v. Maryland* ................................................................. 69

J.  Pursuant to *United States v. Davis, Borden v. United States*, and *United States v. Taylor*, Mr. Taylor's conviction is unconstitutional and must be set aside under Counts Two and Four ................................................. 72

   1.  Procedural History Relevant to Mr. Taylor's §924(c) convictions ... 72

   2.  Capital sentencing factors are not elements of the predicate offense and cannot supply the necessary mens rea to convert an otherwise non-qualifying crime into a crime of violence under the force clause ................................................................................................. 75

       a.  This Court's denial of relief as to Count four is invalid in light of United *States v. Taylor* ............................................................... 76
           i. Mr. Taylor is not required to make a realistic- probability showing ................................................................................... 77
           ii. This Court incorrectly determined that Section 1201(a) has the requisite mens rea to qualify as a crime of violence .................. 81
           iii.    *United States v. Ross* provides additional support that kidnapping resulting in death is not a crime of violence ........... 84
           iv. *United States v. Lighty* and *United States v. Flood* provide additional persuasive authority to support vacatur of Count Four ................................................................................................. 85
           v.    *United States v. Jeffery William Paul* provides persuasive authority to vacate counts two and four .................................... 87

K.  Conclusion ................................................................................. 88

Certificate of Service ................................................................. 90

## Preliminary Statement

All citations to "Doc." refer to the record for *United States v. Taylor*, Eastern District of Tennessee Case No. 1:04-cr-00160-CLC-CHS. All citations to "R." refer to the record for this civil case.

Citations to exhibits filed with this motion include a description of the exhibit and the exhibit number. All other citations are either self-explanatory or will be explained.

Pursuant to this Court's July 11, 2025, Order (Doc. 108), all moot claims from Petitioner's Motion for Collateral Relief (Doc. 1) have been removed from this Amended Motion for Collateral Relief. All claims asserted in this amended petition still present a live case or controversy.

With respect to the issues raised in Petitioner's supplemental briefs (R. 75, 76, 88, 89), R. 76, 88 are now moot. R. 75 and 89 still allege claims that present a live case or controversy. All of the claims that still present a live case or controversy from R. 75 and 89 have been incorporated into this amended petition. The only claims that no longer present a live case or controversy are those related to Mr. Taylor's now commuted death sentence.

The caselaw in Petitioner's Notices of Supplemental Authority in Support of Updated Briefs (R. 92, 93) are still relevant to the issue of whether Petitioner's "conviction under Count Four" is valid and have been incorporated in this amended motion.

<u>**Motion for Collateral Relief to Vacate, Set Aside, or**</u>
<u>**Correct Sentence and for a New Trial**</u>

COMES NOW movant, Rejon Taylor, by and through his undersigned counsel, pursuant to 28 U.S.C. §2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial and vacate the judgment entered against him.

Pursuant to Local Rule 9.2, Mr. Taylor provides the following information: Mr. Taylor's identification number is #41070-074. Mr. Taylor is currently incarcerated at the Bureau of Prisons Federal Correctional Institution, Terre Haute Indiana, under a life sentence. Respondent is the United States of America.

Mr. Taylor was charged by Indictment in the United States District Court for the Eastern District of Tennessee on October 13, 2004. (*United States v. Taylor*, Eastern District of Tennessee Case No. 1:04-cr-00160-CLC-CHS) Doc. 1, Indictment). A Superseding Indictment was returned on November 14, 2007, charging Mr. Taylor with carjacking resulting in death in violation of 18 U.S.C. §2119; firearms murder during and in relation to carjacking in violation of 18 U.S.C. §924; kidnapping resulting in death in violation of 18 U.S.C. §1201; firearms murder during and in relation to kidnapping in violation of 18 U.S.C. § 924. (Doc. 447). On June 1, 2006, the Government filed notice of its intent to seek the death penalty. (Doc. 123.)

Following a jury trial in 2008, Mr. Taylor was found guilty of the offenses of carjacking resulting in death; firearms murder during and in relation to carjacking;

3

kidnapping resulting in death; firearms murder during and in relation to kidnapping. (Doc. 670). After a subsequent penalty phase, the jury recommended that Mr. Taylor be sentenced to death. (Doc. 760, Special Verdict Form). On December 3, 2008, Judge Curtis L. Collier imposed sentence on Mr. Taylor and ordered that he be sentenced to death. (Doc. 789).

Mr. Taylor appealed to the United States Court of Appeals for the Sixth Circuit on April 24, 2009. (Doc. 842, Notice of Appeal). The United States Court of Appeals for the Sixth Circuit denied Mr. Taylor's appeal on February 11, 2016 (Doc. 954). *United States v. Rejon Taylor*, 814 F.3d 340 (6th Cir. 2016). A Writ of Certiorari was denied to Mr. Taylor on May 14, 2018. (Doc. 972). *Rejon Taylor v. United States*, 138 S.Ct. 1975 (May 14, 2018). This is Mr. Taylor's first amended motion for relief pursuant to 28 U.S.C. §2255.

Mr. Taylor was represented at trial and sentencing by William H. Ortwein, Howell G. Clements, Fredrick Lee Ortwein, and Leslie A. Cory. On appeal, Mr. Taylor was represented by Barry J. Fisher, S. Adele Shank, and Leslie A. Cory.

This Court appointed the Office of the Federal Public Defender for the Middle District of Tennessee to represent Mr. Taylor in this proceeding on July 21, 2017. (Doc. 969, Order Appointing Counsel).

On December 23, 2024, President Joseph R. Biden commuted Mr. Taylor's sentence from death to life imprisonment. This amended motion deletes issues previously raised which related only to Mr. Taylor' s death sentence.

## INTRODUCTION

Mr. Taylor suffers from multiple comorbid physiological, cognitive, psychological, and emotional impairments. His impairments manifest themselves in impaired thinking and judgment, delusions, thought disorder, impaired attachments, and psychosis. Layered on top of these impairments, synergistically exacerbating them is his repeated, childhood exposure to guns (direct threats to him) and violence (interpersonal, familial, and community). His brain impairments and trauma history are compounded by profound emotional neglect. Societal and cultural deprivation and hostility heightened the deleterious effect of his impairments. Mr. Taylor's impairments can only be understood against the historical, sociological, cultural, and genetic imprint that he inherited. However, trial counsel failed to develop and present the complex narrative of his life to the jury. Rather, they falsely presented Mr. Taylor as a one-dimensional character, destined to follow in the footsteps of his absentee father and older brother, both of whom had criminal records.

Mr. Taylor's brain impairments contributed to the commission of the crime and compromised his competence. However, though trial counsel recognized that Mr. Taylor was delusional, trial counsel failed to investigate his delusions as a mental disorder. Because counsel failed to understand that Mr. Taylor's delusions were brain based and impaired his perception of reality, counsel failed to litigate his incompetence to stand trial. Additionally, because counsel failed to investigate Mr.

Taylor's social history, counsel knew nothing of the gun violence that created the traumatic reactivity with which Mr. Taylor responded to his co-defendant's firing of his gun inside the van. As a result, though counsel argued to the jury that Mr. Taylor's shots were impulsive, counsel lacked the necessary psycho-social context to support that argument.

Mr. Taylor's family history is one of struggle in post-reconstruction Georgia. Generations of the family contended with racial bias, violence, and pervasive societal injustice. That some of the family members resorted to crime reflects their struggle to survive and the desire to provide something better for their children. In contravention of prevailing professional norms, the trial team failed to investigate the family's inter-generational history, instead presenting only snapshots of his family without the historical and familial factors that would have made those snapshots mitigating.

As a result of these factors and others discussed in this motion, Mr. Taylor, an eighteen-year-old child was convicted. Mr. Taylor could not assist counsel, could not make a rational decision about the guilty plea, did not act with premeditation, and was not a future danger as claimed by the Government.

The injustices in this case are numerous: From Mr. Taylor's lawyers' assumption that his religious delusion was just Black religion, to their failure to appreciate his mental illness and brain impairment, counsel's ineffectiveness resulted in the conviction and condemnation of an incompetent eighteen year old child; from trial counsel's failure to investigate and present the intergenerational

context for Mr. Taylor's participation in identity theft to the failure of trial counsel to properly voir dire about racial bias, Mr. Taylor's trial was infected by racial bias. The constitutional violations reflected in this motion resulted in an unfair trial. For the reasons that follow, and as demonstrated by the numerous exhibits supporting this motion, Mr. Taylor's unconstitutional conviction should be set aside.

## I. GROUNDS FOR RELIEF

### A. Mr. Taylor was incompetent to stand trial in violation of the Fifth and Sixth Amendments to the United States constitution, and counsel were ineffective for failing to investigate, develop, and present proof of his incompetence.

It is well established that the trial of an incompetent person violates due process. *Cooper v. Oklahoma,* 517 U.S. 348 (1996) (quoting *Medina v. California,* 505 U.S. 437 (1992); *see also Drope v. Missouri,* 420 U.S. 162 (1975) ("[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial" (citing *Pate v. Robinson,* 383 U.S. 375, 385 (1966)); 18 U.S.C. § 4241. However, in this case, Mr. Taylor was tried despite being unable to rationally assist counsel with a reasonable degree of rational understanding. *Dusky v. United States,* 362 U.S. 402 (1960). That Mr. Taylor was mentally incompetent during trial constitutes a deprivation of due process necessitating this Court to grant relief; no further prejudice is required. *Pate v. Robinson,* 383 U.S. 375, 386-87 (1966); *Dusky v. United States,* 362 U.S. 402 (1960).

Mr. Taylor suffers from serious brain impairments and from mental illness secondary to those impairments. As a result, Mr. Taylor has religious delusions and brain-based psychosis that rendered him unable to rationally assist counsel and make decisions. As Dr. George Woods found:

> Rejon Taylor was incompetent to stand trial in his capital case. Mr. Taylor suffered from a mental disease or defect that, at the time of his trial, rendered him unable to "consult with his lawyer with a reasonable

degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Mr. Taylor's sense of reality was impaired, such that it substantially undermines his judgment and his ability to rationally cooperate with counsel . . . .

Mr. Taylor has debilitating neurological, psychological, and functional impairments and meets the diagnostic criteria for Bipolar disorder secondary to a general medical conviction, ie. Temporal Lobe Syndrome and Post Traumatic Stress Disorder. Mr. Taylor suffers from Temporal Lobe Syndrome, an umbrella term which indicates serious deficits in emotional and cognitive functioning stemming from impaired function in the temporal lobe. Mr. Taylor displays significant impairment of executive functioning, particularly in his ability to effectively weigh and deliberate, understand social cues, and understand social context. Mr. Taylor's ability to effectively weigh and deliberate is impaired by his psychotic religiosity, which is the direct result of his temporal lobe-based delusions. Mr. Taylor also suffers from a personality change secondary to his temporal lobe dysfunction. The personality change includes a manic-like set of symptoms, which includes mood lability, circumstantiality, loss of ego boundaries, and psychotic ambivalence.

Mr. Taylor's multiple impairments are synergistic and impede his perception of reality and render him psychotic. At the time of trial, Mr. Taylor suffered from religious delusions that prevented him from consulting with counsel with a reasonable degree of rational understanding, i.e., he believed that God would cause the evidence in his case to disappear and release him from custody. His religious delusions were then encapsulated, but have become more pervasive. They have grown more complex in the intervening decade and continue to impact his current thinking.

(Exhibit No. 1, George Woods, M.D., Report, at 2-3); *see also* (Exhibit No. 2, Katherine

Porterfield, Ph.D., Report, at 24) (Exhibit No. 3, Hope Hill, Ph.D., Social History

(finding Mr. Taylor psychotic).

Under *Dusky v. United States*, 362 U.S. 402, 204 (1960), Mr. Taylor's distorted

perception of reality rendered him incompetent where his impairments substantially

undermined his judgment and "preclude[d] him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1990). Because of Mr. Taylor's impairments, the conviction violates Mr. Taylor's constitutional rights to due process, to a fair and reliable determination of guilt and the appropriate penalty, to be both physically and mentally present at trial, to present a defense, to effective assistance of counsel, and to the assistance of qualified mental health experts, because the conviction occurred while he was mentally incompetent to stand trial.

As discussed more fully, below, the trial defense team failed to reasonably investigate Mr. Taylor's competency. If trial counsel had conducted a professionally adequate mitigation investigation, counsel would have realized that Mr. Taylor's delusions were the product of serious brain impairment, including but not limited to temporal lobe syndrome and post-traumatic stress disorder, and they would have learned that as a result, Mr. Taylor was not able to rationally assist counsel, nor to decide whether to proceed to trial or accept the Government's offer of life in prison.

**B.** **In violation of the Sixth Amendment, Mr. Taylor's trial counsel were ineffective in investigation, preparation, and presentation at his trial.**

    **1.** **Defense Counsel's Conduct Prior to, During, and After Trial Was Deficient and Unreasonable According to the Prevailing Professional Norms Under *Strickland v. Washington,* 466 US 668 (1984), and Resulted in Prejudice as There is a Reasonable Probability That But For Counsel's Errors, the Outcome of Mr. Taylor's Trial Would Have Been Different in Violation of his Fifth and Sixth Amendment Rights.**

Mr. Taylor incorporates all the factual averments in this motion and the exhibits appended hereto in support of this claim.

Defense counsel rendered ineffective assistance of counsel when they failed to ensure an impartial jury; to conduct a thorough mitigation investigation; to investigate and present Mr. Taylor's neurological and mental impairments; to object to the prosecution's improper language; to protect his interests during the allocution; and to otherwise test the Government's case. Trial counsel's representation of Mr. Taylor in the motion for new trial, and on direct appeal, fell below constitutional requirements. Counsel's unreasonable errors, which are described further below, both individually and collectively, mean that this Court cannot have confidence in Mr. Taylor's conviction.

    **a.** **Red flags of neurological and developmental impairment, and symptoms of psychosis.**

From the beginning, Mr. Taylor exhibited signs of neurological and developmental impairment, and symptoms of psychosis. Prior to the federal indictment, Mr. Taylor's mother, Reba Taylor retained Richard Heinsman, a local

Hamilton County defense attorney to represent Mr. Taylor against state charges stemming from the underlying offense. *See* (Exhibit No. 4, Heinsman Retainer, Feb. 16, 2004). During his visits with Mr. Taylor, Mr. Heinsman recognized symptoms of mental illness and brain dysfunction. Specifically, he noted that Mr. Taylor "was hyper-religious, possibly delusional, grandiose, and exhibited symptoms that could have been psychosis or dissociation. I was concerned that his brain was impaired." (Exhibit No. 5, Richard Heinsman Dec., at 2). Mr. Taylor's disconcerting behavior continued after the federal government indicted Mr. Taylor for the crime in October 2004. (*United States v. Taylor*, Eastern District of Tennessee Case No. 1:04-cr-00160-CLC-CHS, Document 1, Indictment).

During the October 26, 2004, initial appearance, Magistrate Judge Carter asked Mr. Taylor if he wanted appointed counsel. *See* (Underseal Doc. 849 at 18, PageID#2939). Mr. Taylor initially refused, demurring that the Court would have "to be born again to understand." (*Id.*). At the Court's request for clarification, Mr. Taylor revealed he declined a lawyer because "my heavenly father told me I don't need a lawyer. I don't need you guys to appoint me no one." (*Id.* at 19, PageID#2940). Nevertheless, the court appointed William ("Bill") Ortwein as lead counsel. *See* (Underseal Doc. 849 at 34, PageID#2955).

### b. Assembling a Defense Team

After appointing Bill Ortwein, the Court appointed Howell Clements as co-counsel. *See* (Doc. 22). "Bill and Howell both had significant capital trial experience

at the state level, but neither had tried a federal capital case." (Exhibit 6, Leslie Cory Dec., at 11). Immediately, Bill Ortwein recruited his longtime collaborator, Roy Cooper, a retired Chattanooga police officer, to serve as lead investigator. *See* (*id.* at 1-2); *see also* (Exhibit No. 7, Roy Cooper Dec., at 1) ("I retired from the Chattanooga Police Department after 20 years") and (Doc. 55, p.1). Counsel placed Mr. Cooper "in charge of all investigation in the case, both crime-based and mitigation." (*Id.*); *see also* (Doc. 73, at 6) (explaining that Mr. Cooper will "perform not only mitigation investigations, but also guilt/innocence investigations."). Prior to Mr. Taylor's case, Mr. Cooper had no training in capital mitigation investigation. *See* (*id.* at 1-2) (listing specialized education in homicide investigation, fraud and financial investigation, white collar crime, criminal investigation, computer investigation, asset forfeiture, secret service protection, document examination, FBI instructor training, and traffic investigation).

Within the first couple of months, lead counsel enlisted the help of two additional attorneys: his son, Lee Ortwein, (Exhibit No. 7, Roy Cooper Dec., at 1), and Leslie Cory, who had graduated from law school two years prior. *See* (Exhibit No. 6, Leslie Cory Dec. at 1). Although neither Ms. Cory nor Lee Ortwein had prior capital experience, each ended up with substantial trial responsibility, particularly Ms. Cory. *See* (*id.* at 6).

### c.    Developing the Attorney-Client Relationship

Early in the representation of Mr. Taylor, the defense team struggled to develop a trusting attorney-client relationship with Mr. Taylor. Ms. Cory observed that "Bill, in particular, made Rejon horribly uncomfortable. Rejon did not know how to react or appropriately respond to Bill's forceful personality." (Exhibit 6, Leslie Cory Dec., at 2). Likewise, another team member witnessed a visit between Mr. Cooper and Mr. Taylor: "Mr. Cooper's interaction with Rejon distressed me. I found his manner of speaking to Rejon shocking." (Exhibit 8, Marti Loring Dec., at 4). At the time, Mr. Cooper was attempting to convince Mr. Taylor, with little appreciation of Mr. Taylor's limitations and impairments, to accept the Government's offer of a life sentence: "Mr. Cooper said [to Mr. Taylor] you need to take this offer; there's a man dead and you need to take this. He spoke authoritatively and was demanding." (*Id.*).

### d.    Developing Evidence

Bill Ortwein "was in charge of strategy and overseeing the whole case…He [had] the final say in any decisions about which there was controversy or dissent." (Exhibit No. 6, Leslie Cory Dec., at 1). In the beginning, Bill Ortwein put himself in charge of the first phase of trial and Mr. Clements, the second phase. (*Id.*) Early on, the team voiced concern "that Rejon might not be competent to stand trial" and "discussed hiring a neuro-radiologist…" (*Id.* at 3). Lee Ortwein contacted Dr. Robert Kessler, a radiologist at Vanderbilt University to inquire about funding. (*Id.*). However, at no point before trial did the team seek funding for a radiologist, and

ultimately, they "never hired a neurologist or arranged to have Rejon's brain scanned" despite red flags in Mr. Taylor's behavior indicating neurological impairment. (*Id.*); *see also* (Doc. 65, p. 4-5) (proposed budget lacks funding request for radiologist).

In early 2005, lead counsel arranged to work with Dr. David Solovey, a local psychologist. *See* (Doc. 65, p. 4) (proposed budget includes $3,300.00 request for "Psychologist – Dr. David Salovey"). However, counsel failed to provide Dr. Solovey with information necessary to conduct a competent forensic evaluation of Mr. Taylor. Dr. Solovey's sources of information were limited to the criminal indictment, memoranda from the team about their impressions of Mr. Taylor, Mr. Cooper's single conversation with Mr. Taylor's mother, Reba Taylor, and a few school records from Mr. Taylor's high school. *See* (Exhibit No. 9, Solovey Report, at 1-3). Noticeably absent from the source list was a life history providing information about Mr. Taylor and his family's medical and mental health history, Mr. Taylor's adverse childhood experiences, particularly his exposure to trauma and profound neglect, and other critically important information about Mr. Taylor's developmental years and his caretakers.

Without an adequate life history investigation, Dr. Solovey could not meaningfully answer the sweeping referral questions defense counsel posed to him. *See* (Exhibit No. 9, Dr. Solovey Report, at 1). In fact, he provided inaccurate responses to some of them. *See* (Claim I.A., Competency Claim). Without input or consultation from counsel, Dr. Solovey issued his report eight months later on January 22, 2006. *See* (Exhibit No. 9, Dr. Solovey Report). Unsure how to interpret Dr. Solovey's

findings, or even decipher if there was anything they could use, counsel tabled the report and Dr. Solovey.

### e.      Preparing for Trial

In December 2007, less than a year before trial, the team met and discussed "that in order for Dr. Solovey to provide an accurate and complete assessment of Rejon, he needed a reliable social history." (Exhibit No. 8, Marti Loring Dec., at 7). The team assigned the task to Dr. Loring, but she was unable to produce one without full access to witnesses and records, which the team did not provide. (*Id.*). Without a life history, the defense team's testifying mental health expert, Dr. Mark Cunningham, could not conduct an accurate evaluation.

### f.      Jury Selection

Prior to trial, defense counsel realized that they "desperately needed" a jury consultant. (Exhibit No. 6, Leslie Cory Dec., at 6). Particularly, because lead counsel's declining health forced him to take a back seat on trial preparation. *See* (*id.* at 11) ("After his surgery, Bill turned over most of the individual voir dire to Lee and other issues to me, things I believe he had anticipated handling personally prior to his surgery."). Ms. Cory filed a motion requesting funding for a jury consultant; however, the Sixth Circuit denied the request. *See* (*id.* at 6). Having never conducted capital jury selection, Ms. Cory took the lead, including drafting the questionnaire. *See* (Exhibit No. 6, Leslie Cory Dec., at 6).

On August 25, 2008, the first group of prospective jurors appeared in court for questioning. *See* (Doc. 860 at 1, PageID#3398). At the start of the proceedings, twelve prospective jurors indicated that they were exposed to pretrial media about the case. *See* (*id.* at 9, PageID#3406). Additionally, four prospective jurors expressed their hesitancy to institute the death penalty. *See* (*id.* at 16–18, PageID#3413–15; *id.* at 368, PageID#3765). Defense counsel did not successfully rehabilitate these prospective jurors and the Government removed each for cause. *See* (*id.* at 140, PageID#3537; *id.* at 362, PageID#3759; *id.* at 413–14, PageID#3810–11; PageID#3890–10). Defense counsel's questioning on issues relevant to Mr. Taylor's case was superficial and cursory. Counsel failed to obtain meaningful information about prospective jurors' attitudes toward Black people. *See e.g.,* (*id.* at 88–91, PageID#3486–88; *id.* at 348, PageID#3745).

The second and final day of jury selection occurred on August 26, 2008, with Mr. Clements questioning prospective jurors. *See* (Doc. 861 at 31, PageID#3846). At the start of proceedings, ten individuals indicated that they heard about the case. *See* (*id.* at 3–6, PageID#3818–21). Mr. Clements failed to question jurors about factors directly relevant to Mr. Taylor's case, including jurors' perspectives or attitudes on Black people. At the end of the second day of jury selection, 67 qualified jurors remained in the pool. *See* (*id.* at 194–95, PageID#4009–10). After the parities exercised their peremptory strikes (23 each), the Court selected "the first 12" as jurors and the next six as alternates. (*Id.* at 185, PageID#4010).

17

### g. First Phase of Trial

Opening argument commenced August 27, 2008. *See* (Doc. 895 at 19, PageID#6364). The Government relied on over 20 witnesses, including law enforcement from Georgia and Tennessee and both of Mr. Taylor's co-defendants, to argue that Mr. Taylor planned to kidnap, cross state lines, and kill Mr. Luck because Mr. Luck had reported Mr. Taylor to law enforcement for an earlier burglary Mr. Taylor allegedly committed. *See* (Docs. 895–899). The Government's theory rested heavily on Joey Marshall's testimony, Mr. Taylor's co-defendant, that Mr. Taylor told him that Mr. Taylor knew Mr. Luck had notified authorities about the earlier incident. *See* (Doc. 896 at 82, PageID#6606). The Court later acknowledged the "inherent problems with [Mr. Marshall's] credibility." (Doc. 899 at 88, PageID#7197). Before the parties rested, the Court issued an evidentiary ruling finding that Government's evidence did not support the Government's theory that Mr. Taylor committed murder to eliminate Mr. Luck as a witness. *See* (Doc. 654, PageID#1312–14).

On September 5, 2008, after the Government rested its case-in-chief, the Government, again, offered to rescind the death notice if Mr. Taylor agreed to plead guilty; Mr. Taylor refused the offer. *See* (Doc. 719); *see also* (Exhibit No. 6, Leslie Cory Dec., at 11). Defense counsel did not present a single witness during the first phase of trial. On September 8, 2008, the parties gave closing argument, with Mr. Clements delivering it for the defense. *See* (Exhibit No. 10, Howell Clements Dec., at 6). Mr. Clements began with directions for the jury: "[i]f my recollection of the facts differs

18

from your recollection collectively or individually, ignore what I say." (Doc. 868 at 47, PageID#5092). The remainder of his argument lacked cohesion and structure. *Id.* at 47–62, PageID#5092–5107), "forgive me for jumping around, because this has been a little bit hard for me to organize, and I'm disorganized by nature, anyway." (*Id.* at 57, PageID#5102). Defense counsel did little to rebut the Government's case-in-chief. Conversely, in its closing argument, the Government stuck to their clearly identified theme–that Mr. Taylor committed premeditated murder, peppering their summation of evidence with repeated references to Mr. Taylor, a "black male[]," "circling" and "following" and "stalking" the victim. *See* (Doc. 868 at 41, PageID#5086; Doc. 868 at 73, PageID#5118).

### h. What the Jury Did Not Hear

Had defense counsel performed effectively, they would have recognized that Mr. Taylor was exhibiting encapsulated delusions, was incompetent to assist in his defense, and had debilitating neurological, psychological, and functional impairments. Moreover, counsel failed to grasp that the family Mr. Taylor was born into had endured generations of suffocating structural racism and poverty, and that untreated mental illness and trauma permeated his family tree, manifesting in substance abuse and misconduct. Counsel also failed to recognize the central role that racism played in the unavailability of opportunities—residential, academic, and social—that would have otherwise enabled Mr. Taylor to develop protective factors to buffer him from the profound neglect, violence, and other risk factors to which he was

19

exposed throughout his developmental years. *See* (Exhibit No. 3, Hope Hill, Ph.D., Social History); (Exhibit No. 2, Katherine Porterfield, Ph.D., Report); and (Exhibit No. 1, George Woods, M.D., Report). Instead, counsel's failures allowed the Government to portray Mr. Taylor as a manipulative remorseless killer, whose conduct was inherently criminal.

### i. Motion for New Trial

After the jury sentenced Mr. Taylor to death, the Court asked who he wanted to represent him on direct appeal, Lee Ortwein or Leslie Cory. *See* (Exhibit No.6, Leslie Cory Dec., at 12). Mr. Taylor chose Ms. Cory. (*Id.*). In addition to Mr. Taylor's case being Ms. Cory's first capital trial, his case was also Ms. Cory's first capital appeal. Although the Court later appointed Barry Fisher and Adele Shank to help represent Mr. Taylor on appeal, Ms. Cory "ended up doing most of the posttrial work, such as the motion for new trial and related matters, alone." (*Id.*); *see also* (Doc. 955 at 2–3, PageID#10126–27). In the months following trial, Alternate Juror E.H., the sole Black alternate, spoke to Monica Mercer, a reporter from the *Chattanooga Times Free Press*, about the troubling things he witnessed during his service on the jury. *See* (Doc. 794–1 at 1–2, PageID#2593–94). The information Alternate Juror E.H. gave the media became the basis for the defense's motion for new trial, filed on December 20, 2008. *See* (Docs. 793 and 794).

In a published article, Alternate Juror E.H. stated that the jury, which was comprised of 11 White people, sentenced Mr. Taylor to death because he was Black.

*See* (*id.* at #2594) ("I heard (jurors) talking about how we needed to make an example of him. It was like, here's this little black boy. Let's send him to the chair…"). He also disclosed to the reporter that the jury engaged in premature deliberations. *See* (*id.* at #2593) ("We didn't know we weren't supposed to talk about (the case with each other) until deliberations…We talked about things all the time."). Another article stated that two other jurors confirmed Alternate Juror E.H.'s statements. *See* (Doc. 794–3 at 1, PageID#2596).

On February 25, 2009, the Court conducted a limited hearing with two witnesses: Alternate Juror E.H. and Monica Mercer, *Chattanooga Times Free Press* reporter. *See* (Doc. 905 at 1–95, PageID#7936–8030). Given the constraints of Rule 606(b) at the time neither witness was permitted to testify about whether any juror harbored internal racial bias in rendering the guilty verdict. Ms. Cory was not prepared to conduct the hearing. *See* (Exhibit No. 6, Leslie Cory Dec., at 12). The Court denied the motion for a new trial. *See* (Doc. 836).

### 2. Failure to Conduct Adequate Jury Selection

"Jurors . . . take an oath to follow the law as charged, and they are expected to follow it." *United States v. Powell*, 469 U.S. 57, 66 (1984). For this reason, "trials generally begin with jury selection, by judge or counsel, seeking to identify those jurors who for whatever reason may be unwilling or unable to follow the law and render an impartial verdict on the facts and the evidence." *Powell*, 469 U.S. at 66–67.

Questioning potential jurors elicits information that can "expose possible biases." *McDonough Power Equip., Inc.*, 464 U.S. at 554.

Here, defense counsels' failure to adequately question the jurors and identify the jurors with racial bias, resulted in a jury that contained bias in violation of Mr. Taylor's constitutional rights. Had counsel conducted adequate jury selection, a biased juror would not have participated in the decisions to convict Mr. Taylor. Because counsel's deficient performance resulted in juror bias, which is structural error, Mr. Taylor is entitled to a new trial.

> **a.  Trial Counsel Failed to Utilize Jury Selection to Identify Bias and to Remove Jurors Who Demonstrated Bias**

"Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice." *Gomez v. United States*, 490 U.S. 858, 873 (1989). Without adequate jury selection a trial court cannot meaningfully fulfill its duty to remove biased jurors. *See Rosales-Lopez v. United States*, 451 U.S. at 188. During jury selection, counsel have a constitutional obligation to explore juror bias. *See Miller v. Francis*, 269 F.3d 609, 615 ("Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair trial . . . by using voir dire to identify and ferret out jurors [through questions that elicit information about suspected or expressed suspect beliefs] who are biased.") (6th Cir. 2001).

Here, defense counsel's approach to jury selection was inadequate from the beginning of their representation of Mr. Taylor. On January 14, 2008, lead counsel William Ortwein speculated that jury selection would be lengthy: "I guess a week and a half..." (Doc. 857 at 4, PageID#3292). He explained that a detailed and thorough jury selection in a capital case was "critical." (*Id.* at 29, PageID#3317). However, the following month lead counsel had back surgery, and due to complications with his recovery, the defense requested to postpone the April 2008 trial date. *See* (Exhibit No. 6, Leslie Cory Dec., at 9). As a result, lead counsel "was only able to participate in . . . work by phone for a couple months following his surgery and his participation was limited." (*Id.*). In the meantime, lead counsel gave the responsibility for jury selection, including drafting the questionnaires, requesting a jury consultant, and conducting voir dire, to the least experienced person on the team, Leslie Cory. *See* (*id.* at 6). Ms. Cory had never participated in a capital trial before Mr. Taylor's, let alone conducted jury selection for such a trial. *See* (*id.* at 1). Ms. Cory lamented the Court's denial of funding for a jury consultant because the team, specifically, Ms. Cory, "desperately needed" one. (*Id.*).

Defense counsel had two opportunities to identify prospective jurors' views: (1) through written questionnaires and (2) through in-person questioning. All prospective jurors in Mr. Taylor's case completed a two-page questionnaire with basic biographical information, *see e.g.,* (Underseal Exhibit No. 11 Juror T.H. Form), and a 13-page questionnaire, *see e.g.,* (Underseal Exhibit No. 12 Juror T.H. Questionnaire), with more detailed questions about publicity and views on the death penalty.

Competent counsel in a capital case must use these opportunities to identify bias and remove jurors who express bias from the pool for cause. In addition to Ms. Cory, Lee Ortwein, the second least experienced person who also lacked capital experience assisted with questioning. (Exhibit 6, Leslie Cory Dec., at 11). Jury selection ultimately commenced on August 25, 2008. *See* (Doc. 860 at 1–3, PageID#3398–3400). Instead of lasting a week and a half, as lead counsel anticipated, jury selection took only two days. *See* (Doc. 861 at 199–202, PageID#4014–17).

>            **b.      Due to Defense Counsel's Ineffective Assistance, the Jury That Convicted Mr. Taylor Contained Jurors Who Harbored Racial Bias**

It is "especially pernicious" when racial bias infiltrates the jury. *See Rose v. Mitchell*, 443 U.S. 545, 555 (1979). Juries are designed to ensure the "protection of life and liberty against race or color prejudice." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986) (citing *Strauder v. West Virginia,* 100 U.S. 303, 309 (1880) (internal quotation marks omitted)). In *Peña-Rodriguez v. Colorado*, the United States Supreme Court explained that racial bias in the jury room is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." 137 S. Ct. 855, 868 (2017). To avoid this injury, it is critical to remove jurors who express racial prejudice.

Defense counsel failed to conduct meaningful voir dire on racial bias and thus failed to learn the jurors' views on race despite the racial overtones of Mr. Taylor's case. This was particularly problematic because Mr. Taylor's case dealt squarely with

race—he and his two co-defendants are Black from a majority Black community[1] charged with killing a White man in a predominately White jurisdiction.[2] The few questions counsel posed that touched on race were superficial and did not elicit responses addressing the jurors' attitudes about race.

Defense counsel inquired about race only twice during voir dire. On the first day of trial defense counsel asked all the jurors to raise their hands if they were friends with an African American and if they had an African American co-worker. "But just respond by raising your hand. How many of you are personally friends with an African-American?" (Doc. 860 at 40, PageID#3437) (record does not reflect which prospective jurors raised their hands, or kept their hands down). Defense counsel did not ask any follow up questions to determine the extent of those relationships, or about the level of engagement in the relationships. "Yes. I knew there were several. But let's see a show of hands. All right. So that's quite a few of you." (*Id.*). Rather, defense counsel moved on to ask about prospective juror's professional relationships with Black people. "How many of you have African American coworkers? Quite few of you." (*Id.*). Again, defense counsel moved on—this time to questioning unrelated to race—without inquiring about the extent of prospective jurors' relationships with

---

[1] Atlanta, where Mr. Taylor resided, was 54% Black and 38% White around the time of trial. *See* U.S. Census Bureau, 2010.

[2] The Eastern District of Tennessee, Chattanooga Division, encompassing nine counties (Bledsoe, Bradley, Hamilton, McMinn, Marion, Meigs, Polk, Rhea, and Sequatchie) is 82% White and 12.6% Black. *See id.*

Black people. Like the Black friend question, the Black co-worker question failed to elicit any meaningful information about how the perspective jurors thought about race.

Defense counsel later asked Prospective Juror J.B. if she knew the Defendant, who was sitting in the courtroom, was Black. *See* (*id.* at 220, PageID#3617). Prospective Juror J.B., responded that since she had a Black friend, the Defendant's race had no bearing on her judgment. (*Id.*). Defense counsel then asked Prospective Juror J.B., if she had preconceived notions about the Defendant. (*Id.* at 221, PageID#3618). A simple "no, Sir" from Prospective Juror J.B., ended the inquiry. (*Id.*). Defense counsel failed to follow up on Prospective Juror J.B.,'s thoughts about race or inquire as to how a singular relationship with a Black person might preclude biases against others. J.B. was later selected as a juror.

These two passing inquiries were defense counsel's only engagements with the jurors concerning race. In fact, after the guilt phase, lead counsel acknowledged that the defense had neglected race during jury selection (and trial). Out of the jury's presence, defense counsel stated: "And for the record let me say, of course, that Rejon Taylor is African-American. […] I don't know if that's been brought up or put in the record at any time." (Doc. 871 at 45, PageID#5289). Defense counsel's failure to address race given the race of the Defendant, the race of the victim and nature of the crime, and the racial makeup of the trial jurisdiction created a welcome atmosphere for potential racial bias among the jurors.

26

Questions asking whether jurors had Black friends and co-workers, alone, do not provide tangible insight into potential racial biases or prejudices, particularly when, as here, defense counsel failed to ask any follow up questions once jurors responded with their hands raised (or not raised). Defense counsel's questions neither elicited details of the jurors' nature of contact with Black people nor insight into jurors' perceptions of Black people. Defense counsel's questions incorrectly assumed that mere proximity to Black people precluded bias

Due to defense counsel's deficient voir dire on racial bias, more than one juror who convicted Mr. Taylor based their decision, in part, on the fact that Mr. Taylor was Black. *See* (Exhibit No. 13, Vicky Holloway Dec., at 2) ("During lunch the jurors discussed aspects of the case and their feelings toward Rejon for having killed a white man. My husband told me that many of the jurors thought they had to get rid of Rejon because he killed one of their own, a white man.").

> c. **The Circumstances of Mr. Taylor's Case Warranted Probing Questions from Defense Counsel to Identify and Eradicate Racial Bias from the Jury Pool**

Defense counsel representing any Black client in a murder trial should engage in probing questions on race given the empirical research demonstrating that capital punishment is intimately bound to race. *See Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) (defendants in interracial murders are entitled to question potential jurors about possible racial bias); *see also* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at p. 6) (citing study where White jurors, specifically White male

jurors, "weighed aggravating circumstances more heavily and were reluctant to attach significance to mitigating circumstances for Black defendants compared to White defendants"); Stephen B. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433, 439-42 (1995) (examining historic relationship between racial violence and the death penalty, and describing how racial prejudice continues to influence capital sentencing decisions); William S. Lofquist, *Putting Them There, Keeping Them There, and Killing Them: An Analysis of State-Level Variations in Death Penalty Intensity*, 87 Iowa L. Rev. 1505, 1535 (2002) (presenting social science data correlating death penalty intensity with race-specific factors.

It is especially important to eradicate bias in capital cases involving a Black defendant and a majority White jury pool. *See* Justin J. Exum, *Should Death Be So Different?: Sentencing Purposes and Capital Jury Decisions in an Era of Smart on Crime Sentencing Reform*, 70 Ark. L. Rev. 227, 243-44 (2017) (explaining that racial bias can cause predominately White juries to give diminished effect to mitigating evidence when the defendant is Black and inappropriately add weight to aggravating factors when the victim is white); (Exhibit No. 14, Destiny Peery, Ph.D., Report, at p. 6) (citing multiple studies where White jurors, particularly White male jurors, are more inclined to vote for death when the defendant is Black and to discount mitigating evidence). Disparities in sentencing for Black defendants is exacerbated when the victim is White. *See* Craig Haney, *Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide*, 53

DePaul L. Rev. 1557, 1560 (2004) (noting that Black capital defendants are over-punished when charged with killing White victims); *see also* (Claim I.B.2., Failure to Conduct Adequate Jury Selection).

Here, defense counsel's failure to meaningfully question jurors on potential racial bias given the unique circumstances of Mr. Taylor's case constituted deficient performance. *See United States v. Birchette*, 908 F.3d 50, 57 (4th Cir. 2018) (stating that voir dire can help identify racially biased jurors [and remove them] before they reach the jury).; *see also* Susan Mormino, *Exploring Racial Prejudice on Voir Dire: Constitutional Requirements, and Policy Considerations*, 54 B.U. L. Rev. 394, 418 (1974) (noting that trials with racial overtones require extensive voir dire examination as to racial prejudice). Moreover, Mr. Taylor's jury pool was drawn from predominately White communities with ongoing histories of racial tension and violence. Of the twelve jurors selected, seven were from Hamilton County, four were from Bradley County, and one was from Meigs County.[3] Of the six alternate jurors,

---

[3] Under Seal Exhibits: Exhibit No. 15 (Juror S.B. Questionnaire, Hamilton, 23 yrs.); Exhibit No. 16 (Juror J.B. Questionnaire, Hamilton, 36 yrs., 6 mos.); Exhibit No. 17 (Juror R.B. Questionnaire, Hamilton, 40 yrs.); Exhibit No. 18 (Juror J.H. Questionnaire, Hamilton, 44 yrs.); Exhibit No. 11 (Juror T.H. Questionnaire, Hamilton, 40 yrs.); Exhibit No. 19 (Juror H.S. Questionnaire, Hamilton, 44 yrs., 7 mos.); Exhibit No. 20 (Juror O.W. Questionnaire, Hamilton, 54 yrs.); Exhibit No. 21 (Juror G.C. Questionnaire, Bradley, 62 yrs.); Exhibit No. 22 (Juror A.C. Questionnaire, Bradley, 37 yrs.); Exhibit No. 23 (Juror G.E. Questionnaire, Bradley, 49 yrs., 7 mos.); Exhibit No. 24 (Juror A.G. Questionnaire, Bradley, 28 yrs., 6 mos.); Exhibit No. 25 (Juror C.G. Questionnaire, Meigs, 35 yrs.).

five were from Hamilton County, and one from Bradley.[4] Most of the jurors had spent three or four decades in their home counties, some their entire lives.[5]

For over a century, Hamilton County has grappled with its legacy of racial terror after the 1906 lynching of Ed Johnson. *See* Julissa Treviño, "Public Sculpture in Tennessee Will Memorialize Lynching Victim," *Smithsonian*, April 18, 2018. The lynching marked the boiling point for racial hostility within the community. At the time of Mr. Taylor's trial, Hamilton County had not yet confronted nor reconciled its legacy of racial terror. In 2008, when asked about the history of racial terror in a Hamilton County community, a resident born and raised in the county acknowledged that the racism was still very strong in the community. *See* Carrie A. Russell, *Reckoning with a violent and lawless past: A study of race, violence and Reconciliation in Tennessee* (Aug. 2010), (unpublished Ph.D. dissertation, Vanderbilt University) (on file with Vanderbilt University Library), at 256. The resident conceded that Black people were not welcome in certain areas. (*Id.*).

Race relations were similarly troubling in the other jurors' resident counties. Less than five percent and one percent of residents were Black in Bradley and Meigs Counties, respectively. U.S. Census Bureau, 2010 Census. At least one lynching was

---

[4] Under Seal Exhibits: Exhibit No. 26 (Juror D.B. Questionnaire, Hamilton, 23 yrs.); Exhibit No.27 (Juror C.B. Questionnaire, Hamilton, 33 yrs.); Exhibit No. 28 (Juror A.C. Questionnaire, Hamilton, 44 yrs.); Exhibit No. 29 (Juror J.H. Questionnaire, Bradley, 36 yrs.); Exhibit No. 30 (Juror E.H. Questionnaire, Hamilton, 51 yrs.) Exhibit No. 31 (Juror L.P. Questionnaire, Hamilton, 17 yrs.).
[5] *Id.*

reported in Meigs County. *See* Lynching in America: Confronting the Legacy of Racial Terror; Supplement: Lynchings by County, 6, https://eji.org/sites/default/files/lynching-in-america-second-edition-supplement-by-county.pdf. Furthermore, the White jurors from Bradley and Meigs had little exposure to Black people, and studies show that when lacking exposure to difference, people tend to rely on negative stereotypes to form judgments of others. *See Looking Across the Empathic Divide* at 588; *see also* (Claim I.E., Trial counsel's failure to object to improper language violated Mr. Taylor's Sixth Amendment right to adequate counsel).

### d. Defense Counsel's Failures During Voir Dire Subjected Mr. Taylor to a Biased Jury Incapable of Serving Impartially

Defense counsel's superficial questioning during voir dire exposed Mr. Taylor to constitutionally impermissible levels of bias. The prejudice to Mr. Taylor is clear: due to trial counsel's inadequate voir dire, jurors who harbored death penalty and racial biases convicted Mr. Taylor in violation of his right to an impartial jury. This prejudice created a structural error that warrants a new trial. *See Morgan*, 504 U.S. at 739.

### 3. Failure to Investigate and Present Mr. Taylor's Neurological and Mental Impairments

Mr. Taylor suffers from a constellation of mental, emotional, perceptual impairments stemming both from his neurological condition and from his history of exposure to profound neglect and trauma. *See* (Exhibit No. 1, George Woods, M.D.,

Report); (Exhibit No. 2, Katherine Porterfield, Ph.D., Report). Trial counsel, having failed to retain appropriate experts to assist in the preparation of a full biopsychosocial evaluation of Mr. Taylor, failed to follow up on the clear red flags of neurological impairment and failed to present Mr. Taylor's impairments to the jury. The Sixth Circuit has repeatedly recognized that counsel's conduct is deficient where counsel fails to investigate and develop evidence of a client's mental health impairments, including with the assistance of experts, when there are red flags that such information exits. *See Morales v. Mitchell*, 507 F.3d at 935 (counsel failed to explore client's possible neurological impairment despite indications that it existed); *see also Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (despite evidence indicating client's mental illness, counsel failed to thoroughly investigate and retain appropriate expert).

As discussed above, Mr. Taylor suffers from temporal lobe dysfunction, a neurological impairment that affects his perceptions of reality, his memory, and his sense of self. *See* (Exhibit No. 1, George Woods, M.D., Report, at 3, incorporated by reference). These impairments not only rendered Mr. Taylor incompetent to stand trial but also counsel should have presented both to rebut the Government's aggravating circumstances (i.e., future dangerousness and evidence of planning and premeditation) and as mitigation in and of itself. *See Glenn v. Tate*, 71 F.3d 1204, 1208 (6th Cir. 1995) (deficient performance where trial counsel failed to develop and present mitigating information about client's neurological impairment that cast doubt on state's aggravating circumstances).

Included within counsel's failure to investigate Mr. Taylor's neurological condition was counsel's failure to investigate Mr. Taylor's delusions that prevented his acceptance of the Government's plea offer. Counsel noted, repeatedly, that Mr. Taylor's conviction that God was going to make the evidence in his case disappear impeded his relationship with counsel. *See* (Exhibit No. 6, Leslie Cory Dec., at 2, 9); (Exhibit No. 10, Howell Clements Dec., at 2, 3); (Exhibit No. 8, Roy Cooper Dec., at 2, 5); *see also* (Exhibit No. 5, Richard Heinsman Dec., at 2). Mr. Taylor was unable to contemplate acceptance of the Government's plea offer, because God had not told him to take that offer. See (Exhibit No. 6, Leslie Cory Dec., at 4, 8, 9); (Exhibit No. 10, Howell Clements Dec., at 4); (Exhibit No. 7, Roy Cooper Dec., at 3, 5, 6). Counsel requested an evaluation from Dr. Solovey specifically regarding Mr. Taylor's delusions. (Exhibit No. 10, Howell Clements Dec., at 3); (Exhibit No. 6, Leslie Cory Dec., at 3); (Exhibit No. 7, Roy Cooper Dec., at 2). Despite obtaining a cryptic report from Dr. Solovey, indicating that Mr. Taylor's religious beliefs had "taken on a delusional proportion," counsel did not further investigate the source of such delusions—specifically failing to follow up on a team discussion that Mr. Taylor needed to be seen by a neurologist. (Exhibit No. 6, Leslie Cory Dec., at 3); (Exhibit No. 9, Solovey Report); *see also* (Exhibit No. 32, Caress Ushry Dec., at 1) (explaining that Dr. Solovey admits he does not "engage" with religious delusion and found Mr. Taylor competent because of a paucity of information concerning Mr. Taylor's religion prior to incarceration). Counsel's failure to investigate the medical cause of Mr. Taylor's delusions was not in keeping with prevailing professional norms, constitutes

deficient performance, and prejudiced Mr. Taylor. *See Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (finding that a strategic decision may be the basis for an ineffective-assistance of counsel claim if it is "so ill-chosen that it permeates the entire trial with obvious unfairness"); *Shafer v. Wilson*, 364 Fed. Appx. 940 (6th Cir. 2010 (citing *Hughes*); *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir.1999) (citing *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir.1983) (on rehearing)).

That trial counsel retained a nominally qualified expert to evaluate Mr. Taylor does not end the inquiry. Indeed, where circumstances existed to alert counsel that the expert's opinion was inadequate, counsel's failure to continue to probe Mr. Taylor's ability to rationally assist counsel was ineffective. *See Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006) (holding a licensed practitioner is generally held to be competent, unless counsel has a good reason to believe to the contrary); *see also Skaggs v. Parker*, 235 F.3d 262, 268 (6th Cir. 2000) (finding defense counsel's reliance on expert unreasonable in light of circumstances); *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) (citing *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (establishing that reliance on expert must be reasonable)); *see also O'Neal v. Delo*, 44 F.3d 655, 660 (8th Cir.1995) (evaluating the record for "behavior or other indicia of an abnormal mental state such that counsel could not reasonably decide to proceed without further psychiatric testing"). Trial counsel recognized that Mr. Taylor was delusional and specifically requested assessment of his competency. *See* (Exhibit No. 6, Leslie Cory Dec., at 3); (Exhibit No. 10, Howell Clements Dec., at 3); (Exhibit No. 7, Roy Cooper Dec., at 2).

Here, trial counsel had "behavior or other indicia of an abnormal mental state such that counsel could not reasonably decide to proceed without further [investigation]" despite a preliminary finding that Mr. Taylor was competent to stand trial. *See O'Neal*, 44 F.3d 660; *see also* (Exhibit No. 33, Mark Cunningham Dec., at 4–5) (noting that Dr. Solovey erroneously interpreted Mr. Taylor's MacArthur Competence Assessment, and that Mr. Taylor's results indicate "grave concern[]" about his ability to "mak[e] informed decisions regarding his case."). Counsel recognized that Mr. Taylor's delusions (which were noted by the screening psychologist as problematic for counsel) continued to impair his judgment and his ability to engage both with the proof and with the decision as to whether to accept the Government's plea offer. *See* (Exhibit No. 10, Howell Clements Dec., at 4); (Exhibit No. 7, Roy Cooper Dec. at 4-5); (Exhibit No. 6, Leslie Cory Dec., at 8-9). Despite counsel's acknowledgment that Mr. Taylor's delusions impaired his ability to rationally assist, counsel failed to, inter alia, 1) review the screening psychologist's testing of Mr. Taylor; 2) discern that the screening psychologist did not "engage" with Mr. Taylor's delusions and therefore could not evaluate the pervasiveness nor the cause of the delusion; or 3) engage a neurologist for a neurological examination of Mr. Taylor. *See* (Exhibit No. 6, Leslie Cory Dec., at 9). Counsel's failures were deficient performance and resulted in prejudice. *Glenn v. Tate*, 71 F.3d 1204, 1211 (1995) (finding prejudice where counsel failed to present pertinent evidence of mental history and mental capacity); *see also Powell v. Collins*, 332 F.3d 376, 401 (6th Cir. 2003) (defendant is entitled to relief where counsel presented damaging mental

health testimony from an unqualified expert and failed to independently investigate, develop, and present mitigating evidence of defendant's brain impairment).

### 4. Failure to Object to the Government's Repeated Reference to Mr. Taylor "Stalking" the Victim, a Distinct Uncharged Crime

In the theory of its case, the Government cannot refer to criminal conduct without evidence that the statutory elements of the conduct are satisfied. *United States v. Forlorma*, 94 F.3d 91 (2d Cir. 1996) (reversal for prosecutor's repeated, incorrect claims about the evidence). Defense counsel failed to object to the Government's frequent use of prejudicial, false, and inflammatory language that Mr. Taylor "stalked" the victim. Stalking constitutes a federal crime, pursuant to 18 U.S.C. §2261A, for which the Government did not charge Mr. Taylor nor otherwise demonstrate that Mr. Taylor's conduct met the statutory requirements. The Government referred to Mr. Taylor stalking the victim seven times throughout the trial. In the face of such statements, defense counsel remained silent, allowing jurors to consider additional uncharged criminal acts, further aggravating the crimes that the Government did charge Mr. Taylor with. Counsel's repeated failure to object to such language resulted in constitutionally ineffective assistance of counsel.

In opening statement, the Government told jurors that Mr. Taylor "began, for lack of a better word, stalking Mr. Luck. He frequented his house on East Beechwood, passing by often. He followed Mr. Luck from his restaurant. He surveilled the area of the new house that Mr. Luck was building, the other location." (Doc. 862 at 27–28,

PageID#4044–45) (Sealed) (emphasis added). During closing argument, the Government made multiple references to Mr. Taylor stalking the victim, including that Mr. Taylor "[u]ltimately . . . moved from simply burglarizing this particular victim to stalking him," "[t]he stalking then changed to something more sinister," and then "Joey Marshall told you they'd been stalking this man." (Doc. 868 at 41, PageID#5086; Doc. 868 at 67, PageID#5112) (Sealed). Beyond repeated references to stalking, none of which defense counsel objected to, the Government made multiple statements that conjured the image of Mr. Taylor stalking the victim including that he was "circling around" the victim. *See also* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 11–12).

Interstate stalking has three elements:

> (a) that interstate travel occurred; (b) that defendant's intent was to injure or harass another person; and (c) that the person he intended to harass or injure was placed in reasonable fear of death or serious bodily injury to [him]self or to a member of [his] family as a result of that travel.

*United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir. 2002). The Government's assertion that Mr. Taylor ate at the victim's Atlanta restaurant at some unspecified time, followed the victim to his Atlanta home, and searched for the victim in Atlanta does not meet the statutory requirements of stalking. As a threshold matter, there was no interstate travel involved in the Government's descriptions of Mr. Taylor's conduct. It all occurred in Georgia. The only interstate travel occurred on August 6, 2003, when Mr. Taylor and the co-defendants traveled with the victim across state lines. Traveling with a victim does not constitute stalking, rather interstate stalking

requires defendant to travel to the victim across state lines with the specific intent to harass or injure. *See United States v. Vollmer*, 2001 WL 21234, at \*1 (8th Cir. Jan. 10, 2001) ("defendant's [interstate] travel must actually place the intended victim or an immediate family member in fear of harm."). Thus, the Government's descriptions of Mr. Taylor's actions— both in Georgia prior to the underlying offense, and from Georgia to Tennessee on the day of the underlying offense—do not constitute interstate stalking pursuant to 18 U.S.C. §2261A.

The ABA Guidelines instruct defense counsel to "object to anything that appears unfair or unjust even if it involved challenging well-accepted practices." 31 Hofstra L. Rev. at 1032, Guideline 10.8, commentary. Here, the Government's repeated assertions that Mr. Taylor stalked the victim were both unfair and unjust. *See Freeman v. Class*, 95 F. 3d 639, 644 (8th Cir. 1996) (finding ineffective assistance of counsel where counsel failed to object or move for mistrial based on prosecution's improper comments). In *Crotts v. Smith*, 73 F.3d 861 (9th Cir. 1996), (superseded by statute on other grounds as recognized in *Zapata v. Vasquez*, 788 F. 3d 1106 (9th Cir. 2015)), the court held that failing to object to a false and prejudicial remark constituted ineffective assistance of counsel. *Crotts*, 73 F.3d at 866. The falseness of the statement "diminishes any probative value of introducing the statement into evidence." *Id.* The *Crotts* court dismissed the argument that defense counsel had tactical reasons for failing to object, noting "it is implausible that a reasonably competent attorney would have dismissed the inflammatory . . . testimony as harmless 'hyperbole.'" *Id.* So too here, there is no strategy that a reasonably

competent attorney could rely upon to fail to object to the Government's repeated prejudicial reference that Mr. Taylor stalked the victim.

In *Prichard v. Lockhart*, trial counsel's failure to object to the use of a prior conviction at trial was plainly ineffective and prejudicial. 990 F.2d 352 (8th Cir. 1993). Failure to object to language that references an uncharged crime, as here, has a similarly prejudicial effect. The Government's repeated references to stalking had the same effect as bringing up an uncharged allegation.

The Government's statements that Mr. Taylor stalked the victim further bolstered the Government's theory that the murder was premeditated. Competent trial counsel would have objected to such language given the gravity of the allegations combined with the Government's insufficient evidence of premeditation and future dangerousness.

The failure to object to the Government's repeated language about stalking prejudiced Mr. Taylor because had counsel objected to this language, there is a reasonable probability that at least one juror would not have voted to convict Mr. Taylor. *See Strickland*, 466 U.S. at 694. In these circumstances, the false and prejudicial characterization that Mr. Taylor repeatedly stalked the victim prior to the murder could have made the difference in at least one juror's decision to convict Mr. Taylor.

**5. Mr. Taylor Received Ineffective Assistance of Counsel in Violation of the Sixth Amendment (Other Guilt Phase Issues)**

In addition to the claims cited above, trial counsel's performance objectively fell below professional norms in the following prejudicial ways. Each error, individually and cumulatively with each other and the other claims in this motion, warrant relief.

**a. Trial Counsel's Errors with Respect to Sir Jack Matthews**

Trial counsel has a duty to learn about his client's housing arrangement. *See generally*, ABA Guidelines for the Appointment and Performance of County in Death Penalty Cases. When trial counsel is on notice that the government will seek to enter into agreements with informants and/or co-defendants counsel has an even greater duty to ensure that their client is not housed in a facility where the informant/co-defendant has access to the client. If the government houses an informant/co-defendant in a jail cell with their client with the intention of calling that co-defendant as a witness at trial, trial counsel has a duty to move to suppress any statement made to that co-defendant because the co-defendant is an agent of the government. *Northrop v. Trippett*, 265 F.3d 372, 383 (6th Cir. 2001); *United States v. Henry*, 447 U.S. 264, 273, (1980) (The Fifth and Sixth Amendment rights to counsel not only apply to direct confrontations by known government officers but also to "indirect and surreptitious interrogations" by covert government agents and informants.).

Here, trial counsel failed to learn that Joey Marshall and Sir Jack Matthews continued to be housed at the Hamilton County Jail throughout Mr. Taylor's pretrial incarceration. Worse, they failed to learn that Mr. Mathews was Mr. Taylor's cell mate for over a year. Competent counsel would have requested that Mr. Taylor be transferred to a different facility where Mr. Marshall and Mr. Matthews would not have access to Mr. Taylor. By leaving these teenagers in the same facility the Government continued to amass evidence against them through telephone calls and communications.

Additionally, after Mr. Matthews decided to withdraw his plea, he began to concoct a story to present at Mr. Taylor's trial. Mr. Matthews, who is intellectually impaired, plainly perjured himself. And he did so because he was angry at the Government for not allowing him to withdraw his plea and for attempting to manipulate his testimony, *viz,* that Mr. Taylor panicked when he shot the victim. Mr. Matthews' false testimony was devastating to the defense at trial.

Upon learning that the Government had caused Mr. Mathews and Mr. Taylor to be housed together, trial counsel should have moved to strike his testimony from the record under *Massiah v. United States*, 377 U.S. 201 (1964). [6]

---

[6] The US Marshall is responsible for the pre-trial housing of inmates.

Had Mr. Taylor, who has multiple mental impairments, been housed in a different facility, the Government would not have been able to implicate him in Mr. Matthews' false testimony.

Compounding the error, trial counsel failed to introduce the contents of Sir Jack Matthews' 302 that Mr. Taylor had planned to let the victim out of the van alive. Worse still, trial counsel urged the jury to accept Sir Jack Matthews' testimony as true.

### b. Ineffective Assistance of Counsel with Respect to the Cross Examination of Joey Marshall

Joey Marshall was the key witness for the Government. The Government needed the jury to believe Mr. Marshall in order to convict Mr. Taylor on any of the charges. Given the central importance of Mr. Marshall, his cross-examination was the most critical of any examination in the guilt/innocence phase of the trial. Trial counsel failed to adequately confront and cross-examine Mr. Marshall about his plea agreement, his pending charges in Georgia which were later dismissed, and his prior inconsistent statements. *See* (Doc. 863 at 120–236, PageID#4316–4432). Moreover, lead counsel, Bill Ortwein, who conducted the cross-examination was having trouble hearing the witness throughout his testimony. *See e.g.*, (*id.* at 129, PageID#4325) ("I'm sorry. I didn't hear you."). Trial counsel's professional errors were prejudicial where the credibility of Mr. Marshall was the key to the Government's conviction.

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316

(1974). "The partiality of a witness is subject to exploration at trial" as are "possible biases, prejudices, or ulterior motives." *Id.* Competent cross-examination is "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970). The Sixth Circuit has consistently found that inadequate cross-examination—such as occurred here—amounts to deficient performance and causes prejudice. *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006) (finding counsel was ineffective for failing to cross-examine key witness against defendant, when that witness "was also a suspect whose interest in avoiding criminal culpability was tied to convincing the jury that [defendant] shot [victim]."); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.1987) (finding ineffective assistance where counsel failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness's] testimony was the only plausible hope [the defendant] had for acquittal").

### c. Trial Counsel Failed to Object to Mr. Taylor's Absence During a Critical Stage of the Trial (Fifth and Sixth Amendment Violations)

A criminal defendant has the right to be present at all critical stages of the trial against him. Any time there is communication between the parties with the jury is a critical stage. Here, the trial judge discussed notes received from the jury and answers to their notes outside the presence of Mr. Taylor. Mr. Taylor did not knowingly, intelligently, or voluntarily waive his right to be present. Denial of the

right to be present is structural error. Mr. Taylor was prejudiced by counsel's unprofessional errors.

### 6. Cumulative Prejudicial Effect

Individually and cumulatively, the numerous errors outlined above and elsewhere in this petition denied Mr. Taylor his right to a fair trial. Trial counsel's failures: to investigate, prepare, and present evidence to support the defense's case; to ensure an impartial jury; and to object to the Government's improper and inflammatory evidence and arguments, prejudiced Mr. Taylor. But for trial counsel's ineffective representation, there is a reasonable probability that Mr. Taylor would not have been found guilty of capital murder. *See Kyles v. Whitley*, 514 U.S. 419, 434-46 (1995) (recognizing that errors must be considered cumulatively under the *Brady* materiality standard, which is identical to the *Strickland* prejudice standard); *see also Mackey v. Russell*, 148 Fed.Appx. 355, 365, 2005 WL 2175926, at *8 (6th Cir. Aug. 9, 2005) ("The *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel."); *Daniel v. Commissioner, Alabama Dep't of Corr.*, 822 F.3d 1248, 1278 (11th Cir. 2006) (under clearly established Supreme Court precedent, courts must consider prejudice cumulatively). These errors constitute a violation of Mr. Taylor's rights under the Fifth and Sixth Amendments to the United States Constitution. *See Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland*, 466 U.S. 668.

**C.** **In violation of Mr. Taylor's right to a fair and impartial jury, the jury that convicted him was biased and engaged in misconduct.**

The jury is an "essential instrumentality – an appendage of the court, the body ordained to pass upon guilt or innocence." *Sinclair v United States*, 279 U.S. 749, 765 (1929). It serves as the "prized shield against oppression." *Glasser v. United States*, 315 U.S. 60, 84 (1942). As such, it is imperative that the jury be impartial. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). The Constitution expressly guarantees as much, assuring criminal defendants "the right to a . . . trial, by an impartial jury. . ." U.S. Const. amend. VI; *see also Wainwright v. Witt*, 469 U.S. 412 (1985); *Turner v. Murray,* 476 U.S. 28 (1986). However, in the instant case, the jury that convicted Mr. Taylor to death was biased and engaged in misconduct, violating Mr. Taylor's Sixth Amendment right to an impartial jury.

An impartial jury is one in which each juror is "capable and willing to decide the case solely on the evidence before [him or her]." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982) (internal quotation marks omitted)). "The presence of even a single biased juror deprives a defendant of his right to an impartial jury." *Williams v. Bagley*, 380 F.3d 932, 944 (2004); *Franklin v. Anderson,* 434 F.3d 412, 428 (6th Cir. 2006). *See also United States v. Martinez–Salazar*, 528 U.S. 304, 316–17 (2000). Here, the jurors' biased views on race and violated Mr. Taylor's Sixth Amendment right to a fair and impartial jury.

**1.     In Violation of Mr. Taylor's Right to an Impartial Jury, the Jury that Convicted Mr. Taylor Was Racially Biased**

"The jury is a central foundation of our justice system and our democracy." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017). It is "especially pernicious" when racial bias infiltrates that sacred space. *See Rose v. Mitchell*, 443 U.S. 545, 555 (1979). And even more so, when a jury is charged with the awesome responsibility of deciding life or death; a qualitatively different form of punishment that requires "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (joint opinion of Stewart, Powell, and Stevens, J. J.). When the circumstances of the case necessitate it, counsel should use voir dire to ask prospective jurors about racial bias and then remove jurors unable to serve impartially. *See Ham v. South Carolina*, 409 U.S. 524, 524 (1973). Yet in this case, defense counsel failed to engage in meaningful voir dire on race, creating the opportunity for racial bias to remain within the jury. *See* (Claim I.B.2., Failure to Conduct Adequate Jury Selection).

The sole Black alternate juror, Alternate Juror E.H., disclosed that racial bias existed among the other jurors who convicted Mr. Taylor. In a published *Chattanooga Times Free Press* article after trial, Alternate Juror E.H. stated that the jury, which was comprised of 11 White people, was influenced by Mr. Taylor's race. *See* (Doc. 794-1 at 2) ("I heard (jurors) talking about how we needed to make an example of him. It was like, here's this little black boy. Let's send him to the chair..."). Additionally, other evidence indicated that jurors contravened Court orders, and participated in

pre-deliberations discussions.  E.H.'s statements. *See* (*Id.* at 1) ("Two regular jurors confirmed that they talked about the case throughout the trial," indicating Juror C.G. and Juror R.B.). On December 20, 2008, based on this information, the defense filed a motion for new trial. (Docs. 793, 794). Pursuant to Federal Rule of Evidence 606(b), the Court prohibited questioning jurors on the content of their deliberations, and thus here, the Court did not fully investigate the jurors' racial bias or misconduct.

However, Alternate Juror E.H.'s widow confirmed that jurors who convicted Mr. Taylor, participated in improper discussions and were influenced, in part, by Mr. Taylor's race. In recounting her husband's comments to her after the trial, jurors frequently discussed aspects of the case and their feeling towards Mr. Taylor outside of formal deliberation process. *See* (Exhibit No. 13, Vicky Holloway Dec., at 2). From these improper discussions, Juror E.H. learned that some jurors had already made up their mind to sentence Mr. Taylor to death before the sentencing phase even began, because he was Black and because he was charged with killing a white man. (*Id.*). One white male juror went as far as to say: "Yea, we need to kill him off." (*Id.*). However, given the jury's racial bias, the outcome of Mr. Taylor's capital trial is far from reliable; it is instead contaminated with racial prejudice. Racial bias "casts doubt on the integrity of the judicial process" and "impairs the confidence of the public in the administration of justice." *Rose*, 443 U.S. at 556. The racially biased views of members of Mr. Taylor's jury have no place in any judicial process. To remedy the unconstitutional injustice, this Court must overturn Mr. Taylor's conviction and grant a new trial.

**2.** **In Violation of Mr. Taylor's Sixth Amendment Rights to a Fair Trial Before an Impartial Jury, the Jurors Who Presided Over His Case Engaged in Misconduct**

Mr. Taylor's Sixth Amendment right to an impartial jury was violated when the jurors who presided over his case engaged in misconduct. A defendant has a right to an impartial jury that is "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Jury misconduct undermines this fundamental right. Here, over the Court's repeated admonishments, the jurors engaged in premature deliberations. Combined with the Government's evidence that Mr. Taylor posed a danger in the future, some of which misrepresented fact, the jury's misconduct prejudiced Mr. Taylor and violated his constitutional right to a fair and impartial jury.

So here too, the record reveals multiple instances of juror misconduct, that when examined together, warrant a new trial. Here, jurors admitted to engaging in premature deliberation and to discussing with a spouse whether to secure a weapon as protection against Mr. Taylor. *See* (Doc. 871 at 2–33, PageID#5246–77) (Sealed). This misconduct, combined with the Government's evidence inaccurately implying that Mr. Taylor had intimidated a witness and posed a danger in the future, was highly prejudicial.

Juror 1 stated:

Juror 1:      Oh, a couple of things I'd like to ask if I may.

The Court:   Uh-huh.

Juror 1:    Is it the usual procedure that the defendant knows the jurors' names? I've had some concern, you know. It is a murder trial, after all. And there might be some repercussions down the pike, of being found and something happening... Is that normal for jurors' names to be called?...

[W]ith the Internet nowadays, it's not so tough [to determine jurors' identities]. So, you know, there was some concern. My husband and I, that's the only thing we've talked about. So [we're] thinking of getting a weapon.

(Doc. 871 at 4–5, PageID#5248–49). Juror 1's admission that she had safety concerns and discussed obtaining a weapon for protection came as a direct response to the Court's inquiry regarding whether she was aware that Mr. Taylor had allegedly referred to her as a "racist redneck." Juror 1 also admitted to talking about the case and her fears of Mr. Taylor with her husband.

Juror 1's conduct, in which she discussed the case and needing protection from Mr. Taylor with her husband, constituted misconduct, requiring a new trial. *See e.g., Gaffney*, 676 F. Supp. at 1552-53. Moreover, that Juror 1 served as the foreperson, wielding additional authority over the other jurors, provided the opportunity for her misconduct and resulting bias to impact the other jurors' views. *See* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 15)

Lastly, multiple jurors admitted to engaging in pretrial deliberations. Alternate Juror E.H. disclosed to Monica Mercer, a reporter from the *Chattanooga Times Free Press*, shortly after the trial, that jurors discussed Mr. Taylor's race, witness credibility, and other aspects of the case amongst themselves. *See* (Doc. 794-1 at 1–2, PageID#2593–94). Alternate Juror E.H. later confirmed those facts during

49

a post-trial hearing, "We didn't—We wasn't aware that we wasn't supposed to talk to each other. But that's what had happened. I'd had discussions with them, arguments, about who was lying and who wasn't and things like that…" (Doc. 905 at 6, PageID#7941). Two other jurors confirmed Alternate Juror E.H.'s statements about the existence of pretrial deliberations. (Doc. 794-1 at 1) ("Two regular jurors confirmed that they talked about the case throughout the trial," indicating Juror C.G. and Juror R.B.). Here, evidence revealed that all jurors—including those who convicted Mr. Taylor—engaged in pervasive and casual premature deliberations. *See* (Exhibit No.13, Vicky Holloway Dec., at 2) ("My husband told me that he and other jurors spoke frequently throughout the trial about what was going on in the trial. Everage told me that it was clear from the jurors' conversations that they had already made up their minds to sentence Mr. Taylor to death before the sentencing phase even began."). Premature deliberation by a jury can amount to prejudice, warranting a new trial. *See United States v. Sabhnani,* 529 F. Supp. 2d 384, 390 (E.D.N.Y. 2008) (reasoning that in criminal cases, premature jury deliberations may warrant a new trial if they result in actual prejudice to the one of the parties); *see also United States v. Cox,* 324 F.3d 77, 86 (2d Cir. 2003) (stating that "[w]here the district court instructs a jury to refrain from premature deliberation … and the jury nonetheless discusses the case before the close of trial, that premature deliberation may constitute juror misconduct.") (Citation omitted)).

The multiple instances of juror misconduct among deliberating jurors, combined with the circumstances of the case, violated Mr. Taylor's right to a fair and impartial jury and warrant a new trial.

**D.     In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government used improper language to describe him.**

Prosecutors "may strike hard blows, [but are] not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). "Prosecutorial misconduct may warrant . . . relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999). In determining whether a trial was fundamentally unfair, the reviewing court must evaluate the totality of the circumstances. *See Angel v. Overberg*, 682 F.2d 605 (6th Cir. 1982). Here, this Court must consider not just the Government's misconduct as asserted below, but consider it in conjunction with the Government's *Brady*/false testimony violations and Mr. Taylor's ineffective assistance of counsel claims, *see* (Claim I.B., In violation of the Sixth Amendment, Mr. Taylor's counsel were ineffective in investigation, preparation, and presentation at his trial); *see also U.S. v Hernandez*, 227 F. 3d 686, 697 (6th Cir. 2000) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983) (acknowledging that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

Throughout trial, the Government used improper language that was dehumanizing and racially coded to appeal to jurors' emotion and bias to convict Mr. Taylor. Considering the facts and circumstances of this case, the Government's injection of inflammatory, racially prejudicial language into the trial was improper, and constitutes reversible error. *See, e.g., United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir.) *cert. denied*, 400 U.S. 967 (1970) ("Appeals to racial prejudice are foul blows and the courts of this country reject them.").

**1. The Government Repeatedly Used Racially Coded, Dehumanizing Language to Refer to Mr. Taylor as a Stalker Throughout Trial**

Throughout the guilt phase of Mr. Taylor's trial, the Government repeatedly used racially coded and dehumanizing language to describe Mr. Taylor's conduct as animalistic to appeal to the jurors' fears of and bias against Black people. "Research on dehumanization commonly defines dehumanization as a process by which individuals or groups of people (such as racial groups) are denied 'full humanness', including denials of human feelings (e.g., love, regret, or otherwise more complex human emotions) and full human cognitive capacity." (Exhibit No. 14, Destiny Peery Report, at 7). Further, "dehumanization help[s] explain how people . . . systematically treat some social groups in ways that subject them to more violence and punishment than other social groups, even when both are engaged in the same behaviors." (*Id.* at 8). Dehumanization is particularly problematic when tied to race. (*Id.* at 9) ("research has shown that the dehumanization of Black people via comparisons to animals leads

people to see and remember Black people differently and to endorse more violence against Black criminal suspects.").

The Government repeatedly referenced Mr. Taylor as a "what" rather than a who. *See* (Doc. 868 at 67, PageID#5112). On top of express animalistic references, the Government reminded the jurors that it was "two *black* males [that] were circling around" the victim. (Doc. 868 at 73, PageID#5118) (emphasis added). The Government used this language to remove Mr. Taylor's humanity.

### 2. The Government's Language was Flagrant Enough to Warrant Reversal

As a threshold matter, the reviewing court must determine whether the challenged statements were improper. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). If the court finds impropriety, it then looks to determine if the conduct was flagrant enough to warrant reversal. *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994). Flagrancy is determined by a four-factor balancing test: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of evidence against the accused." *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *Francis*, 170 F.3d at 549–50).

### a. The Government's Remarks Misled the Jury and Prejudiced Mr. Taylor

First, the Government's language misled jurors when they repeatedly referred to Mr. Taylor "stalking" and "circling," the victim, and in calling him "what" instead of a who. As argued elsewhere, stalking constitutes a federal offense for which the government did not charge Mr. Taylor. *See* (Claim I.B.4., Failure to Object to the Government's Repeated Reference to Mr. Taylor "Stalking" the Victim, a Distinct Uncharged Crime). Such dehumanizing and distorting language also prejudiced Mr. Taylor because it appealed to juror's racial biases and stereotypes.

### i. The Depiction of Black Men as Inherently Violent and Dangerous Is an Enduring Racial Stereotype That Has the Potential to Exert a Unique Power Over Jurors

The stereotype of a young Black male as inherently violent and dangerous has the potential to have a pernicious effect on young Black male defendants in the criminal justice system, as it obscures their humanity and youth. *See Turner,* 476 U.S. at 35 (recognizing that a juror reliance on stereotypes that Blacks are violence prone might impermissibly incline the juror to favor the death penalty); *see also Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (stating that stereotyping Black men as somehow more violence-prone than others is a "particularly noxious strain of racial prejudice").

### ii. The Stereotype of the Young Black Male as Violent and Criminal is Deeply Entrenched in American History and Culture

The stereotype of young Black men as violent and criminals has long permeated American society. These narratives were introduced to American psyche as early as slavery, "when Black people were believed to be not just inferior, but also savage brutes prone to violence and criminality unless domesticated and made docile." *See* George M. Frederickson, *The Black Image in the White Mind: The Debate on Afro-American Character and Destiny, 1817-1914* 45 (1987)). These racist tropes persisted after emancipation. *See id.; see also* Booker T. Washington et al., *The Negro Problem* (J. Pott & Company 697 1903); Kali N. Gross, *Colored Amazons: Crime, Violence, and Black Women in the City of Brotherly Love, 1880-1910*, (1st ed. 2006) at 133. Continuing through the twentieth century, menacing images of violent Black men spread through the media, as criminals from drug controlled rough neighborhoods. *See* Douglas S. Massey, *Getting Away with Murder: Segregation and Violent Crime in Urban America*, 143 U. Pa. L. Rev. 1203, 1204-05 (1995). Combined with local news linking crime with Black communities, viewers linked violence with Black people. *See* Robert M. Entman, *The Black Image in the White Mind: Media and Race in America* 78 (2000).

By the 1990s, there was "a widespread belief that Black people, and particularly young Black inner-city males, [were] far more prone to violence than white people." *See* Evan Stark*, The Myth of Black Violence*, 38 Soc. Work 485, 485 (1993). Black Americans, as one commentator noted, had become "the repository for

the American fear of crime. *See* Katheryn Russell-Brown, *The Color of Crime: Racial Hoaxes, White Fear, Black Protectionism, Police Harassment, and Other Macroaggressions* xiii (1998). Young Black males were believed to be "wildin," super predators, synonymous with criminal. *See* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 4) ("In 1996, Hillary Clinton, now infamously, described these young Black and brown "super predators" as violent, threatening, and lacking conscience and empathy.").

### iii.   Stereotypes of Black Men as Violent and Dangerous Has Patent Effect on Perceptions and Judgment

Stereotypes are "cognitive structures that contain the perceiver's knowledge, beliefs, and expectations about human groups." Mark Peffley et al., *Racial Stereotypes and Whites' Political Views of Blacks in the Context of Welfare and Crime*, 41 Am. J. Pol. Sci. 30, 31 (1997). These cognitive generalizations shape processing and perception. *See id.* "Researchers have documented people's explicit knowledge of the societal stereotypes about Blacks in particular," who are "construed as violent, threatening, criminal, unintelligent, uneducated, lazy, poor, athletic, and musical." Phillip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences,* 94 J. Personality & Soc. Psychol. 292, 294 (2008). Racial stereotypes influence perception and judgments even in the absence of animus or bigotry and may create bias or preference for one group over another. *See* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 2-3). "The stereotype

of Black Americans as violent and criminal has been documented by social psychologists for almost 60 years." Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processing,* 87 J. Personality & Soc. Psychol. 876, 876 (2004).

Further, White people often associate Black males with non-human behavior or as animals. *See* Philip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, 94 J. Personality & Soc. Psychol. 292, 292-306 (2008) (study demonstrating that individuals often associate Black people with apes, even though participants indicated that they had never heard the Blacks as apes stereotype). Dr. Peery reports that "young Black men are often stereotyped as possessing a particular competence for crime even if they're deemed incompetent elsewhere, as possessing innate, animalistic tendencies with respect to committing crime, and even as having rather singular focuses on engaging in criminal or deviant activities." (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 4). These narratives manifest into real fears that have the potential to threaten the constitutional guarantees of Black defendants within the criminal context. *See* Sophie Trawalter et al., *Attending to Threat: Race-Based Patterns of Selective Attention*, 44 J. Exp'l Psychol. 1322, 1322-27 (2008) (scientific study demonstrating that people feel more threatened by Black people than White people). Young Black men are especially likely to be portrayed by the media and stereotyped by the general population as "deviant, dangerous, and dysfunctional." (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 4).

In respect to the influence these biases have on capital juries, studies have found that Black defendants' higher likelihood to be sentenced to death can be explained by juror's assessment of Black defendants as violent by nature, more likely to reoffend, and "more cold hearted," simply because they are Black rather than the evidence presented against them. Mona Lynch & Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide,"* 45 Law & Soc'y Rev. 69, 76-77, 88, 91-92 (2011). Stereotypes that Black men are intrinsically violent can affect perceptions about their likelihood of future crime and lead to harsher sentencing. *See* (Exhibit No. 14, Destiny Peery Report, at 5) ("Research has examined the interaction between age, race, and gender in sentencing and found that young Black males are sentenced the most harshly compared to all other combinations of defendant characteristics.").

### b. The Government's remarks were recurring and extensive

Second, the Government's remarks were not isolated. Throughout opening and closing of trial, the Government referred to Mr. Taylor as "stalking" (or some variant) the victim. (Doc. 868 at 41, PageID#5086; Doc. 868 at 65, PageID#5110; Doc. 868 at 67, PageID#5112). These references were dehumanizing and intended, specifically, to invoke an image of a predatory animal. *See* (Exhibit No. 14, Destiny Peery, Ph.D., Report, at 11-12).

**c. The Government deliberately used this language to stoke racial fears and appeal to racial biases of jurors**

Third, the Government's language was strategic and deliberate, playing directly into the jurors' racial stereotypes and biases, particularly Juror 1, who between the two phases of trial, expressed fear of Mr. Taylor and the desire to obtain a weapon as protection against Mr. Taylor and/or his friends. *See* (Claim I.C., In violation of Mr. Taylor's right to a fair and impartial jury, the jury that convicted him was biased and engaged in misconduct). The Government's repeated use of the improper language throughout the trial demonstrates that they did not use these words accidentally. Four separate mentions of "stalking" is no accident.

**d. The Government's evidence of premeditated first-degree murder was weak**

The evidence supporting first-degree premeditated murder, substantial planning, and premeditation was weak. In fact, the facts of the crime reflected impulsive behavior from a young man with neurological and developmental impairment. Research shows that teenagers, due to their still developing brains, engage in immature and impulsive behavior, are more susceptible to negative influences and peer pressure, and have transitory personality traits. *See* (Exhibit No. 1, George Woods, M.D., Report, at 19) ("it is my opinion that his actions were impulsive, trauma-driven, and the result of the combined effect of that trauma on his impaired neurological functioning.").

The Government's repeated references to Mr. Taylor as a stalker, animal, and monster—which the defense failed to examine, explain, or challenge—was materially misleading, stripping Mr. Taylor of his right to a fair trial. Further, the Government's reliance on words and phrases that degraded Mr. Taylor's humanity, allowed jurors to more easily "otherize" Mr. Taylor and to rely on facts not in evidence to convict him without assessing "the characteristics of the person who committed the crime." *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (plurality opinion). The Government's misconduct violated Mr. Taylor's rights to due process and a fair trial, warranting this Court's reversal of Mr. Taylor's conviction.

E. **Trial counsel's failure to object to improper language violated Mr. Taylor's Sixth Amendment right to constitutionally adequate counsel.**

Defense counsel failed to object to the Government's repeated use of improper language to describe Mr. Taylor and his conduct. *See* (Claim I.D., In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government used improper language to describe him.). As a result, the jury relied, in part, on racial bias and stereotypes to convict Mr. Taylor in violation of his right to a fair trial. Prevailing norms instruct defense counsel to "object to anything that appears unfair or unjust even if it involved challenging well-accepted practices." 31 Hofstra L. Rev. at 1032, Guideline 10.8, commentary. Here, the Government's repeated reference to Mr. Taylor in dehumanizing, racially coded terms was both unfair and unjust. *See Hodge v. Hurley,* 426 F.3d 368, 376 (6th Cir. 2005) (finding ineffective assistance of counsel for "trial

counsel's failure to object to any of the numerous improper statements in the prosecution's closing argument)*; see also Freeman v. Class*, 95 F. 3d 639, 644 (8th Cir. 1996) (finding ineffective assistance of counsel where counsel failed to object or move for mistrial based on prosecution's improper comments). Counsel's repeated failure to object to such language resulted in constitutionally ineffective assistance of counsel.

### 1. Defense Counsel Was Required to Object to the Government's Racially Inflammatory Language

Given the difficulty of measuring a jury's impartiality following exposure to appeals to racial prejudice, defense counsel must object and consider moving for a mistrial any time racially inflammatory rhetoric threatens the fairness of the trial. *See Hodge,* 426 F.3d at 386 (6th Cir. 2005) (stating that "failure to object to [. . .] derogatory statements by the prosecutor is much less susceptible to the argument that it should be considered reasonable trial strategy").

In evaluating the performance of trial counsel, courts may look to the "[p]revailing norms of practice as reflected in [ABA] standards and the like..." *See Strickland*, 466 U.S. at 688. The ABA Guidelines explain that: "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." *See* 31 Hofstra L. Rev. at 1030 (quoting Stephen B. Bright, "Preserving Error at Capital Trials," *The Champion*, Apr. 1997, at 42-3).This obligation is not limited to motion filing. Heightened vigilance in capital cases requires counsel to object to

anything that appears unfair or unjust to their client. *Id.* at 1032; *see Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (observing in the grand jury context that "[w]hen constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm").

Moreover, defense counsel must be vigilant to identify and challenge inflammatory language, particularly language that appeals to racial bias and stereotype, because criminal sentences must not be based on racial prejudice. *See Buck,* 137 S. Ct. 759 (2017); *see also Peña-Rodriguez*, 137 S.Ct. 855 (2017).

### 2. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Constituted Deficient Performance

During the Government's opening arguments in the guilt/innocence phase the government repeatedly referred to Mr. Taylor as "stalking," (Doc. 895 at 27–28, PageID#6372–73), and "circling" the victim, (*id.* at 30–31, PageID#6375–76). *See also* (Claim I.D., In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government used improper language to describe him) and (Claim I.B.4., Failure to Object to the Government's Repeated Reference to Mr. Taylor "Stalking" the Victim, a Distinct Uncharged Crime). Because these remarks were improper, defense counsel had a duty to object to them. *See Reed v. United States,* 133 F. App'x 204, 208 (6th Cir. 2005) (noting defense counsel's duty to object to remarks that were deemed prosecutorial misconduct).

Despite being on notice of the Government's improper language, the defense was similarly silent when the government returned to these themes in closing: arguing that Mr. Taylor was "stalking" the victim, that "stalking then changed to something more sinister," "[t]he stalking became what we saw the end result of here." (Doc. 868 at 41, PageID#5086). Reminding the jurors that "two *black* males were circling around" the victim. (*Id.* at 73, PageID#5118) (emphasis added).

Not once did defense counsel object to the Government's repeated invocation of racial stereotypes and dehumanizing language. To be sure, the defense made objections during the Government's other arguments. Thus, defense counsel was not failing to object during the government's closing based on some strategy to not interrupt the Government's argument. Rather, defense counsels' failure to challenge the Government's racially inflammatory remarks constituted deficient performance. *See Hodge, supra; see also See Buck*, 137 S. Ct. at 779.

### 3. Trial Counsel's Failure to Object to the Government's Racially Inflammatory Language Prejudiced Mr. Taylor

When a prosecutor's conduct is improper, "there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge,* 426 F.3d at 377.

Here, counsel's failure to object to the Government's improper language resulted in the jury relying, in part, on racial stereotype and bias to convict. Where defense counsel's deficient performance resulted in the jury relying on prejudice and

race, even just in part, to convict Mr. Taylor, the proper remedy is a new trial. *See Weaver v. Massachusetts*, 137 S.Ct. 1899 (2017) (prejudice is presumed where counsel's deficient performance resulted in structural error that undermines due process).

**F. The Government violated Mr. Taylor's right to a constitutionally adequate trial by impermissibly excusing Black jurors for non-race-neutral-reasons.**

In violation of the right to a fair and impartial jury as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Government used preemptory strikes in a non-race-neutral manner, excusing Black prospective jurors while accepting identically or similarly situated and responding White jurors. *Batson v. Kentucky*, 476 U.S. 79 (1986). By information and belief, the prosecution excused two Black jurors, Prospective Juror S.C., *see* (Doc. 860 at 58, 64, 65, 73), and Prospective Juror R.W., *see* (*id.* at 24, 40, 41, 64, 65, 108), whose responses to the Court's questionnaire and to voir dire by both parties did not reflect any nonracially motivated reason for the use of a preemptory strike. *See also* (Underseal Exhibit No. 34, Juror S.C. Jury Questionnaire) and (Underseal Exhibit No. 35, Juror R.W. Jury Questionnaire). This was a clear violation of the rule of *Batson*; the error is structural. *See United States v. McFerron,* 163 F.3d 952, 955 (6th Cir.1998); *U.S. v. Kimbrel*, 532 F.3d 461 (2008).

Trial counsel provided ineffective assistance of counsel with regard to the *Batson* violation. *See Strickland*, 466 U.S. at 696. Counsel failed to object to the

Government's racially motivated use of preemptory strikes, failed to require the Government to provide a nonracially motivated justification for the strikes, and failed to request a ruling from the Court as to whether the Government's strike violated *Batson,* 476 U.S. 79. Further, defense counsel failed to show that these Black jurors' answers on their questionnaires and in voir dire were similar or identical to the answers of several White jurors who the prosecution accepted. *See Snyder v. Louisiana*, 552 U.S. 472 (2008) (finding *Batson* violation despite facially race-neutral justification where White jurors with same quality were not excused). Counsel's failure to object to the dismissal of Jurors S.C., and R.W., violated the prevailing professional norms for the defense in a capital case and Mr. Taylor was prejudiced by counsel's failure. *See Hestle v. U.S.*, 2013 WL 1147712 (E.D. Mich. Mar. 19, 2013) (noting that application of the *Strickland* "prevailing professional norms" analysis to the *Batson* context requires proof that if the objection had been made, there was a reasonable probability that it would have been sustained). Further, appellate counsel was ineffective in failing to raise the *Batson* issue on direct appeal and Mr. Taylor was prejudiced. *Strickland, supra*; *Evitts v. Lucey*, 469 U.S. 387 (1985).

### G. Mr. Taylor's rights to a fair trial under the Fifth and Sixth Amendments were violated by prosecutorial misconduct in closing argument and counsel were ineffective for failing to object.

In violation of the Fifth and Sixth Amendments to the United States Constitution, the prosecution engaged in misconduct during its arguments to the jury that deprived Mr. Taylor of due process, a fair and reliable trial, and an impartial

jury. Although courts afford prosecutors "wide latitude" (*United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir.2013)) during closing argument, a prosecutor may not "urge jurors to identify individually with the victim[]" (*United States v. Boyd*, 640 F.3d 657, 670 (6th Cir. 2011)) or urge jurors to convict "in order to protect community values, preserve civil order, or deter future law breaking," *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir.1991). "[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir.2008).

Here, the Government engaged in improper (guilt-phase) closing argument when, inter alia, it impermissibly alleged that Mr. Taylor "continues to conspire to attack the victim" with regard to the prosecution's claim that Mr. Taylor influenced Mr. Matthews to testify as Mr. Matthews did. (Doc. 868 at 32, PageID#5077). Because the Government's argument that Mr. Taylor was continuing to conspire with Mr. Matthews was entirely conjecture, the argument was improper. Further, after an early objection to the Government's use of the word "we" as improper vouching (*id.* at 6), the Government vouched for this argument saying, "We know they were plotting and planning this and that Mr. Taylor was affecting this." (*Id.* at 64, PageID#5109). Finally, the Government argued other facts not in evidence through its argument that Mr. Taylor would "get up – after he's acquitted on this story, get up and do the same thing for Sir Jack Matthews, and say, 'oh no, it was self-defense'?" (*Id.* at 66, PageID#5111).

As noted by the Sixth Circuit, neither trial nor appellate counsel objected to these arguments. *See Taylor*, 814 F.3d 389. Counsel's failure to object and to raise this issue on appeal was ineffective assistance of counsel and Mr. Taylor's rights under the Sixth Amendment were violated by trial and appellate counsel's failures.

**H. Women and Black people were unconstitutionally underrepresented on the grand jury that indicted Mr. Taylor in violation of the Fifth and Sixth Amendments to the United States Constitution.**

Discrimination in the selection of the grand jury "is a grave constitutional trespass," which "undermines the structural integrity of the criminal tribunal itself, and is not amendable to harmless-error review." *Vasquez v. Hillery*, 474 U.S. 254, 252, 263-264 (1986). Such grand jury discrimination profoundly affects the fairness of any subsequent conviction:

> [W]e [are not] persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from the grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense – all on the basis of the same facts. Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' *United States v. Ciambrone*, 601 F.2d 616, 629 (CA2 1979)(Friendly, J., dissenting). Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

*Vasquez v. Hillery*, 474 U.S. at 263. *See also Duren v. Missouri*, 439 U.S. 347, 366 (1979) (systemic underrepresentation found where women underrepresented for period of only nine months); *Sims v. Georgia*, 389 U.S. 404 (1967) (defendant entitled to relief where Black people underrepresented by 19.7% in grand jury pool and 14.6% in petit jury pool).

Upon information and belief, Mr. Taylor alleges that the grand jury empaneled here unconstitutionally underrepresented women and Black people.[7]

It is well-settled that underrepresentation of any group by greater than two to three standard deviations indicates that the group has been underrepresented and excluded through invidious, discriminatory means. *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (1977); *see also Jefferson v. Morgan*, 962 F.2d 1185, 1190 (6th Cir. 1992); *see also Hazelwood School District v. United States*, 433 U.S. 299, 308-309 n. 14 (1977); *see also Vogel v. City of Cincinnati*, 959 F.2d 594, 600 (6th Cir. 1992).

When a grand jury is "plainly illegal in [its] composition" it denies the defendant due process of law to subject him to indictment by that grand jury. *Peters v. Kiff*, 407 U.S. 493, 501 (1972). There is a "presumption of prejudice which supports the existence of the right" to a grand jury empaneled free from invidious

---

[7] Mr. Taylor will seek discovery in order to supplement this claim with additional facts and evidence.

discrimination and underrepresentation of cognizable groups. *Davis v. United States*, 411 U.S. 233, 245 (1973) (discussing *Peters* right, but rejecting petitioner's due process claim on basis of waiver); *see United States v. Ovalle*, 136 F.3d at 1107 (holding that presumption of prejudice arises from underrepresentation and discrimination in grand jury selection). When there is unconstitutional or invidious discrimination against cognizable groups, the indictment simply cannot stand. *See also Berryhill v. Zant*, 858 F.2d 633 (11th Cir. 1988) (overturning of capital conviction because of systemic underrepresentation of women in jury pool); *Gibson v. Zant*, 705 F.2d 1543 (11th Cir. 1983) (granting relief to a Black defendant because of substantial underrepresentation of women and Black people in grand and petit jury pools).

**I. In violation of Mr. Taylor's Fifth and Sixth Amendment rights, the Government suppressed material exculpatory evidence in violation of *Brady v. Maryland.***

The Government has an affirmative obligation to disclose material exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Strickler v. Greene*, 527 U.S. 263 (1999); *Banks v. Dretke,* 540 U.S. 668 (2004)*; Cone v. Bell*, 556 U.S. 449 (2009); *Wearry v. Cain*, 136 S.Ct. 1002 (2016). A successful *Brady* claim requires Mr. Taylor to show that (1) the Government withheld evidence (whether intentionally or not); (2) that the withheld evidence was favorable to him; and (3) that the withheld exculpatory evidence was material. *See Jamison v. Collins*, 291 F.3d 380, 384-85 (6th Cir. 2002). This rule applies not only to evidence tending

to exculpate Mr. Taylor, but to evidence tending to impeach the Government's witnesses as well, *United States v. Bagley*, 473 U.S. 667, 676 (1985); and to evidence known to Government investigatory agencies, not only the prosecution, *Kyles v. Whitley*, 514 U.S. at 433-34. Thus, the Court may impute investigatory agency knowledge to the Government.

Here, the Government suppressed material exculpatory evidence which tended to show, inter alia: that Mr. Taylor did not possess the requisite mental state to be guilty under any of the charges in the indictment, *see* (Doc. 447) (superseding indictment); and that Mr. Taylor acted impulsively when he discharged the gun; and that Mr. Marshall was granted consideration for the disposition of criminal charges in other jurisdictions, including Dekalb County, in exchange for his testimony in Mr. Taylor's prosecution, *see* (Doc. 896 at 49–236, PageID#6573–6760); and that the Government promised Mr. Marshall a sentence at the low-end of the Guidelines in exchange for his testimony in Mr. Taylor's prosecution, *see* (*id.*); and that the government knew that Sir Jack Matthews intended to testify falsely when they presented his testimony, *see* (Doc. 866 at 8–49, PageID#4789–4830).

Withheld exculpatory evidence is material if there is any reasonable likelihood that, considered cumulatively, it could have affected the jury's verdict. *See Kyles*, 514 U.S. at 436 (courts must consider suppressed evidence "collectively, not item by item" when determining materiality). However, the "materiality" test does not require a petitioner to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514

U.S. at 434-35. Rather, evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Id.* at 435.

For example, based on information and belief, the Government possessed information that Mr. Taylor acted impulsively and, in a panic, when he fired shots at the victim. Not only did the Government withhold that information from the defense, but the Government also knowingly presented a false theory of the case when they argued otherwise—that Mr. Taylor acted with substantial planning and premeditation. Specifically, the Government relied heavily on Mr. Marshall's testimony—over 150 pages worth, including cross-examination—to argue that Mr. Taylor acted with premeditation and substantial planning when committing murder. Through Mr. Marshall, the Government established that Mr. Taylor intended to kill the victim because the victim had taken a "warrant out" on Mr. Taylor and that Mr. Taylor saw a copy of the warrant when he was in the victim's house. (Doc. 896 at 82–83, PageID#6606–07). Mr. Marshall also testified that he and Mr. Taylor "followed" the victim from his restaurant to his house, (*id.* at 110, PageID#6634), and then repeated on redirect that Mr. Taylor was "following" the victim, explaining that when he said he "lied" in an earlier statement to law enforcement, it was because he "left out several details" about Mr. Taylor "following" the victim. (*Id.* at 221 Page#6745) (claiming that that was "what [he was] talking about . . . when [he] told the jury that [he] lied" earlier).

Then, during closing argument, the Government recharacterized Mr. Marshall's testimony as: "Joey Marshall told you they'd been *stalking* this man." (Doc. 868 at 41, PageID#5086; Doc. 868 at 67, PageID#5112) (emphasis added). In fact, the Government's theme—that Mr. Taylor was "stalking," "circling," and "following" the victim before killing him—was based squarely off Mr. Marshall's testimony. (Doc. 868 at 73, PageID#5118).

Mr. Taylor was clearly prejudiced by the Government's suppression of material exculpatory evidence. The Government's case was erroneously premised on the argument that Mr. Taylor intended to kill Guy Luck from the moment of the kidnapping. The evidence suppressed by the Government would have rebutted those allegations.

It is reasonably probable that had the Government disclosed this evidence the result of the proceedings at trial would have been different and Mr. Taylor would not have been convicted.

### J. Pursuant to *United States v. Davis*, *Borden v. United States*, and *United States v. Taylor*, Mr. Taylor's conviction is unconstitutional and must be set aside under Counts Two and Four.

#### 1. Procedural History Relevant to Mr. Taylor's §924(c) convictions.

In 2008, a jury convicted Mr. Taylor of four offenses: (1) carjacking resulting in death pursuant to 18 U.S.C. § 2119; (2) use of a firearm during and in relation to carjacking, resulting in death, pursuant to 18 U.S.C. §§ 924(c) and (j); (3) kidnapping resulting in death, as defined by 18 U.S.C. § 1201(a); and (4) use of a firearm during

and in relation to kidnapping, resulting in death pursuant to 18 U.S.C. §§ 924(c) and

(j). Doc. 670. A jury sentenced Mr. Taylor to death without identifying a particular

count to which it was attaching the death sentence, or whether it was recommending

death based on one or more of his convictions. *Id.*

Mr. Taylor appealed to the Sixth Circuit, arguing, *inter alia*, that his firearms

convictions were invalid based on *Johnson v. United States*, 576 U.S. 591 (2015),

which held that the residual clause of the Armed Career Criminal Act (ACCA) is

unconstitutionally vague, and that convictions imposed under ACCA's residual clause

must be vacated. *See United States v. Taylor*, 814 F.3d 340, 375–79 (6th Cir. 2016).

Mr. Taylor argued that he was convicted of offenses under 18 U.S.C. § 924(c),[8] which

has a residual clause functionally identical to that of ACCA, and that therefore

---

[8] Section 924(c)(3) enhances criminal penalties for individuals convicted of using a firearm in the commission of a felony that constitutes a "crime of violence." 18 U.S.C. § 924(c)(3). The statute defines a crime of violence as an offense that:

> (A) has an element the use, attempted use, or threatened use of physical force against the person or property of another, [commonly referred to as the "elements" or "force" clause] or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," [commonly referred to as the residual clause].

18 U.S.C. § 924(c)(3)(A)–(B). Section 924(j) provides that individuals who violate Section 924(c) and cause the death of another shall be punished "by death or by imprisonment for any term of years or life." 18 U.S.C. § 924(j)(1). A defendant must be found guilty under Section 924(c) before they can be deemed death eligible under Section 924(j). Thus, if a charged offense is not a crime of violence pursuant to Section 924(c), a defendant cannot be found guilty of Section 924(j) or eligible for a death sentence under that provision.

*Johnson* requires that his convictions likewise be invalidated. The Sixth Circuit disagreed, believing that ACCA was more narrowly drawn than Section 924(c), rendering *Johnson* inapplicable. *Id.* It, therefore, denied relief. *Id.*

In 2019, Mr. Taylor filed a motion for relief pursuant to 28 U.S.C. § 2255, again arguing that his convictions under Section 924(c) were constitutionally deficient. Thereafter, the Supreme Court decided in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019), that the residual clause of Section 924(c) was indeed unconstitutional. At this Court's request, the parties briefed the applicability of *Davis* to Mr. Taylor's Section 924(c) convictions and sentence. R. 43; R. 46; R. 49

Subsequently, in June 2021, the Supreme Court decided *Borden v. United States*, 141 S. Ct. 1817 (2021). There, the Court held that violence that results from reckless conduct is insufficient to satisfy the elements clause and, hence, offenses that can be committed by reckless use of physical force categorically fail to qualify as crimes of violence. *Id.* at 1834. The parties then filed supplemental briefing on the applicability of *Borden* to Mr. Taylor's Section 924(c) convictions and sentence. *See* R. 58; R. 61; R. 62. On May 27, 2022, this Court denied Mr. Taylor's *Davis* claim as to Count Four, finding that the predicate offense for his conviction—kidnapping resulting in death under 18 U.S.C. § 1201(a)—categorically qualifies as a crime of violence under 18 U.S.C. § 924(c)(3)(A)'s elements clause and reserved a decision on Count two. R. 63

**2. Capital sentencing factors are not elements of the predicate offense and cannot supply the necessary mens rea to convert an otherwise non-qualifying crime into a crime of violence under the force clause.**

The Court's finding that kidnapping resulting in death qualifies as a crime of violence under 18 U.S.C. § 924(c)'s elements clause is invalid in light of the Supreme Court's decision in *United States v. Taylor*, 142 S. Ct. 2015 (2022), and the United States Court of Appeals for the Eighth Circuit's decision in *United States v. Ross*, No. 18-2800, 2022 WL 4103064 (8th Cir. Sept. 7, 2022). Thus, Mr. Taylor's conviction under Count Four no longer stands.

Since this Court's May 2022 decision, two significant opinions were decided. First, in *United States v. Taylor* the Supreme Court held that attempted Hobbs Act robbery is not a crime of violence under Section 924(c)(3)(A)'s elements clause. 142 S. Ct. 2015. In reaching this conclusion, the Court rejected the proposition that a petitioner must satisfy a realistic-probability standard to be eligible for relief, and instead, reiterated the straightforward mandate of the court to look squarely "at the elements of the underlying crime." *Id.* at 2024–25. In its opinion, the Court also criticized the government's reliance on *Gonzales v. Duenas-Alvarez*, 439 U.S. 183 (2007). *Id.* at 2025. Notably, in its May 2022 opinion, not only did this Court require Mr. Taylor to make a realistic-probability showing, but it also relied on *Duenas-Alvarez* in reaching that conclusion. Second, in *United States v. Ross*, the Eighth Circuit held that kidnapping resulting in death is not a crime of violence. 2022 WL 4103064, at *1.

In light of the Supreme Court's decision in *Taylor* and the Eight Circuit's decision in *Ross*, which qualitatively affect this Court's decision denying Mr. Taylor's *Davis* claim as to Count Four, the Court must correct the conviction and order a new trial.

### *a.* This Court's denial of relief as to Count four is invalid in light of United *States v. Taylor.*

A determination as to whether to vacate Mr. Taylor's conviction under Count Four rests entirely on whether kidnapping resulting in death under § 1201(a) categorically qualifies as a crime of violence under the elements clause of § 924(c). In denying Mr. Taylor relief, the Court found that kidnapping resulting in death categorically qualifies as a crime of violence under § 924(c)(3)(A), and therefore Mr. Taylor's firearms conviction under Count Four remains valid. R. 63 at 45, Page ID# 1776; R. 63 at 54, PageID#1785. Specifically, this Court found that kidnapping resulting in death under § 1201(a) satisfies the two requirements necessary to qualify as a crime of violence under § 924(c)(3)(A): (1) it "has as an element the use, attempted use, or threatened use of [violent] physical force against the person or property of another"; and (2) the death-results provision of § 1201(a) requires proof that a petitioner knowingly committed the act, as opposed to mere "reckless conduct." The Supreme Court's decision in *Taylor* reveals that this analysis and conclusion are now in error.

### i. Mr. Taylor is not required to make a realistic-probability showing.

In determining that kidnapping resulting in death under § 1201(a) "has as an element the use, attempted use, or threatened use of [violent] physical force against the person or property of another" this Court focused largely on Mr. Taylor's alleged failure to satisfy the realistic-probability standard, which requires a showing that there is a realistic probability the government would apply its statute to conduct that falls outside the generic definition of a crime, in order to be eligible for relief. R. 63 at 33, PageID#1764 (citing *Duenas-Alvarez*, 549 U.S. at 193–94). By requiring a realistic-probability showing, this Court analyzed Mr. Taylor's claim in a manner that is in direct conflict with the Supreme Court's decision in *Taylor*.

In *Taylor*, the Supreme Court held that attempted Hobbs Act robbery under 18 U.S.C. § 1951(a) does not qualify as a "crime of violence" under § 924(c)(3)(A)'s elements clause because no element of the offense requires proof that the defendant used, attempted to use, or threatened to use force. 142 S. Ct. at 2025-26. Importantly, in reaching this conclusion, the Supreme Court squarely addressed whether a petitioner is required to make a realistic-probability showing—an issue central to this Court's May 2022 denial of relief.

In *Taylor*, the government insisted that a defendant must present an example from an actual case of how the crime in question could be committed without a "threat of force." *Id.* at 2024. In support of this argument, the government pointed to *Duenas-Alvarez*, a Supreme Court decision where the Court required a petitioner to show a

realistic-probability that the State would apply its statute to conduct falling outside the generic definition of a crime. *Id.* at 2024-25; *see also Duenas-Alvarez*, 549 U.S. at 193. Ultimately, the *Taylor* Court rejected the proposition that a petitioner must make a realistic-probability showing as part of the use of force categorical inquiry. It explained that such a requirement places an undue "burden on the defendant to present empirical evidence about the government's own prosecutorial habits." *Taylor*, 142 S.Ct. at 2024. It also noted "the practical challenges such a burden would present" on defendants given that "most cases end in plea agreements, and not all of those cases make their way into easily accessible commercial databases." *Id.*

The *Taylor* Court also criticized the government's reliance on *Duenas-Alvarez,* explaining that *Duenas-Alvarez* is not helpful in the context of determining whether a federal offense qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause for two reasons. First, the Court explained, "the immigration statute at issue . . . required a federal court to make a judgment about the meaning of a state statute." *Id.* at 2025. The Court continued that it made sense in that context for the federal court "to consult how a state court would interpret its own State's laws." *Id.* In *Taylor*, as here, there is "no such federalism concern . . . in play." *Id.* Secondly, the Court pointed out that in *Duenas-Alvarez,* an "element[] of the relevant state and federal offenses . . . overlapped," leaving "the only question [for] the Court [to] face[] was whether state courts" could apply the "'statute in [a] special (nongeneric) manner.'" *Id.* at 2025 (internal citation omitted). Again, those issues did not exist in *Taylor*, and they do not exist here.

78

In rejecting imposing a realistic-probability showing on a petitioner, the Court explained that imposing such a requirement would "effectively replicat[e] the work formerly performed by the residual clause" and invite constitutional challenges. *Id.* at 2023. The Court also reiterated that in § 924(c)(3)(A), Congress did not "mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on the defendant to present proof about the government's own prosecutorial habits." *Id.* Rather, "Congress tasked the courts with a much more straightforward job: Look at the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force." *Id.*

To help illustrate the importance of looking solely at the elements of the underlying offense, Justice Alito, writing for the majority in *Taylor*, presented a hypothetical involving Adam, a would-be robber. In that scenario, Adam drafts a note reading, "Your money or your life." *Id.* at 2021. The note is a bluff, but Adam hopes the cashier will believe he is armed and dangerous. *Id.* However, upon crossing the threshold of the store, Adam is arrested without ever presenting the note. *Id.* The Court's hypothetical presents an example in which the government would succeed on a conviction of attempted Hobbs Act robbery, without making a crime of violence showing under the elements clause. As the Court notes,

> Adam did not 'use' physical force. He did not 'attempt' to use such force— his note was a bluff and never delivered. And he never even got to the point of threatening the use of force . . . he may have intended and attempted to do just that, but he failed."

*Id.*

79

This Court's order is in direct conflict with *Taylor*, in that not only did this Court place the onus on Mr. Taylor to supply cases to satisfy the realistic-probability standard, but it also relied on *Duenas-Alvarez* in reaching this conclusion. R. 63 at 33, PageID#1764. In its May 2022 opinion, this Court insisted that Mr. Taylor point to "his own case or other cases in which the . . . courts in fact did apply the statute in the special (nongeneric) manner for which he argues," and then ultimately denied relief based on Mr. Taylor's failure to make this realistic-probability showing.[9] *Id.* (citing *Duenas-Alvaraz*, 549 at 193). By requiring Mr. Taylor to make a realistic-probability showing, the Court imposed a burden on Mr. Taylor that the Supreme Court flatly rejected in *Taylor*. And, as the *Taylor* Court makes clear, *Duenas-Alvarez* is not relevant where, as here, there are no federalism concerns invoked (given that this is a § 2255 habeas petition involving convictions under federal law), and there is no overlap between the requirements of §§ 1201(a) and 924(c)(3)(A).

As the Supreme Court made clear in *Taylor*, "[t]he only relevant question is whether the federal felony at issue *always* requires the government to prove–beyond a reasonable doubt, as an element of its case–the use, attempted use, or threatened use of force." 142 S. Ct. at 2020 (emphasis added). Kidnapping resulting in death under § 1201(a) does not require the government to prove the use, attempted use, or threatened use of physical force. Section 1201(a) is defined in a way that allows for

---

[9] In prior briefing, Mr. Taylor provided three realistically probable examples. *See* R. 63 at PageID#1764–65.

both violent and nonviolent means of commission; therefore, it cannot categorically qualify as a crime of violence under § 924(c)(3)(A). Thus, § 1201(a)'s death-results provision does not convert kidnapping into a crime of violence, as § 1201 does not require the death be the result of physical force—it simply requires proof of causation.[10] See R. 43 at 12, PageID#1627. The clear language of § 1201(a)'s death-results provision indicates the statute can be used to criminalize accidental or negligent death during a kidnapping.

> ### ii. This Court incorrectly determined that Section 1201(a) has the requisite mens rea to qualify as a crime of violence.

This Court also incorrectly determined that the death-results provision of § 1201(a) has the requisite mens rea to qualify as a crime of violence under § 924(c)(3)(A). Mr. Taylor argued, in part, kidnapping resulting in death cannot qualify as a crime of violence under § 924(c)(3)(A) because the death-results provision lacks a "heightened *mens rea*"—i.e., that a defendant intentionally or knowingly caused death. R. 43 at 1629–32. This Court disagreed, finding that the minimum

---

[10] This Court also determined that because kidnapping resulting in death requires proof that a petitioner caused the death of another, it necessarily involves the use of physical force. R. 63 at 31, PageID#1762 (citing *United States v. Collins*, 799 F.3d 554, 597 (6th Cir. 2015)). Notably, in determining that causing the death of another necessarily involves the use of physical force, the *Collins* court relied exclusively on *United States v. Anderson*, 695 F.3d 390 (6th Cir. 2012), which was overruled by *United States v. Burris*, 912 F.3d 386, 402 (6th Cir. 2019), on the basis that the *Anderson* panel incorrectly found the statute at issue categorically qualifies as a violent-felony predicate.

conduct criminalized by kidnapping resulting in death under § 1201(a) is not merely reckless conduct, but rather knowing conduct. R. 63 at 52, PageID#1783. Based on this reasoning, this Court concluded that Mr. Taylor does not benefit from *Borden*. *Id.* at PageID#1785. In reaching this conclusion, this Court incorrectly imputed "knowingly" onto the death-results provision of § 1201(a).

A recent Supreme Court decision helps shed light on instances where imputing a mens rea requirement from one part of a statute to another is appropriate. In *Ruan v. United States*, two medical doctors licensed to prescribe controlled substances were tried for violating 21 U.S.C. § 841, which makes it a federal crime, "[e]xcept as authorized[,]. . . for any person knowingly or intentionally to manufacture, distribute, or dispense . . . a controlled substance." 142 S. Ct. 2370, 2372 (2022) (citing 21 U.S.C. § 841). At issue in *Ruan*, was whether the "knowingly or intentionally" mens rea applied to the authorization clause of the statute. 142 S. Ct. at 2370. The Court concluded that § 841's "knowingly or intentionally" mens rea did in fact apply to the statute's authorization clause, reasoning that the mens rea requirement helped advance "the purpose of scienter, for it help[ed] to separate wrongful from innocent acts." *Id.* at 2370, 2377 (internal citations omitted). In Mr. Taylor's case, a similar application is not necessary. Imputing a "knowledge" requirement onto the death-results provision is not necessary in order to differentiate wrongful conduct from innocent conduct, as there is no ambiguity as to whether kidnapping alone is a wrongful act, with or without death resulting.

However, assuming *arguendo*, that as this Court found, kidnapping resulting in death under § 1201(a) is a crime of general intent and the scienter requirement is imputed onto the death-results provision, *Taylor* demonstrates that a heightened mens rea does not automatically result in a crime of violence finding. Take for example the statute at issue in *Taylor,* attempted Hobbs Act Robbery under 18 U.S.C. § 1951(a), which requires proving: (1) the defendant intended to unlawfully take or obtain personal property by means of actual or threatened force; and (2) completed a substantial step toward that end. *See, e.g., United States v. Resendiz-Ponce*, 549 U.S. 102 (2007). The first element requires a showing of specific intent. Despite this heightened mens rea requirement, the Court in *Taylor* found that attempted Hobbs Act robbery does not qualify as a crime of violence. Take also, for example, the simple kidnapping statute at issue in Mr. Taylor's case. Federal courts have found simple kidnapping under § 1201 to be a crime of general intent. *See United States v. Sneezer*, 983 F.2d 920, 922–23 (9th Cir. 1992). Yet, despite the statute requiring the government to prove a defendant knowingly committed the crime, here, the Government did not argue simple kidnapping qualifies as a crime of violence. R. 63 at PageID#1759–60 (noting "the Government has conceded that simple kidnapping under § 1201(a) is not a crime of violence under § 924(c)'s elements clause").

Importantly, in *Taylor*, the Court emphasized that "[t]he only relevant question is whether the federal felony at issue *always* requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." 142 S. Ct. at 2035 (emphasis added). To obtain a conviction

for kidnapping resulting in death under § 1201(a), the Government must prove the first two elements of simple kidnapping: that the accused (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away a person; and (2) held a person "for ransom or reward or otherwise." 18 U.S.C. § 1201(a).[11] The death-results provision of § 1201(a) requires an additional causation showing. *See Burrage v. United States*, 571 U.S. 204, 214 (2014). Simple kidnapping under § 1201(a) does not qualify as a crime of violence. R. 63 at PageID#1756. Because simple kidnapping does not qualify as a crime of violence, and elements one and two of simple kidnapping overlap with elements from kidnapping resulting in death under § 1201(a), the use of force showing hinges entirely on the third element ("death . . . results"). *See* 18 U.S.C. § 1201(a). But proof of "death . . . results" only requires causation, not state of mind or any other showing related to use of force. Thus, § 1201(a) does not contain the requisite mens rea to qualify as a crime of violence.

### iii. *United States v. Ross* provides additional support that kidnapping resulting in death is not a crime of violence.

In addition to *Taylor*, on September 7, 2022, the Eighth Circuit held that kidnapping resulting in death is not a crime of violence. *United States v. Ross,* 2022 WL 4103064, at *1. Previously, the Eighth Circuit held that kidnapping resulting in

---

[11] There is also a jurisdictional requirement requiring the government to show that the accused "willfully transported" another "in interstate or foreign commerce." 18 U.S.C. §1201(a)(1).

death under § 1201(a) is a crime of violence under § 924(c)(3)(A). *United States v. Ross*, 969 F.3d 829 (8th Cir. 2020). That decision, however, predated *Borden*. In October 2021, the Supreme Court granted certiorari in *Ross* and a companion case, vacated judgment, and remanded the case for further consideration in light of *Borden*. *See King v. United States*, 142 S. Ct. 332 (2021). On remand, the government took the position that kidnapping resulting in death is not a crime of violence in light of *Borden*. 2022 WL 4103064, at *1. Upon consideration of *Borden*, the Eighth Circuit agreed that kidnapping resulting in death is not a crime of violence and issued an updated opinion in *Ross*. *Id.* at *2. This decision should apply the same here because as discussed above, the "crime of violence" analysis does not change. Mr. Taylor was convicted of the same § 924(j) crime (based on the same predicate offense of kidnapping resulting in death). Thus, because *Ross's* § 924(j) conviction is void after *Borden*, Mr. Taylor's conviction should also be void.

### iv. *United States v. Lighty* and *United States v. Flood* provide additional persuasive authority to support vacatur of Count Four.

In *United States v. Lighty*, Case No. 8:03-cr-00457-PJM (D. Md. Apr. 13, 2023), the United States District Court for the District of Maryland vacated the defendant's § 924(c) conviction and ordered resentencing in the capital case. In granting the defendant's motion to vacate, the court accepted the parties' shared position that the predicate offenses of conspiracy to commit kidnapping and kidnapping resulting in death no longer qualify as "crimes of violence." *Id.* at 4 citing *Johnson v. United*

*States*, 576 U.S. 591 (2015); *United States v. Davis*, 139 S. Ct. 2319 (2019); and *Borden v. United States*, 141 S. Ct. 1817 (2021)). The opinion, Doc. 678, is attached.

Importantly, in *Lighty*, the Government acknowledged the *Ross*-decision, noting that "the government's concession in *Ross* was made after it consulted with the Department of Justice's Office of the Solicitor General ('OSG'). Here, the Government similarly concedes that kidnapping resulting in death is not categorically a crime of violence under Section 924(c) because it is bound by OSG's legal position." *Lighty,* No. 8:03-cr-457-PJM, R. 671 (Gov't Supplemental Resp.) at 4. *Lighty* calls into question the position the Government takes here, as it appears that OSG's legal position, which is binding on the Government, is that kidnapping resulting in death is not categorically a crime of violence, in both capital and non-capital cases.[12]

In *United States v. Flood*, No. 8:03-cr-457-PJM-3, R. 668 (Gov't Resp.) at 9–10 (D. Md. Dec. 1, 2022), the government also conceded "that kidnapping resulting in death also does not qualify as a predicate offense, adhering to its position in *United States v. Ross.*"

---

[12] *See* Role of the Solicitor Gen., 1 U.S. Op. Off. Legal Couns. 228, 231, 234 (1977) (explaining that one role of the Solicitor General is that she or he "must coordinate conflicting views within the executive branch" and that his or her "judgment must be permitted to be dispositive in the ordinary course;" "[o]nce the Solicitor General has taken a position with respect to a pending case, that position will, in most cases, become the Government's position as a matter of course").

### v. *United States v. Jeffery William Paul* provides persuasive authority to vacate counts two and four.

In *United States v. Jeffery William Paul*, Case No. 6:96-cr-60022-TLB-1 (E.D. Ark. Oct. 18, 2023), the government announced its intention to withdraw its request for the death penalty and Mr. Paul was sentenced to life imprisonment by agreement of the parties. (Exhibit No. 36, Notice of No Seek, and Exhibit No. 37, Amended Judgment). Mr. Paul's case is materially indistinguishable from Mr. Taylor's case. Paul was charged by superseding indictment with aiding and abetting first degree murder and use of firearm during a crime of violence resulting in death. (Exhibit No. 38, Paul Indictment). Mr. Paul and a co-defendant abducted their victim, shot him, drug him into the Hot Springs National Forest, and took all the cash out of his wallet. Exhibit No. 39, *Paul v. Superintendant*, Case No. 2:13-cv-00304-JMS-MJD (S.D. Ind. (August 2, 2022) (Order granting relief).

Paul's firearms' conviction was vacated by order of the United States District Court for the Southern District of Indiana because robbery is not a crime of violence under *Borden v. United States*, 141 S.Ct. 1817 (2021). Paul had to meet a higher standard of review than Mr. Taylor here because Paul's claim was brought under the savings clause of 28 U.S.C. § 2241. (Exhibit No. 39, Paul Order granting relief).

Given the strong similarities in the two cases, the recent decision of the government to abandon the death penalty in the Paul case is persuasive authority that this Court should vacate counts two and four of the indictment in this case.

Equitable principles require no less as the disparate treatment of the two cases is otherwise inexplicable.

### K. CONCLUSION

WHEREFORE, movant Rejon Taylor asks that the Court provide him with the following relief:

I.     That the Court conduct a status conference and schedule for further proceedings related to this Motion submitted in accordance with Rule 15(a) of the Federal Rules of Civil Procedure and, thereafter, submission of the Government's Answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases.

II.     That the Court permit Mr. Taylor to amend this Motion to include further evidence in support of the claims currently pled.

III.     That the Court permit Mr. Taylor to utilize the process of discovery as contemplated by Rule 6 of the Rules Governing 28 U.S.C. §2255 Cases.

IV.     That the Court permit Mr. Taylor to amend this Motion to include any additional allegations of claims not presently known to him or his counsel which may be identified or uncovered in the court of discovery, additional investigation, and litigation of this Motion, and to allow the amendments to related back to the date of the filing of this Motion.

V.     That Mr. Taylor be permitted to file a Traverse to Respondent's Answer, responding to any affirmative defenses raised by Respondent.

VI.     That Mr. Taylor be permitted to file a Memorandum of Law in Support of this Motion in accordance with a schedule established by the Court.

VII.    That the Court conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion or by Mr. Taylor's Traverse to be filed in response to any affirmative defenses raised by Respondent.

VIII.   That the Court permit oral argument on this Motion.

IX.     That the Court vacate Mr. Taylor's conviction and order a new trial.

X.      That the Court grant such further and additional relief as the law dictates.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER FOR
THE MIDDLE DISTRICT OF TENNESSEE
CAPITAL HABEAS UNIT

KELLEY J. HENRY
Supervisory Asst. Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203
Phone:  (615) 736-5047
Fax:     (615) 736-5265
Email:   kelley_henry@fd.org

By: */s/ Kelley J. Henry*
Counsel for Rejon Taylor

**CERTIFICATE OF SERVICE**

I certify that a copy of this document has been served on counsel for Respondent, Debra A. Breneman, AUSA, 800 Market Street Suite 211 Knoxville, TN 37902 and Franklin Pearson Clark, AUSA 1110 Market Street Suite 515, Chattanooga, TN 37402 by electronic case filing via the PACER CM/ECF system.

*/s/ Kelley J. Henry*
Date of Service: September 9, 2025