Exhibit 2

**Katherine Porterfield, Ph.D.**
589 11th Street, Suite #1
Brooklyn, NY 11215
New York State License # 014105-1

Ms. Kelley Henry
Supervisory Assistant Federal Public Defender
Ms. Amy Harwell
Assistant Chief, Capital Habeas Unit
Office the Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203

Ms. Alexis Hoag
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

10 May, 2019

RE: Rejon Taylor

Dear Ms. Henry, et al:

I have conducted an initial evaluation of your client, Rejon Taylor. You have asked me to describe the impact of traumatic stress and adverse events on Rejon Taylor's development and biopsychosocial functioning from childhood up to and including the offense.

**Summary of Conclusions**

In this letter, I will share my initial conclusions. I am gathering further information with which I will amend my report. To a reasonable degree of psychological certainty, my initial clinical conclusions are:

1. **Rejon Taylor demonstrates pervasive effects of longstanding, chronic traumatic stress from:**
   a. exposure to chronic, direct and indirect life-threatening violence throughout childhood and adolescence
   b. disturbed attachment and coercive relationships

1

Exhibit 2

c.  corruption by major adults and figures in his life in regards to normalizing of criminal behavior, violence and imprisonment
d.  family members with substance abuse and mental health problems
e.  community violence

2. **Rejon Taylor demonstrates emotional dysregulation—that is, an inability to identify, process and manage emotions—in the form of dissociation that reaches the level of psychosis. This is consistent with a person with early childhood pervasive trauma and neglect, as well as other neurophysiological vulnerabilities.**

3. **Rejon Taylor demonstrates a disturbed sense of self and relationships in the form of feeling controlled and being able to perceive the future and people's "energy," which are also symptoms of psychosis.**

4. **Rejon Taylor's report of his actions during the offense suggests that he reacted in shock and dissociation to the events. This is consistent with his impairments in reality testing and emotional perception that are part of the biopsychosocial effects of trauma-impaired development.**

## Qualifications

My qualifications are outlined in my curriculum vitae, which is attached. In sum, I am a clinical psychologist, licensed to practice in the State of New York. I received my Ph.D. in Clinical Psychology from the University of Michigan in 1998. My pre-doctoral and postdoctoral training included extensive training in the evaluation and diagnosis of mental disorders. Since 1998, I have worked as a psychologist at Bellevue Hospital and NYU School of Medicine at the Bellevue/NYU Program for Survivors of Torture. I have evaluated, treated, and supervised the treatment of numerous children, adolescents, and adults who have experienced war trauma and torture. I have evaluated individuals and served as an expert witness for court proceedings in the Military Commissions in Guantanamo Bay; US Federal Court, Southern and Eastern Districts in New York and the Western District of Missouri; Superior Court, Skagit County, Washington, and for immigration proceedings in courts through the Executive Office of Immigration Review. I have trained hundreds of health professionals and attorneys on the evaluation and treatment of war trauma and torture and have lectured or conducted seminars on issues of torture and complex trauma sponsored by a wide variety of

2

Exhibit 2

organizations, including human rights organizations, governmental entities, universities, and the United Nations.

I have co-authored several publications pertaining to the assessment and treatment of trauma, including that suffered by survivors of torture. I have also published on treatment of traumatic stress in children. These peer-reviewed articles have been published in textbooks and professional journals, including *The Journal of Nervous and Mental Disease*; *The Prevention Researcher*; *Psychiatry: Interpersonal and Biological Processes*; *OMEGA – Journal of Death and Dying*; and *Journal of the American Academy of Child & Adolescent Psychiatry*. I serve as an ad-hoc reviewer on several peer-reviewed journals and presses, including *Anxiety, Stress, and Coping: An International Journal, Cambridge University Press Medical Group, International Journal of Law and Psychiatry, Journal of Clinical Child and Adolescent Psychology*, and *Journal of Clinical Psychology*.

## Methodology and Material Reviewed:

In order to address the referral questions asked of me, I have begun an evaluation of Rejon Taylor. I met with him for approximately 6 hours in USP Terre Haute on April 8, 2019.

In addition, I have begun to review voluminous life history documents, including: academic records; medical and mental health records; juvenile records; court records; law enforcement records; institutional records; and testimony and declarations from lay witnesses. The records I have reviewed are the types of materials and information routinely relief upon by mental health professionals routinely in reaching reliable opinions and clinical conclusions. I reviewed the following documents: Reports of Dr. George Woods and Dr. Hope Hill; Declarations of: Edward Joseph Gatlin; Felisha Gatlin; Harold Hall; Jessica Jackson Langford; John Taylor II; Johnny Taylor; Joseph Anthony Gatlin; Jovante McCoy; Keashawn K Washington; Lisa Taylor Griggs; Marti Loring; Nedras Moreland; Nicole Gatlin; Pearl Rankins; Precious Heflin; Ramon Shepard; Rashard Blackwell; Rosa Moss; Saadia Heflin; Sandra G. Hines; Sarah Harper; Sylvia Stokes; Tameka Shepard; Tayanau Nunez; Tonya Walton; Traketa Taylor; Vanessa Heflin; Walter Lee Taylor; and Warren Almand
I also reviewed records on John Taylor, namely, Dekalb County Criminal Court Records; Dekalb County Police Department Records; Dekalb County Jail Records; Clayton County Criminal Court Records; Atlanta Police Department records; Fulton County Criminal Court Records. I reviewed Georgia Department of Corrections Records; Georgia Board of Pardons and Parole Records; US District

3

Exhibit 2

Court Records; Fulton County Criminal Court Records; Clayton County Criminal Court Records on Mr. Taylor's father, Johnny Taylor. I also reviewed the "Offender Page" related to Michael Thomas; The Georgia Department of Corrections – offender look up related to Leonard Gatlin Jr; and the Georgia Department of Corrections – offender look up for Wilbur Forts. Finally, I reviewed various 302s and government investigatory documents relating to the crime for which Mr. Taylor is convicted.

An expert examination of the impact of trauma on a child's development requires that the expert have knowledge of the extensive body of research and clinical literature addressing the deleterious impact of childhood traumatic stress on the child. An expert with this knowledge is necessary not only for the proper analysis of the evaluation material, but also in order to conduct interviews that are trauma-focused and sensitive and thereby garner valid information. Thus, throughout this report, I include citations to scientific literature from the fields of traumatology and child development that are relevant to this evaluation. It is my opinion that a thorough examination of an individual's childhood history of traumatic stress and risk and protective factors requires this methodology and expertise in order to draw valid conclusions.

## Scientific findings relevant to Rejon Taylor's history

Before I review Rejon Taylor's life events that are linked to his impaired functioning and clinical condition, I will briefly review the scientific literature that pertains to the impact of chronic childhood trauma on the neurobiological development of children. There is a robust body of scientific research on the impact of adverse life events on child development.

### A. Mental health problems: Links to toxic stress in childhood

The Centers for Disease Control and Kaiser Permanente collaborated on the Adverse Child Experiences Study (ACE Study). This study, of over 17,000 adults, is one of the largest scientific investigations conducted into the links between childhood life events and adult outcomes. The data from this study confirmed the connection between various negative childhood experiences, such as being physically and emotionally abused, witnessing domestic violence and having a mentally ill, substance-using or incarcerated family member, and a variety of negative psychological outcomes.

The ten ACE risk factors that were analyzed were:

Exhibit 2

- (1) emotional, (2) physical and (3) sexual abuse;
- (4) emotional and (5) physical neglect,
- (6) parental separation/divorce,
- (7) mother treated violently
- (8) substance abuse in the home;
- (9) family member with mental illness,
- (10) incarcerated family member.

Notably, Rejon Taylor had 6-7 of these risk factors present in chronic and severe levels throughout his childhood.

Essentially, the ACE research found a "dose response" to toxic life events—that is, as the number of childhood traumatic events increased, the poor mental health and physical outcomes increased.[1] For example, individuals with 4 ACE events showed much greater likelihood of mental health difficulties, such as depression, anxiety, substance abuse, and difficulty controlling anger than those with fewer ACE events.[2] People with four or more ACE events also had a 4.4 fold increase in the likelihood of impaired memory functioning, and far greater chance of having learning and behavioral problems.

In addition to the ACE study which demonstrated the prevalence of mental health problems in adulthood following childhood abuse, other scientific research has shown that maltreated children—especially those from distressed families—demonstrate a host of emotional problems, including depression and anxiety during childhood, emotional dysregulation, interpersonal problems, and impulsivity.[3] Summarizing the vast research on childhood trauma, D'Andrea et al. state, "Research has shown that the number and complexity of symptoms and diagnoses that children and adolescents suffer increases as the number of types of traumatic stressors that they were exposed to in childhood increases."[4] Other researchers

---

[1] Anda, R. Felitti, V. Bremner, J, Walker, J., Whitfield, C., Perry, B., Dube, S., and Giles, W. (2006) The Enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology. Eur Arch Psychiatry and Clin, 256: 174–186.

[2] Merrick, M., Ports, K., Ford, D., Afifi, T., Gershoff, E., & Grogan-Kaylor, A. (2017) Unpacking the impact of adverse childhood experiences on adult mental health. Child Abuse and Neglect, 69: 10-19.

[3] Ford, J, Connor, D, Hawke, J. (2009) Complex trauma among psychiatrically impaired children: A cross-sectional, chart-review study. Journal of Clinical Psychiatry, 70(8): 1155-1163.

[4] D'Andrea, W., Ford, J. D., Stolbach, B., Spinazzola, J., & van der Kolk, B. (2012) Understanding interpersonal trauma in children: Why we need a developmentally appropriate

5

Exhibit 2

have echoed this, arguing that an accumulation of stressors across multiple domains places children at greater risk for depression and behavioral problems.[5]

## B. Why does childhood trauma result in poor outcomes: Brain alterations due to traumatic stress

Rather than simply positing a correlation between adverse life events in childhood and poor outcomes in adulthood, there is scientific consensus based upon studies from multiple disciplines that early abuse and neglect *alter* brain development and functioning and *cause* these negative outcomes. The growing child's experiences and environment have a powerful influence on how his/her brain develops. An enormous amount of brain development, from the pruning of critical neurochemical synapses to the growth and development of brain structures, takes place throughout childhood and adolescence, and can be disrupted and permanently altered by the growing child's neurophysiological responses to trauma and extreme stress.[6] The Institute of Medicine and National Research Council, summarizing the most recent research on child abuse, notes that damage and alterations in the neurochemical and neuroendocrine systems, as well as the architecture of the brain are present in individuals with histories of childhood abuse, family violence, and neglect. These brain abnormalities are implicated in the numerous emotional, behavioral, and physical problems that individuals with histories of severe child abuse later manifest. As the ACE researchers note, overwhelming childhood stress *causes* brain alterations:

> Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences *cause enduring brain dysfunction* that, in turn, affects health and quality of life throughout the lifespan.[7]

---

trauma diagnosis. American Journal of Orthopsychiatry, 82: 187–200. *See also*, Ford, J. D & Delker, BC. (2018) Polyvictimization in childhood and its adverse impacts across the lifespan: Introduction to the special issue. Journal of Trauma & Dissociation, 19(3): 275-288.

[5] Gerard, J., Buehler, C. (2004) Cumulative environmental risk and youth maladjustment: The role of youth attributes. Child Development, November/December, Volume 75, (6): 1832 – 1849.

[6] IOM (Institute of Medicine) and NRC (National Research Council) (2014) New Directions in Child Abuse and Neglect Research. Washington, DC: The National Academies Press.

[7] Anda, R. Felitti, V. Bremner, J, Walker, J., Whitfield, C., Perry, B., Dube, S., and Giles, W. (2006) The Enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology. Eur Arch Psychiatry and Clin, 256: 174–186.

6

Exhibit 2

The U.S. Department of Health and Human Services reported on the often long-lasting effects of child maltreatment on the developing brain. DHHS found that since the majority of brain development occurs after birth, critical functions such as language acquisition, attachment, and abstract reasoning can be adversely affected by a toxic environment. DHHS research shows that the neurochemical and neuroendocrine processes that are disrupted by childhood stress may be permanently destroyed or damaged, and parts of the brain can atrophy or shrink.[8]

Below, some of the major findings regarding neurobiological effects of adverse events are reviewed:

- Neurochemical— Numerous studies demonstrate dysregulation of neurochemical functioning in maltreated and traumatized animals and children. Neurochemicals are molecules that carry information through the brain across synapses, which are the pathways by which neurons communicate with each other. They are linked to numerous human behaviors and functions, including sleep, mood, appetite, and of particular relevance here, stress response. Throughout childhood, the synapses are "pruned"—i.e. removed from the brain's functionality—if they are not used. Nelson et al. summarized how this process takes place, noting,

  > The prefrontal cortex of the 1 year-old child has many more synapses than the adult brain, but over the next one to two decades, these synapses are pruned back to adult numbers, *based largely on experience.*[9]

  Maltreatment and traumatic stress disrupt this pruning process, thereby creating impairments in the normal connectivity that is essential to human functioning of mood, sleep, etc.[10] Monoamine neurotransmitters such as dopamine, noradrenaline, adrenaline, and serotonin play a critical role in arousal, emotion, and cognition.

---

[8] U.S. Department of Health and Human Services (2009) Understanding the Effects of Child Maltreatment on Brain Development. *Child Welfare Information Gateway,* Washington, D.C. (https://www.childwelfare.gov/survey/publications/index.cfm).

[9] Nelson, C. A., K. Bos, M. R. Gunnar, and E. J. S., Sonuga-Barke, V., (2011) The Neurobiological toll of early human deprivation. Monographs of the Society for Research in Child Development, 76(4):127-146.

[10] Bremner, J. (2003) Long-term effects of childhood abuse on brain and neurobiology. Child Adolesc Psychiatr Clin North Am, 12: 271–292.

7

Exhibit 2

Dysfunction in this system has been linked to childhood stress and a range of psychiatric problems including aggression, attention deficits, and anxiety and depression.[11]

- Neuroendocrine— The hypothalamic-pituitary-adrenocortical (HPA) axis is the hormonal system that plays a major role in the human reaction to stress. It also contributes to multiple psychophysiological functions, including mood, immune response, and digestive processes. The HPA system produces hormones called glucocorticoids which are critical to the human stress-response system, directing energy to the body systems that are necessary when mounting a stress response. These glucocorticoids are also related to daily patterns of circadian rest and alertness. Research has shown that early stress alters the HPA system, affecting these glucocorticoid responses to stress. Maltreated and neglected children have been shown to have "flattened" patterns of glucocorticoid regulation, suggesting that earlier hyperactivation of the stress system (during stressful, frightening situations of abuse and neglect) alters the HPA systems, thereby altering major aspects of the child's regulation system.[12] Thus, abused and neglected children may have permanently and seriously altered stress-response systems, even if they are taken out of the abuse situation.

- Neuroanatomical— Research has also demonstrated that chronic child abuse and stress-inducing trauma can permanently alter the physiology and structure of the developing brain. The dysregulated glucocorticoid response described above in the hormonal system has been connected to damage to the brain structures, particularly the hippocampus, amygdala, and corpus callosum.[13] The hippocampus is

---

[11]De Bellis M. Baum, A., Birmaher, B., Keshavan, M, Eccard, C., Boring, A., Jenkins, F., Ryan, N. (1999) AE Bennett Research Award. Developmental traumatology. Part I: Biological stress systems. Biological Psychiatry, 15(45): 1259–1270.

[12] Bernard, K., Z. Butzin-Dozier, J. Rittenhouse, and M. Dozier. (2010) Cortisol production patterns in young children living with birth parents vs children placed in foster care following involvement of child protective services. Archives of Pediatrics and Adolescent Medicine, 164(5): 438-443; Bruce, J., P. A. Fisher, K. C. Pears, and S. Levine. (2009) Morning cortisol levels in pre-school aged foster children: Differential effects of maltreatment type. Developmental Psychobiology, 51(1): 14-23.

[13]Twardosz, S., and J. R. Lutzker. (2010) Child maltreatment and the developing brain: A review of neuroscience perspectives. Aggression and Violent Behavior, 15(1): 59-68.

8

Exhibit 2

the brain structure responsible for the encoding and retrieving of memory and has been identified as one of the primary areas of potential damage from early and severe stress. It has been shown to atrophy when exposed to too much glucocorticoid.[14] Individuals with severe childhood stress have evidenced smaller hippocampi, and demonstrated attendant memory problems. Similarly, the amygdala, the brain structure responsible for learning and for the consolidation of emotional memories, has been shown to be reduced in size in those who suffered childhood traumatic stress.[15] These anatomical changes in the brain are linked to multiple behavioral and psychological problems, including memory disruption, anxiety, and intrusive re-experiencing of traumatic memories, all of which can lead to impaired functioning when the individual is under stress.[16]

Another brain structure implicated in maltreatment of children is the corpus callosum. The corpus callosum is a band of neural tissue that connects the two cerebral hemispheres of the brain, allowing messages to be sent between them and to allow for integrated left/right function of the brain and body. There is a large body of research that has shown damage to the corpus callosum in children who have been neglected and maltreated.[17] Research shows that this impairment to the integrative capacities of the brain is related to post traumatic symptoms, such as dissociation and memory.[18]

C. *Dissociation in relation to trauma.*

---

[14] Bremner, J. (2003) Long-term effects of childhood abuse on brain and neurobiology. Child Adolesc Psychiatr Clin North Am, 12: 271–292.

[15] Hanson, J., Nacewicz, B., Sutterer, M., Cayo, A., Schaefer, S., Rudolph, K., Shirtcliff, E., Pollak, S., & Davidson, R., (2015) Behavioral problems after early life stress: Contributions of the hippocampus and amygdala. *Biological Psychiatry,* 77: 314-323.

[16] Whittle, S, Dennison, M., Vijayakumar, N., Simmons, J., Yücel, M., Lubman, D., Pantelis, C., Allen, N. (2013) Childhood maltreatment and psychopathology affect brain development during adolescence. Journal of the American Academy of Child and Adolescent Psychitatry, 52(9), 940-952.

[17]Teicher, M., Anderson, S., Polcari, A, Anderson, C., Navalta, C., & Kim, D. (2003) The Neurobiological consequences of early stress and child maltreatment. Neuroscience and Biobehavioral Reviews, (27): 33-44.; Teicher, M. H., N. L. Dumont, Y. Ito, C. Vaituzis, J. N. Giedd, and S. L. Andersen. (2004) Childhood neglect is associated with reduced corpus callosum area. Biological Psychiatry, 56(2): 80-85.

[18] Putnam, F. (2003) Ten Year research update review: Child sexual abuse. Journal of the American Academy of Child and Adolescent Psychiatry, 42(3): 269-278.

Exhibit 2

Dissociation is a process of the human nervous system in which neurochemical and neuroendocrine reactions to excessive stress lead to alterations in consciousness, changing perceptions of the senses, the environment, and the self. Dissociation represents a lowering of consciousness, sometimes to the point of an actual rupture of consciousness and awareness.[19] Clinical models of dissociation explain how humans, like other animals, when under severe threat, will sometimes experience the release of neurochemicals that are anesthetic and that lower the experience of pain and fear. When humans experience this peritraumatic ("during the trauma") dissociation, they are often left with residual difficulties after the trauma, such as amnesia, fragmentation of memory, and other perceptual disturbances. If the individual suffers multiple traumatic events that lead to frequent and lengthy periods of peritraumatic dissociation, the after-effects will likely be more pervasive and more severe. These can include altered states of consciousness that linger after the traumatic events, such as time distortions, memory fragmentation or amnesia, bodily symptoms (depersonalization and derealization), and emotional numbing.[20] These states can also be triggered by reminders of the traumatic events, both conscious and unconscious, particularly under stress. Dissociative symptoms can reach the level of psychosis, as when an individual suffers hallucinatory phenomena, such as voices talking at him or her in an attacking manner or perceives reality or their body in a distorted way (derealization and depersonalization).

**Relevant data in Rejon Taylor's life history**

My examination of Rejon Taylor thus far has involved a six-hour clinical evaluation of him, as well as review of voluminous materials provided by counsel. What is striking in this material is the prevalence of traumatic stress in Rejon Taylor's childhood and adolescence. Below, I will review several domains in which he experienced the type of life events that have been linked to enduring and pervasive problems in biopsychosocial functioning. As my evaluation and review continue it is likely that further data will emerge.

A. *A childhood immersed in the traumatic stress of violence*

---

[19]Lanius, U., Paulsen, S., & Corrigan, F. (2014) Neurobiology and Treatment of Traumatic Dissociation: Toward an Embodied Self, Springer: New York.

[20] Frewen, P. & Lanius, R. (2014) Trauma related altered states of consciousness: Exploring the 4-D model. Journal of Trauma and Dissociation, 15: 436-456.

Exhibit 2

The overarching dynamic in Rejon's family life was one of violence and coercive control by family members against one another and of exposure to lethal violence. Family members were murdered and/or shot; others suffered abuse at the hands of each other. Rejon, himself, was exposed to gun violence by the age of 7 or 8, including being almost shot by his brother-in-law and then actually shot by his brother with a BB gun.

In Rejon's early childhood, his Aunt Bettye was murdered by her husband.[21] This event reverberated through the family and was an early lesson to Rejon that family could be lethal. Numerous family members noted the profoundly destructive impact the murder had on the family.[22] Additionally, Rejon was aware that his father had committed a murder when his father was 16 years old. When Rejon was a pre-schooler, his sister Tameka came home with a bloodied face and black eye from a boyfriend. [23] Rejon's aunt, Tonya, moved in with Rejon's family when he was approximately 4 years old, because her husband was abusive to her and her children, often flying into "fits of rage." [24] While he was still a small child, Rejon's half-sister, Tameka, with whom Rejon was very close, lost her father to murder. Years later, Tameka's cousin died of reported suicide that the family believed was a domestic violence murder.[25] Rejon also recalled other incidents of disturbing violence. He remembered his uncle beating his Aunt Tonya and "throwing her off a porch."[26] In his neighborhood gas station where his mother worked, Rejon watched a man beat a woman until she was bleeding and lying on the ground.

When Rejon was approximately 8 years old, his brother-in-law Ramon was shot at close range.[27] This would have been a terrifying event for any child to learn about, given that Ramon was an important figure in Rejon's life. But, for a child who had already been exposed to guns and to stories of family members' murders, it brought the reality of gun violence frighteningly close to home.

Rejon also experienced domestic violence between his parents, Johnny Taylor and Reba Taylor. Rejon was conceived while Johnny was on escape status

---

[21] Declarations of Lisa Taylor Griggs, John Taylor, Saadia Heflint, Vanessa Heflin

[22] Declarations of Johnny Taylor;Lisa Taylor; Walter Taylor; Precious Heflin; and Vanessa Heflin.

[23] Porterfield interview, Rejon Taylor; Declaration of Tameka Shepard

[24] Declaration of Tayanau Nunez

[25] Declarations of Ramon Shepard, Tameka Shepard, Felisha Gatlin

[26] Porterfield interview, Rejon Taylor.

[27] Declaration of Ramon Shepard

Exhibit 2

from prison, and his parents' relationship thereafter was tumultuous [28] Rejon recalled his parents fighting behind a door and his mother screeching in a distorted voice.[29] His sister described another incident:

> During the time that Johnny had the house on Beaupree, he hit [Reba]. He got mad about something. After he hit her, she walked all the way from Beaupree to the house on Rollingwood, leaving John and Rejon with their father. They were small when it happened. Grandma Eva and I were home. My mother was bloody. Her eye was cut, swollen, and puffy.[30]

Rejon's sister and cousin noted that Johnny gave Reba a black eye: "A few years ago, Auntie Reba confirmed that Johnny was responsible for her black eye."[31] Rejon's father noted that his wife "slung pots" at him and slapped him.[32] While this is certainly a credible description of violence between partners, it is noteworthy that Mr. Taylor does not endorse any aggression towards his ex-wife, though others do note it.[33] In another story Mr. Taylor notes, "I put my hands up to protect myself. I had my keys in my hand and Reba ran into my keys."

Studies regarding the emotional development of children raised in homes with violence establish the negative long and short-term effects of exposure to domestic violence on cognitive, behavioral, and relational functioning. Additionally, the development of emotional control or self-regulation in children, an essential part of a healthy maturational process, is believed to be profoundly altered when children are placed in a chronic state of terror, anxiety, and hyperarousal due to being exposed to violence.[34] Witnessing abuse within the family has been linked to disturbed attachments, because children must make sense of their most essential caretakers as being also sources of fear and horror. [35] As these critically important caretakers become sources of such overwhelming feelings and therefore *not* sources of comfort, children are left to manage these

---

[28] Declarations of John Taylor, Tameka Shepard, and John Taylor II

[29] Porterfield interview, Rejon Taylor.

[30] Declaration of Tameka Shepard.

[31] Declarations of Tayanau Nunez andTonya Walton.

[32] Declaration of Johnny Taylor.

[33] Declaration of Johnny Taylor.

[34]Teicher, M. (2000) Wounds that time won't heal: The neurobiology of child abuse. Cerebrum: The Dana Forum on Brain Science, 2(4).

[35] Holt, S., Buckley, H., and Whelan, S., (2008) The Impact of exposure to domestic violence on children and young people: A review of the literature. Child Abuse and Neglect, 32: 797-810.

Exhibit 2

emotions in whatever way they can. This can lead to dissociation, emotional dyscontrol, and a host of problems managing their feelings about themselves and about other people.

B. *Rejon's direct victimization with guns*

Rejon's childhood and adolescence is remarkable for the sheer number of times he was directly or indirectly exposed to gun violence. As a small boy, he was almost shot by his older brother-in-law, Ramon. This occurred in the home and the family did nothing to address what this experience felt like for Rejon.[36] For a child to survive being shot at and have no one provide nurturance or caretaking in the aftermath is an astonishing lack of basic caregiving. Rejon described this event vividly but could not recall who shot at him, incorrectly saying it was his brother.[37] This kind of misidentification from trauma is quite common, especially in a traumatic childhood memory.

Rejon's impaired memory of the near shooting also echoes the power dynamics in his family. Rejon remembers it was his brother—rather than his adult brother in law—who almost killed him. This altered memory reflects the dynamic that became powerful throughout Rejon's life: that is that his brother John posed a lethal danger and threat to his existence. At age 10, Rejon was shot by John with a BB gun.[38] Rejon's father reported that during the years the boys lived with him (Rejon was between 8-13) John got out the father's gun and aimed it at Rejon, scaring Rejon.[39] Later in his adolescence, Rejon reported that his brother held a gun directly on him and was prepared to shoot him.[40] These events appear to have coalesced in Rejon's experience of his brother, making him a powerfully threatening figure for Rejon. Rejon's descriptions of his brother throughout the evaluation were of an almost omnipotent person. Rejon stated that, if he wasn't in prison, his brother would have probably "killed me." His descriptions of John were of a person who totally controlled him and who was repulsed by Rejon. These perceptions are likely linked to Rejon's actual experiences of his brother, but they also were indicative of a distorted sense of other people, something that will be discussed in the Clinical Conclusions section.

---

[36] Declarations of Tameka Shepard and Ramon Shepard.

[37] Porterfield interview, Rejon Taylor.

[38] Declaration of John Taylor II

[39] Declaration of John Taylor

[40] Porterfield interview, Rejon Taylor.

13

Exhibit 2

Finally, as a high schooler, Rejon was carjacked at gunpoint by a group of young men. For a young person to be subject to direct gun violence or threat of gun violence five times before he was 18 is an astonishing dose of trauma and threat that would likely result in biophysiological post-traumatic reactions, including hypervigilance, arousal, dissociation and numbing.

C. *Disturbed attachment due to parental/caretaker corruption and incarceration*

Adverse outcomes, such as poor health, mental health problems, depression, and delinquent behavior are known to be linked to the experience of having adult caretakers who are involved in criminal activities or who are incarcerated.[41] The inherent conflict between a child's feelings of love for, loyalty to, and dependence on a parent and the fear *of* that parent combined with the fear *for* that parent (of detection of the illegality, apprehension or incarceration) combine to overwhelm the child, creating chronic stress and confusion. Immersion in a culture of adult criminal behavior creates enormous risk for a child, both because he learns distorted norms and also because he must absorb the sometimes frightening, out-of-control behavior of the adults around him. The negative outcomes which often result from such situations flow both from the modeling of criminal behaviors, as well as from the traumatic stress of witnessing, learning about, or feeling threatened by such conflicting, frightening adult behaviors.

Sadly, for many families who become involved in illegal activities, the parental involvement in these actions reflects the parent's *own* childhood experiences of trauma, neglect, and adversity. And without intervention and mental health support, families struggle with repetitive cycles of violence and chaos. Dr. Hope Hill's report documents the family history of Johnny and Reba Taylor.[42] The history of this family, dating back to post-civil war Georgia, demonstrates chronic conditions of severe violence, poverty, trauma, and racism. Rejon's ancestors faced overwhelming obstacles in their struggle to survive. I agree with Dr. Hill's conclusions that these obstacles played an important role in Rejon's social,

---

[41] Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000) Predictors of youth violence. Juvenile Justice Bulletin, U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention; Gjelsvik, A., Dumont, D., Nunn, A., Rosen, D. (2014) Adverse childhood events: Incarceration of household members and health-related quality of life in adulthood. *Journal of Health Care for the Poor and Underserved,* 25.3(3) 1169-1182.

[42] Report, Hope Hill, Ph.D.

Exhibit 2

emotional, and physical development, as they created an intergenerational cascade of genetic, psychological, and behavioral effects.

Living with adults who engage in unlawful behavior creates a fundamental conflict for a child. Children who witness caregiver criminal behavior are not developmentally equipped to contextualize that which they observe. They must make sense of knowing that certain behaviors are "wrong," "forbidden" or "bad," while watching important attachment figures engage in such acts. An imprisoned parent further heightens this conflict, as the child must navigate feelings, such as guilt, anger, shame, and sadness about the loss of the parent. Further, a child is not capable of understanding the environmental, social, and psychological factors that contributed to the adult's illegal behavior. For example, as a child, Rejon would have been incapable of understanding the exploitative, historical legacy of slavery and African-American impoverishment that induced his grandmothers into prostitution.[43] And in a relationship much more central to him, he would have been unaware of the factual circumstances surrounding his father's conviction for murder when he was a young man. For Rejon, the story of his father's crime was a frightening one—both signifying threat *to* his father (his father had been taken away and locked up once, it could happen again) but also threat *from* his father (his father had killed before and therefore could do it again).

Rejon's life was replete with these types of unresolvable conflicts, especially in relation to his father. He lived within a world in which he had to endure and process threat both *to* and *from* those with whom he was most intimately connected. As a child, Rejon knew that his father had been in prison for committing a murder as a teenager and that he had escaped from prison. He knew that he had been conceived while his father was a fugitive. Rejon's father was in prison until Rejon was 8 years old and returned to prison when Rejon was 14 years old, where he remained for the next 17 years. His mother took Rejon weekly to see his father in the prison for several years, regularly exposing him to the confusing and upsetting setting where his father was held.[44] He noted that he felt "unsafe" visiting with his father in prison.[45] Rejon's sister noted: "There was a time that I thought Rejon despised his father. Johnny was not a positive influence in Rejon's life." She added: "Rejon was scared of [Johhny] when he was little...I knew by the way Rejon acted when he was around Johnny. He pulled back, was

---

[43] *See*, Report, Hope Hill, Ph.D.
[44] Declaration of Johnny Taylor.
[45] Porterfield interview, Rejon Taylor.

Exhibit 2

even quieter than usual."[46] Rejon vividly remembers his father showing him a gun when he was about 8 years old. Rejon related that he started crying when he saw the gun, only to have his father call him a "sissy." In his life up to this point, Rejon had been almost shot, had known people who had been murdered, and knew his father had gone to prison for murder. His reaction to seeing a gun—crying out of fear—was a completely predictable response, given his history of threatening gun violence, and yet one in which he was immediately shut down and humiliated by his parent.

Rejon's relationship to his father was conflicted because Johnny Taylor was not only a source of fear and humiliation for him, but also a beloved, yearned-for father. Once Johnny emerged from prison and lived, however briefly, with Rejon, he provided Rejon the most reliable affection and structure Rejon had known.[47] Johnny's nurturance was conflictual for Rejon, because Rejon's grandmother had described his father as "bad" and "evil" for years. [48] Hearing this throughout his childhood, made Johnny's attempts to provide his son structure (making good breakfasts, checking homework, doing yardwork as a family)[49] confusing for Rejon. Further, Johnny Taylor introduced Rejon to identity theft during this period. As he admitted, he left "a lot of information [about identity theft] lying around the house." [50] Because Johnny Taylor came back into Rejon's life and provided structure, losing him back into the criminal justice system was even more devastating for this adolescent boy. Rejon noted that throughout his life he felt deeply confused feelings about his father—wishing he was a source of protection and love, but finding him unsafe and frightening.

This kind of conflicted relationship to a parent can lead to inner turmoil and identity confusion for children. Because children have difficulty holding onto two opposing feelings—I love my father and my father frightens me—they often have to "split" or turn off their reality in a way that can make it more tolerable for them. Rejon engaged in this kind of disconnection from his feelings, retreating as a way to mitigate the pain of his father's role in his life. When his father was imprisoned again during Rejon's teenage years, he sat in the car during visits, rather than go in and deal with his father.

[46] Declaration of Tameka Shepard
[47] Porterfield interview, Rejon Taylor; Declaration of Johnny Taylor
[48] Porterfield interview, Rejon Taylor.
[49] Declaration of Johnny Taylor.
[50] 2008 Interview of Johnny Taylor by Marti Loring

Exhibit 2

Rejon's brother John was another powerful male figure in Rejon's life who engaged in illegal acts that threatened and confused Rejon. John's arrest history began when he was 16 and Rejon was 13 and continued throughout Rejon's adolescence. Rejon recalls his brother as a looming, omnipotent controller because of Rejon's childhood experiences of being frightened and threatened by John, as well as being the recipient of John's largesse. Rejon recalled John sending him to school in a limousine, a moment that both overpowered Rejon's individuality, while also cementing his status at his school. John exists as an omnipotent and destructive presence in Rejon's perspective, either as a result of actual trauma or from memory impairment secondary to Rejon's dissociative impairments and neuropsychiatric vulnerabilities (see Report of Dr. George Woods) – or from both. When Rejon remembered almost being shot as a child, he remembers it as if it were his brother who shot him—even though his brother would have been a small boy at the time. After describing this, he said, "My brother never wanted me around…that's why he later shot me with a BB gun." Again, this kind of description suggests that Rejon's memories and reactions to his brothers are distorted by traumatic associations.

## D. *Profound Neglect*

Healthy child development and well-being occurs within a context of a nurturing environment in which the physical and emotional needs of the child are fulfilled by a predictable, reliable caretaker. Neglect is defined as a pervasive pattern of caregiver/child interactions that is harmful to the child in the lack of provision of these basic needs or ill treatment of the child in ways that deny the child's basic, human needs. [51] The ill effects of neglect can be serious and long-lasting. Without emotional nurturance and the provision for physical and environmental needs, research has shown that children go on to develop problems in many of areas including academic impairments, problems in emotional regulation, social withdrawal, and impairments in sense of self.[52]

It is my clinical opinion that in Rejon Taylor's life, there is evidence of sustained and profound neglect. Overall, there was a pervasive lack of supervision and emotional responsiveness provided to Rejon by his caregivers. This entailed

---

[51] Glaser, D. (2002) Emotional abuse and neglect (Psychological maltreatment): A conceptual framework. Child Abuse and Neglect, 26, 697-714.

[52] Hildyard, K. & Wolfe, D. (2002) Child neglect: Developmental issues and outcomes. Child Abuse and Neglect, 26 679-695.

Exhibit 2

his being isolated emotionally and left without supervision or a parent who was emotionally available to him and responsive of his needs.

For much of his childhood, Rejon's father was in prison and his mother was unavailable because she was working multiple jobs. Many family members note how Rejon and his brother were shuttled between family members, including his great-grandmother Anna Bell, his grandmother Eva, his sister, his Aunt Lisa, and his grandmother Addie Taylor.[53] While many families use extended family to provide childcare for young children, the quality and consistency of that care is critical to whether the child is able to build a sense of safety and stability. Family members noted that Rejon's mother seemed unable to engage with the children when they were little. His cousin noted: "When they were growing up, Reba was either sleeping or about to fall asleep. They needed a present parent and they didn't have one."[54] Another cousin noted: "Aunt Reba was hardly home when I was there. She was constantly working multiple jobs. If anything, I would see her sleeping briefly in between jobs."[55] His brother in law, who knew him in early childhood, said: "Rejon and John did not have a consistent disciplinary figure in their lives. They went without discipline because Reba was either working or sleeping between jobs."[56] Rejon's childhood friend remembers him sneaking out at night with her because "no one was watching us."[57]

Rejon's father's imprisonment throughout his childhood ensured his absence from his sons. This was noted by numerous relatives who observed the boys' lack of parenting. Their uncle noted: "A true father figure was absent in Rejon and John's life. I tried to fill that void as best I could. Still, they suffered from a lack of guidance and discipline."[58] A cousin noted of Rejon and John, "They did not have someone who they could look to as an example. They needed to see a Black man go to work and provide for the family."[59] Their family friend noted: "Rejon did not have the influence of a male role model or authority figure in his life. I did not see uncles or older male cousins or father-figures in Rejon's home when I spent time there."[60] Even Rejon's father noted that Rejon received no real parental guidance: "I told Reba that it was not good for them to be on their own

---

[53] Declaration of Tameka Shepard.
[54] Declaration of Edward Joseph Gatlin.
[55] Declaration of Edward Joseph Gatlin.
[56] Declaration of Ramon Shepard.
[57] Declaration of Jessica Jackson Langford.
[58] Declaration of Joseph Gatlin.
[59] Declaration of Edward Joseph Gatlin
[60] Declaration of Jessical Jackson.

Exhibit 2

like that, but I said those things while in prison. I knew I was not going to convince anyone."[61]

The house on Rollingwood where Rejon spent large periods of his young life was also a place where family, friends, or neighbors were allowed to stay without notice. There was a constant parade of people in and out of the modest house. Rejon never knew who might be sleeping where – including whether he would be displaced for someone else.[62] In addition to the Rollingwood house, Rejon lived for a time with his mother and father on Beaupree but then his mother left Rejon with his father and returned to Rollingwood.[63] Rejon also lived with his sister and her husband from time to time.[64] He also lived with a friend at one point to be able to attend a different school.[65] Rejon never had a stable, safe place that was his home. This lack of structure likely contributed to his sense of the world as unstable—an experience that would lead a child to be emotionally overwhelmed.

E. *Substance abuse and mental illness in the family*

There were multiple family members in Rejon's paternal and maternal family who struggled with mental illness and substance abuse. Members of the paternal and maternal sides of Rejon's family have been diagnosed and/or have exhibited mental health problems. These problems have spanned generations. Only in the most recent generation has treatment been sought.

Rejon's mother, Reba Taylor, and his sister, Tameka Shepard, have been described as both suffering from depression.[66] Rejon's father, Johnny Taylor, has said he was told that he was born with a "veil" over his face.[67] Johnny believes this has allowed him to see visions of the future. Johnny had multiple incarcerations as a teenager and young adult. A psychiatrist told his parents that he had mental problems after evaluating him.[68] Rejon shares these unusual beliefs about his own ability to perceive things. Even with an understanding of the culturally normative aspects of such a set of beliefs, they are unusual and, in

---

[61] Declaration of Johnny Taylor.

[62] Declarations of Tameka Shepard; Ramon Shepard; Tayanay Nunez, and Tonya Walton

[63] Declarations of John Taylor; Tameka Shepard; and John Taylor II

[64] Declarations of Tameka Shepard and Ramon Shepard

[65] Declaration of Rashard Blackwell

[66] Declaration of Tayanay Nunez

[67] Declaration of John Taylor

[68] Declaration of John Taylor

Exhibit 2

combination with other indications of poor functioning, suggest that there are psychiatric issues that could explain these beliefs.

There are numerous other relatives of Rejon's who had mental illness. On Rejon's paternal side, his first cousin Erica Gould, who found her mother after she had been murdered by her father, was diagnosed with schizophrenia.[69] Another paternal first cousin, Saadia Heflin, was diagnosed with Post-traumatic Stress Disorder (PTSD), depression and anxiety.[70] This was due to the physical, mental, and emotional abuse she and her sister (Vanessa Heflin) received at the hands of their mother, Barbara Heflin (Rejon's paternal aunt). Saadia and Vanessa were removed from their mother's custody by DeKalb County Division of Family and Children Services due to the abuse they received.[71] Although Vanessa has not received a diagnosis, she describes severe mental problems, such as panic attacks, anxiety, and uncontrolled crying that she has lived with since childhood. She describes self-medicating with alcohol and marijuana to this day.[72]

On Rejon's maternal side, his first cousin Edward Gatlin was diagnosed as Bipolar when he was 16 years-old at the Charter House, a juvenile mental health facility.[73] Edward's father, Joseph Gatlin (Rejon's maternal uncle) is described by members of his family as being emotionally abusive to his children and numerous wives and of self-medicating with drugs and alcohol.[74] Edward was prescribed Depakote, a mood stabilizer often prescribed for Bipolar Disorder and seizure disorders to treat mental illness.[75]

Other members of Rejon's maternal family have been described as being mentally slow, unstable, and unable to keep a home.[76] Joseph's brother Stanley Gatlin (Rejon's maternal uncle) was hit by a car when he was 12 years-old and is described by family members as severely impaired ever since.[77]

Family members also noted numerous relatives of Rejon's who struggled with substance abuse. For example, his Uncle Willy was noted to have severe

---

[69] Declarations of Vanessa Heflin and Lisa Taylor Griggs
[70] Declaration of Saadia Heflin
[71] *Id.*; Declaration of Vanessa Heflin
[72] Declaration of Vanessa Heflin
[73] Declaration of Edward Joseph Gatlin
[74] *Id.*
[75] *Id.*
[76] Declarations of Edward Joseph Gatlin; Tayanau Nunez
[77] Declaration of Joseph Anthony Gatlin

Exhibit 2

alcoholism which resulted in his death. [78] Another uncle Larry Gatlin Jr , who was present for Rejon's childhood was in prison and ultimately died of alcoholism.[79]

Family members with serious mental illness create risk for children in a number of ways. First, there is the genetic risk that exists in families with a high incidence of mental illness and substance abuse. Each family member with these conditions increases the likelihood of heritable illnesses passing onto the next generation. However, there is also the lived risk for children with family members with mental illness, as they are exposed to unpredictable, frightening and disturbing symptoms in their loved ones. Finally, family members with mental illness and substance abusing behaviors may have symptoms and impairments in functioning that prevent them from providing basic needs for children. Thus, the risks to children with multiple family members with these conditions is genetic, psychological and environmental.

F. *Community trauma*

Neighborhood crime, the presence of drug activity, and community disorganization have been implicated as risk factors for youth.[80] The mechanism of risk that is created for children who grow up in such communities is believed to be an interaction of environmental and internal factors. The community provides the exposure to the traumatic stressors of crime, drug usage, aggressive, racially-charged policing, and general chaos. This environmental stress overload then leads to a host of emotional and cognitive reactions that the child must manage—these can include shock, horror, fear, anxiety, sadness and frustration. Now, the emotionally overwhelmed child is living in a continuously and chronically stressful environment, and the cycle worsens his ongoing functioning.

Rejon spent much of his life in neighborhoods replete with community violence, drug trafficking and crime. Exacerbating this stress was the fact that his own family participated in some of these activities. This likely complicated his reactions to this environment. To this day, he struggles to understand and make sense of the negative influences to which his family exposed him.

---

[78] Declaration of Walter Taylor

[79] Declaration of Rosa Pat Moss

[80] U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, (2001) Risk Factors for Delinquency: An Overview.

Exhibit 2

As Dr. Hope Hill's report describes in some detail, at the time of Rejon's birth, Reba was living in the Gresham Park neighborhood. Gresham Park was a predominantly African-American neighborhood with under resourced and underfunded schools serving African-American children. The neighborhood was overrun with crime and violence. "One neighbor said: "Gresham Park neighborhood was hood to me…There was something going on outside all day and night in Gresham Park."[81]

Rejon was exposed to violence and other traumas while in middle school. For example, a student brought a gun,[82] one student raped another,[83] five students were injured on the bus when a student threw a brick at them.[84] High school was even worse: a classmate was shot and killed off campus,[85] police were routinely called to the school and arrested students,[86] students regularly brought weapons,[87] a women's burned, dead body was found in the truck of a car in the parking lot,[88] and Rejon experienced a carjacking attempt.

During eleven years of education, Rejon changed schools ten times. Rejon also lived for a time with his sister Tameka and her husband Ramon in an even more dangerous part of Atlanta.[89] This sort of instability in his education, coupled with the fact that the schools themselves were failing and overrun with drugs, gangs, and violence added to Rejon's vulnerablity. As noted by James Garbarino, an expert on the impact of urban violence on children's development, experiences of ongoing violence in a child's community keep them in a state of fear and mistrust and distort their ability to imagine a healthy future.[90] As a child who had been almost shot, this immersion in unstable communities would be highly overwhelming for him.

---

[81] Declaration of Keashawn Washington.

[82] "First student to get gun tip reward," Atlanta Constitution (Feb. 21, 1998).

[83] "14-year-old charged with raping classmate," *Atlanta Constitution* (May 26, 1999).

[84] "Hurled brick injures 5 on DeKalb school bus," *Atlanta constitution* (Oct. 3, 1998).

[85] "Student shot, killed at zoo had missed Friday prom," *Atlanta Constitution* (May 8, 2001).

[86] "McNair needed help 3 times in one day," *Atlanta Constitution* (Mar. 19, 1998).

[87] "Security experts to evaluate schools," *Atlanta Constitution* (Feb. 19, 1998).

[88] "DA may seek death penalty in student's slaying," *Atlanta Constitution* (Dec. 14, 2000).

[89] Declaration of Tameka Shepard

[90] Garbarino, J., Kostelny, K., & Dubrow, N. (1991) No place to be a child: Growing up in a war zone Jossey-Bass, San Francisco, CA.

Exhibit 2

## Clinical conclusions

I interviewed Rejon Taylor for 6 hours in USP Terre Haute on April 8, 2019 He was cooperative and talkative throughout our meeting. He demonstrated a willingness to talk about his life and stated a desire to understand himself. Rejon demonstrated unusual eye contact—looking directly at me but becoming easily distracted by my hand motions. The effect was that he seemed fragmented in his ability to pay attention and focus during our conversation. That said, he was mostly able to follow the thread of what we discussed. His manner, however, suggested some interference or disconnection in his ability to stay focused and connected with his interviewer. Rejon's speech and language skills were broadly intact and he was able to express himself. He did, however, use some unusual language and concepts to explain his perceptions of the world. These will be discussed below in more detail. Emotionally, he vacillated between a slightly "glazed over" affect (seemingly disconnected) and an intense presentation (leaning forward, speaking intently).

In the evaluation, Rejon demonstrated several behaviors and described ways that he perceived things that were noteworthy as serious clinical symptoms. These are:

**1. Rejon Taylor demonstrated dissociation that reaches the level of psychosis in its perceptual and cognitive disturbance.**

Rejon's dissociation is consistent with a person with pervasive childhood trauma and neglect, as well as other neurophysiological vulnerabilities.[91] Throughout the evaluation, Rejon talked about "energy" and the fact that he has seen things "emanating" from people since he was a small child. He described that people are "electric in a sense" and that he "absorb[s]" people's energy. Rejon emphasized that language was not a useful or helpful tool for him as a child because he "didn't have language." When describing a car accident he was in, he said he didn't have a memory of it, but had an "energy" from it. He described that "energy is in motion in me and alive in me, creating molecules of emotion." When describing being almost shot as a little boy, he stated, "I remember the details, but I

---

[91] *See* Report, Dr. George Woods. While my observations and conclusions are independent of Dr. Woods', I agree with his assessment of Mr. Taylor's impairments and accept his diagnosis of as temporal lobe syndrome as part of the etiology of the constellation of symptoms we both document.

Exhibit 2

don't associate to the physical response." (Notably, as discussed above the details he remembers are sometimes distorted and historically inaccurate).

Rejon's language indicates that he experiences certain cognitive and emotional experiences—perceptions, memories, and feelings—as not within him. His description of his *internal* experiences is as if they are *outside* of him. Thus a memory becomes an "energy." A feeling becomes "electricity." This level of disconnection from his own perceptions and experiences is psychotic.

Rejon's emotional dysregulation—a difficulty managing emotions in a functional way—dates back to childhood. He was described by multiple family members as a vulnerable, emotional child. Multiple people in the family described him as extremely sensitive and as crying frequently.[92] His sister said that Rejon did not use words to say what he felt but "just cried."[93] By his own description, he "had no language" as a child and cried constantly.[94] He recalled being called a "sissy" by his father for his crying. The picture that emerges of Rejon is of an emotionally overwhelmed child—overwhelmed by sadness, stress and fear—who has few internal or external resources to provide him comfort.

This difficulty managing overwhelming emotional experiences is related to Rejon's many traumatic experiences. For example, he described when he was a little boy and he witnessed a man severely beating a woman in a gas station. He noted, "I felt so overwhelmed by the violent energy…everything I knew was disoriented by this. Like a physical blow." He described his reaction: "You freeze up…my body locks up." Rejon's language captures effect of a childhood traumatic experience: he is overwhelmed physically by the sensory experience, then he becomes disoriented and ultimately frozen into a state where he cannot process what is happening. He quickly followed this story with a story of his sister coming home with a black eye and beaten face. He stated about this event: "I can feel the violent energy." His use of the present tense and the externalization of the violence into an "energy" are both signs that he learned to dissociate from upsetting and distressing experiences. When describing time in jail after his arrest, he noted, "I'd feel the violence there—feel it in my stomach, knots in my stomach." He described his coping in jail, saying, "I shut everything out. I had to get away to a secret place." Rejon's dissociation is severe in that he does not

---

[92] Declarations of Joseph Gatlin; Lisa Taylor; Ramon Shepard; and Tayanau Nunez
[93] Declaration of Tayanau Nunez;
[94] Porterfield interview, Rejon Taylor.

Exhibit 2

recognize that he is disconnected and has, in fact, created a world view around his perceptual disturbances. This too is a sign of psychotic thinking.

Another example of Rejon's distorted perceptual and cognitive functioning is his fragmented and distorted memories. As mentioned earlier, he recalled being almost shot as a small boy and he described his brother as the person who almost shot him. This confabulation—distorting a detail of a memory—likely reflects Rejon's disturbed relationship to his brother, who he felt controlled him.

## 2. Rejon Taylor demonstrated a disturbed sense of self and relationships.

Related to these above symptoms of dissociation but distinct from them is Rejon's disturbed sense of self and relationships. This often takes the form of his feeling controlled by people, of feeling outside of interactions, and feeling able to perceive the future and people's "energy." These experiences can also be symptoms of dissociation, but they reach a level of psychosis.

To illustrate: Rejon's descriptions of himself and of himself in relation to other people are replete with disconnected language that suggests being controlled and overcome by others. For example, when describing the car-jacking that took place when he was a teenager, he described that earlier that day he saw one of the teens who (later) carjacked him, and was "pulled to look at him," as if he knew what was going to happen. He described, "I felt his energy, looked up and saw him." This is likely a confabulated memory—that is a memory that is distorted or incorrectly combined with some other memory or thought. This kind of memory is common in dissociated people after a trauma. In the memory, Rejon is controlled, as if by an outside, malevolent force.

Rejon's descriptions of his brother, John, also have a distorted quality where he perceives his brother as omnipotent. He noted of his brother, "I was an extension of him...I changed under him and didn't know myself. It was like I was walking in shoes that my feet didn't fit. I lost myself." While it can be normal to perceive a powerful family member as influencing oneself, these descriptions capture Rejon's almost absent sense of self in relation to his family. He stated, "I was invisible to him," and "All influences came through him."

Rejon described another psychotic memory when he described being held in the jail after his arrest and being subjected to a line-up and a psychological evaluation. Rejon described that in the line-up he had to remove his shirt. However, he also then related that when he was evaluated by a psychologist, he

Exhibit 2

was forced to remove his shirt for the psychologist in a room surrounded with windows. When he recounted this, Rejon became notably distressed and described "submitting" to this evaluation with his shirt off, even though he wanted it to end. He said, "I had to go along with it… like I'm a specimen. I wanted it to be over." Rejon's memory of one distressing and possibly humiliating experience (the line-up where he had to remove his shirt) is conflated (cognitively merged) with the psychological evaluation ordered by his defense team. In both events, he felt that he was exposed, exploited and without power. This kind of misperception/memory impairment would have made him likely to be extremely suspicious of his defense team and would have affected his ability to assist counsel.

It is my clinical opinion that these ways of perceiving and relating reflect impairments in Rejon's functioning that have come from his childhood experiences of the powerlessness of living through trauma, as well as neuropsychiatric vulnerabilities. A person who perceives things pervasively in a strange or unusual way often possesses some neuropsychiatric vulnerability or impairment that contributes to the distorted perceptions. However, life experiences of stress and trauma can also contribute to this way of perceiving the world. Dissociation, as discussed previously, can be a neurophysiological adaptation to overwhelming events (a survival mechanism) that becomes an overarching way of functioning. Thus, adaptation to the child's distressing environment requires disconnection from people and feelings. This adaptation becomes ingrained in the child's functioning and becomes a predominant way he then responds to the environment.

Life overwhelmed Rejon and he sought comfort and nurturance, only to be met with his parents' absence or, conversely, with overwhelming family members. His (unconscious) coping strategy in this situation was to disconnect and shut down, dissociate. This strategy left him, however, without a major source of needed support—that of other people. His relational impairments developed from this disconnection and are reflected in his distorted descriptions of people.

### 3. Rejon Taylor's pervasive impairments affected his behavior during the offense.

Rejon Taylor clearly demonstrates impairments in reality testing, emotional regulation, and sense of self and others that are likely the result of a childhood replete with traumatic stress, as well as neuropsychiatric vulnerabilities. It is likely that these vulnerabilities and symptoms influenced his actions during the offense, given that they are such pervasive impairments. A trauma-focused evaluation of

Exhibit 2

his history and his behavior during the offense would have pointed out such impairments.

The present evaluation indicates a life replete with traumatic stress and the multiple impairments that flow from such a life. Rejon's dissociative response to stress results in him becoming emotionally dysregulated and begins a cascade of responses that shuts down and distances him from his physiological experience of fear and terror. This has been described above. During the events of the crime, Rejon recounted an experience of disconnection and depersonalization (not feeling that he was in his body) that overtook him.

Specifically, when Rejon described the events of the crime to me, his language and perceptions were completely consistent with the impairments listed above. That is, he described feeling "like nothing is happening, like it speeds up and then slows down." It appears that his responses during the offense were exacerbated by a strong, dissociated reaction to the gun. He noted a "ringing in my ears" and then "nothing…like not there." He noticed a weird smell and said, "I was in a state of shock the whole way home. It didn't make sense. It wasn't real." This kind of physiological state of arousal, followed by dissociation would be expected for Rejon, given his past trauma involving guns and his symptomatology. Coupled with this reaction, Rejon describes his present state of continued "shock" at what happened. He describes repetitive dreams of the events of the crime and his repeated belief that "the gun can't shoot…it doesn't shoot"—a psychological phenomena known as "undoing." When describing these dreams, he vacillated between present tense and past tense—as if his ability to recall the events were not stable and were temporally fluid for him. This too is an indicator of psychotic thinking.

Rejon's recounting of these reactions is consistent with his earlier descriptions of himself as a child and in the present. Specifically, he describes experiencing an event, being totally overwhelmed during it and then feeling disconnected from the event and dissociated from it. Rejon's descriptions of the offense were consistent with how he described much of his life, and they did not appear self-serving, as much as bewildering to him. When he described the offense, his emotional and cognitive limitations were pronounced—he spoke in a fragmented, disconnected and distorted way about his actions. He had almost no ability to coherently piece together the events. Notably, he did express profound remorse and a sense of devastation at what happened. His body flagged as he talked about the crime and he became flattened in his affect and notably disconnected.

Exhibit 2

## Conclusion

Rejon Taylor's life and functioning demonstrate a fundamental psychological principle that is well-documented and understood: an accumulation of negative and toxic life circumstances, beginning in childhood, with little appropriate therapeutic or protective responses from the environment will result in profound and pervasive negative outcomes in the developing child's life. As children are subjected to more and more traumatic stress, their biopsychosocial development becomes distorted by their overwhelming experiences of fear, anxiety, sadness, and insecurity. The child then suffers impairments in their developing sense of self, body, interpersonal relationships, cognitive functions, and emotional regulation. The risk factors that have been outlined above and that persisted throughout Rejon's entire life with little relief are: chronic exposure to direct and indirect violence in his family and community, exposure to corruption by adult caregivers; loss of his father to prison; exposure to substance abuse and mental illness in his family; and neglect of basic physical and emotional needs.

The impact of these risk factors as individual influences cannot be overstated, and their compounding interaction on Rejon as a developing child is best described as exponential. Thus, each risk factor, if not ameliorated, compounds and worsens the likelihood of further risk and adversity and decreases the likelihood of positive, healthy outcomes. For Rejon, his early years in which he was exposed to gun violence, lost his father to prison, and had little nurturance from adults led him to develop emotional dysregulation—predominantly, a dissociative adaptation to stress—in which he chronically disconnected from his experiences and went numb.

Rejon remembers himself as a child, being "without language"—subject to overwhelming experiences of people's "energies" and "electricity." This dissociated way of being in the world led to psychotic misperception and distortion. He perceives his inner world as a collection of outside "energies" rather than embodied feelings and thoughts. He perceives himself as vulnerable to people's intrusions and control. And he perceives others as sources of threat or as unboundaried energy acting upon him. All of these ways of perceiving the world and himself have impaired Rejon's functioning and contributed to his actions that led to the offense. As the events of the crime unfolded, Rejon, barely 18 years old and functioning with a highly impaired physiological stress response system became completely undone, overwhelmed and outside of himself. His actions were the result of and a reflection of his impaired functioning.

Exhibit 2

Rejon's response to prison has been positive in that the structure of prison has allowed him to function appropriately and without major stress reactions. He has been able to work as a porter in the prison for several years, a job that reflects positive adjustment to the structured environment and an ability to follow rules and interact appropriately with prison staff. He has built positive relationships with family members from within prison, including nephews and nieces, to whom he offers emotional and spiritual support.

Each of the above opinions is state to a reasonable degree of psychological certainty. I will continue my evaluation and review of information that is provided to me. Please do not hesitate to contact me with questions.

Sincerely,

Katherine Porterfield, Ph.D.
New York State License # 014105-1

Exhibit 2

# References

Anda, R. Felitti, V. Bremner, J, Walker, J., Whitfield, C., Perry, B., Dube, S., and Giles, W. (2006) The Enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology. *Eur Arch Psychiatry and Clin,* 256: 174–186.

Bremner, J. (2003) Long-term effects of childhood abuse on brain and neurobiology. *Child Adolesc Psychiatr Clin North Am,* 12: 271–292.

Bernard, K., Z. Butzin-Dozier, J. Rittenhouse, and M. Dozier. (2010) Cortisol production patterns in young children living with birth parents vs children placed in foster care following involvement of child protective services. *Archives of Pediatrics and Adolescent Medicine,* 164(5): 438-443.

Bruce, J., P. A. Fisher, K. C. Pears, and S. Levine. (2009) Morning cortisol levels in pre-school aged foster children: Differential effects of maltreatment type. *Developmental Psychobiology,* 51(1): 14-23.

D'Andrea, W., Ford, J. D., Stolbach, B., Spinazzola, J., & van der Kolk, B. (2012) Understanding interpersonal trauma in children: Why we need a developmentally appropriate trauma diagnosis. *American Journal of Orthopsychiatry,* 82: 187–200.

De Bellis M. Baum, A., Birmaher, B., Keshavan, M, Eccard, C., Boring, A., Jenkins, F., Ryan, N. (1999) AE Bennett Research Award. Developmental traumatology. Part I: Biological stress systems. *Biological Psychiatry,* 15(45): 1259–1270.

Ford, J, Connor, D, Hawke, J. (2009) Complex trauma among psychiatrically impaired children: A cross-sectional, chart-review study. *Journal of Clinical Psychiatry,* 70(8): 1155-1163.

Ford, J. D & Delker, BC. (2018) Polyvictimization in childhood and its adverse impacts across the lifespan: Introduction to the special issue. *Journal of Trauma & Dissociation,* 19(3): 275-288.

Frewen, P. & Lanius, R. (2014) Trauma related altered states of consciousness: Exploring the 4-D model. *Journal of Trauma and Dissociation,* 15: 436-456.

Garbarino, J., Kostelny, K., & Dubrow, N. (1991) No place to be a child: Growing up in a war zone Jossey-Bass, San Francisco, CA.

Gerard, J., Buehler, C. (2004) Cumulative environmental risk and youth maladjustment: The role of youth attributes. *Child Development, November/December, Volume 75,* (6): 1832 – 1849.

Gjelsvik, A., Dumont, D., Nunn, A., Rosen, D. (2014)) Adverse childhood events: Incarceration of household members and health-related quality of life in adulthood. *Journal of Health Care for the Poor and Underserved,* 25.3(3) 1169-1182.

Exhibit 2

Glaser, D. (2002) Emotional abuse and neglect (Psychological maltreatment): A conceptual framework. *Child Abuse and Neglect,* 26, 697-714.

Hanson, J., Nacewicz, B., Sutterer, M., Cayo, A., Schaefer, S., Rudolph, K., Shirtcliff, E., Pollak, S., & Davidson, R., (2015) Behavioral problems after early life stress: Contributions of the hippocampus and amygdala. *Biological Psychiatry,* 77: 314-323.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000) Predictors of youth violence. *Juvenile Justice Bulletin,* U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hildyard, K. & Wolfe, D. (2002) Child neglect: Developmental issues and outcomes. *Child Abuse and Neglect,* 26 679-695.

Holt, S., Buckley, H., and Whelan, S., (2008) The Impact of exposure to domestic violence on children and young people: A review of the literature. *Child Abuse and Neglect,* 32: 797-810.

IOM (Institute of Medicine) and NRC (National Research Council) (2014) *New Directions in Child Abuse and Neglect Research.* Washington, DC: The National Academies Press.

Lanius, U., Paulsen, S., & Corrigan, F. (2014) Neurobiology and Treatment of Traumatic Dissociation: Toward an Embodied Self, Springer: New York.

Merrick, M., Ports, K., Ford, D., Afifi, T., Gershoff, E., & Grogan-Kaylor, A. (2017) Unpacking the impact of adverse childhood experiences on adult mental health. *Child Abuse and Neglect,* 69: 10-19.

Nelson, C. A., K. Bos, M. R. Gunnar, and E. J. S., Sonuga-Barke, V., (2011) The Neurobiological toll of early human deprivation. *Monographs of the Society for Research in Child Development,* 76(4):127-146.

Putnam, F. (2003) Ten Year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry,* 42(3): 269-278.

Teicher, M. (2000) Wounds that time won't heal: The neurobiology of child abuse. *Cerebrum: The Dana Forum on Brain Science,* 2(4).

Teicher, M., Anderson, S., Polcari, A, Anderson, C., Navalta, C., & Kim, D. (2003) The Neurobiological consequences of early stress and child maltreatment. *Neuroscience and Biobehavioral Reviews,* (27): 33-44.

Teicher, M. H., N. L. Dumont, Y. Ito, C. Vaituzis, J. N. Giedd, and S. L. Andersen. (2004) Childhood neglect is associated with reduced corpus callosum area. *Biological Psychiatry,* 56(2): 80-85.

Twardosz, S., and J. R. Lutzker. (2010) Child maltreatment and the developing brain: A review of neuroscience perspectives. *Aggression and Violent Behavior,* 15(1): 59-68.

Exhibit 2

U.S. Department of Health and Human Services (2009) Understanding the Effects of Child Maltreatment on Brain Development. *Child Welfare Information Gateway,* Washington, D.C.
(https://www.childwelfare.gov/survey/publications/index.cfm).

US Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, (2001) Risk Factors for Delinquency: An Overview.

Whittle, S, Dennison, M., Vijayakumar, N., Simmons, J., Yücel, M., Lubman, D., Pantelis, C., Allen, N. (2013) Childhood maltreatment and psychopathology affect brain development during adolescence. *Journal of the American Academy of Child and Adolescent Psychitatry,* 52(9), 940-952.