Exhibit 7

# DECLARATION OF ROY COOPER

I, Roy Cooper, a resident of Hamilton County, Tennessee, being of lawful age declare as follows:

1. I am a private investigator, licensed in Tennessee and Georgia. In 2004, Bill Ortwein retained me to provide investigative services in the Rejon Taylor case. Prior to Rejon's case, I worked over 30 death noticed, state cases including two cases that went to a capital sentencing proceeding – all in Georgia.

2. My role in the case was lead investigator. I was in charge of all investigation in the case, both crime-based and mitigation. In fact, no investigation occurred of which I was not a part. Federal capital cases are different from state cases in that the team has to work up the mitigation before the case is authorized. I did that for Rejon's team prior to the presentation to DOJ in April 2006. I later provided my mitigation investigation to the mitigation specialist, Marti Loring, for her to work from. I documented every witness interview and every task. At the end of the case, I provided my entire file to Leslie Cory for her to maintain with the client file.

3. Prior to Rejon's case, I had worked with Bill Ortwein a number of times. In fact, in 1997 when I retired from the Chattanooga Police Department after 20 years, Bill called me the very next week and asked me what I knew about Ponzi schemes. He had a white collar case on which he needed my help. That case began a long working relationship. I enjoyed working with Bill; we had a great professional relationship and we both relied on each other to do the work.

4. Bill put together our team for Rejon. I was his first call after the judge appointed him and Howell Clements. Initially Bill's son, Lee, was the only associate counsel on the case, but later the court also appointed Leslie Cory as associate counsel. Lee and Leslie had limited roles, because neither was experienced in capital work. In fact, Leslie was just out of law school maybe a year or so at the time. Though she is a bright lady and very book smart, she did not yet understand much about how to work a case. She was always asking why we were doing this or that, trying to learn.

5. Both Bill and Howell were nearing retirement at the time of Rejon's case, and they relied on me. Bill got ill before the trial and had to ask for a continuance when he had complications after surgery. Howell had always had good days and bad days, but by the time of this case, he was struggling to keep up. I pitched in, helping him with his Grand Jury challenge and his other motions.

6. For a while in late 2004, Rejon did not talk to us much. He said nothing about the crime or his case. There were times that Rejon declined to see us altogether.

1

Exhibit 7

7. In December 2004, we had an organizational meeting at Ortwein and Ortwein. I also met with Reba Taylor in Atlanta to get an initial impression of her and to take an initial life history on Rejon.

8. In January 2005, I was worried about Rejon's mental state. I noted that he seemed delusional, believing that God would magically cause the evidence against him to go away. At that time, I was aware from other team members that Rejon was comparing himself to Biblical figures and claimed to have had a profound experience of the Divine while in the Hamilton Co jail. I told the team we had a job to do whether Rejon was on board or not – we were ethically and professionally bound to investigate the facts of his case. We discussed these matters at our January team meeting.

9. Bill decided that we would hire Dr. David Solovey as our mental health expert in the case. Bill assigned each of us to write Dr. Solovey our initial impressions/concerns regarding Rejon. In my memo for Dr. Solovey, I said I had explained to Rejon that I was to gather the information to be used in the sentencing phase. Rejon had replied that such was not necessary because God was going to make the evidence disappear. I related that I questioned Rejon and that it appeared to me that he believed what he said. I related that I had told Rejon that he should just let me do my job so I can make money, and that I had the impression that he would allow me to do that. However, when I went back the next week, he would not see me. After that I attended a meeting with Bill, Lee, and Dr. Solovey in January 2005 where Bill told Dr. Solovey about the team's concerns.

10. I performed crime-based investigative tasks such as photographing the scene, reviewing discovery and converting it to digital format for the team, serving subpoenas, identifying and corresponding with experts. I believe I attended all the attorneys' meetings with opposing counsel as well as all court appearances. I attended virtually every team meeting and I met with Rejon frequently, sometimes alone, but mostly with Bill or Lee Ortwein. Much of my work in mid-2005 involved reviewing the discovery and putting the information into a timeline of the case.

11. In the team meeting at the end of March 2005, we discussed our plan for Bill and me to interview family witnesses to prepare a mitigation video for presentation in Washington. We never made this interview.

12. In April 2005, Bill and I interviewed Rejon's brother, John. He was upfront about his cocaine dealing.

2

Exhibit 7

13. I also kept a mitigation timeline of Rejon's life. It is my belief and understanding that the information I obtained and put into that timeline is the information used by the team in developing our penalty phase strategy and testimony. I do not know of anyone developing information about Rejon's life story that was not in my timeline. The thing about a federal death penalty case is that you have to work up your mitigation prior to the authorization determination, that is, you do the work up prior to your full investigation of the case.

14. In June 2005, I interviewed witnesses in Rejon's family, specifically Reba (mother); John (brother); Tamika (sister); Eva Williams (grandmother), John (father), and I attempted to interview Charlene Middlebrooks and Wanye Kemp (neighbors).

15. Bill Ortwein and I interviewed Rejon's father at the Hancock State Prison in Sparta, Georgia in June 2005. He admitted to us that he became physical with Rejon's mother, Reba, in front of the children, upsetting them. He said that he last saw Rejon when Rejon was about ten-years-old.

16. In August 2005, I was present when Bill Ortwein first explained the government's life without parole offer to Rejon. I was also present with Bill and Howell a week later when they went back to see if he had made a decision or had any questions. Rejon indicated he needed more time. This stretched on and on, ultimately Rejon told Bill that he realized that the team could not do anything for him, that what would happen was up to God. He continued to profess a belief that God was going to do something to deliver him and to say he would be fine. He indicated that he was standing on the rock until/unless told by God to do something else.

17. In November 2005, the team was focused on our presentation to the US Attorneys to convince them not to seek death. We collected letters from volunteers in the jail, from Rejon's classes in the jail, and prepared exhibits to show that Rejon did not deserve the death penalty because he was doing good things for other people while in jail and he was not pose a danger. Howell Clements was responsible for the oral presentation to the AUSAs.

18. In November 2005, we obtained information regarding the estate of Guy Luck that enabled us to identify Mr. Luck's sister in France and to contact her counsel in Atlanta. We met with that counsel in December and began a lengthy process of trying to contact Marie Lorraine in France. We initially attempted contact through her attorneys — both in Atlanta and in France — but soon progressed to trying to contact her directly. We hired translators to assist us with the calls. As far as I know, none of those calls/efforts were ever fruitful.

3

Exhibit 7

19. In 2006 the team contracted with Dr. Marti Loring, a mitigation specialist from Atlanta. Initially, the team was interested in her as an expert in domestic violence, because we knew about some violence between Rejon's mother and father. I already knew Marti and had worked with her previously. Howell was so sure that she would not have time for our case – he thought she was really big time. I called her up and that was that, she was in. Howell and I met with her in Atlanta in May 2005, but she did not come on board until December 2006. Marti did not interview any mitigation witnesses I had not already talked to. By the time she started work on the case, I had already identified everyone that was relevant and had already interviewed them. She went back and talked to Rejon's extended family, including some aunts and uncles, but she did not learn anything I had not already uncovered. I've been told that Marti's file was only about seven pages of work product. That sounds about right to me. Marti met with Rejon a couple of times without me, but I tried to be present at her interviews with the family.

20. Dr. Loring did not do much on the case before we told her to concentrate on Luck's girlfriend. I met with Marti and the victim's girlfriend, Stephanie Belcher, a number of times, trying to get Belcher to sign a statement that she was opposed to the death penalty. She did not really want Rejon to get the death penalty, but she would not sign the statement. Ms. Belcher said that Guy Luck had been frightened because a Black male in his 40's had been stalking him. It sounded to me like Mr. Luck had a disgruntled employee. I would have investigated this angle, but Ms. Belcher would not allow us to interview Mr. Luck's employees.

21. In February 2006, after our team's presentation, the local US Attorney's office recommended against death certification. This was covered in the news and we also told Rejon of this decision.

22. Despite the local's recommendation, we continued to prepare for the presentation to DOJ, obtaining updated letters from the Chaplin and other jail/character witnesses. I prepared a disc of the materials the attorneys wished to present in Washington and sent it ahead of our team so that the lawyers there could review prior to our presentation.

23. I went to D.C. with Bill, Howell, and Lee in April 2006 for the presentation at DOJ. Apparently while we were traveling, Rejon and three companions attempted to escape from the Hamilton County Jail. This was a real blow to our team. We were all quite angry with Rejon; it was a completely stupid thing to do. He shot himself in the foot, both with the DOJ and with the team.

4

Exhibit 7

24. After the escape, Howell and I were the ones to tell Rejon that the government had decided to seek death. Howell told Rejon that there might still be some chance to obtain a plea.

25. In June 2006, Bill got James Aiken's name as a potential corrections expert and reached out to Aiken.

26. After the death notice, the team hired a couple of private investigators in Georgia to help me with various tasks like serving subpoenas and locating fact witnesses. They were all worthless. I had to do all the work myself because I was not convinced I could trust any of their work to be accurate or even honest.

27. After a team meeting in mid-2006, Bill decided to take a different approach with Rejon. Bill would be his primary contact and his discussions with Rejon would focus more on the facts of the crime, with less letting him ramble about his religious/spiritual views or other unrelated matters. I accompanied Bill for several of these more focused client meetings, including in July 2006 when Bill told Rejon that the settlement deadline for the case was September. For the remainder of 2006 into 2007, we handled Rejon by having Bill and me visit him. Leslie and Howell each went to see him a time or two, but mostly it was Bill or me or both of us, and we kept those meetings very focused on the facts of the crime.

28. Much of my work in 2006 focused on the jury composition issue that Howell Clements was developing. We spent a lot of time getting statistics, taking depositions and other tasks supporting that motion. I also spent a large amount of time researching data to support Howell's proportionality motion.

29. In 2007, we began working with Dr. Cunningham, a psychologist out of Texas. I sent him all the documentation we had on Rejon and write ups of the interviews Marti had done with the family, assessing how each witness would perform on the stand. He came to Atlanta and did his own interviews with the family. When it came time for his presentation in court, the judge ruled that his expertise in future dangerousness was not admissible. He was left with little to say.

30. Despite the fact that the AUSAs continued to indicate that if Rejon would accept a life sentence they would ask DOJ to allow a plea, Rejon persisted in always responding to any discussion of a plea that God had not told him to plead. This was quite frustrating. I used every strategy of which I was aware to get him to think more clearly about what he was risking, what he was doing. We went over and over the evidence, showing him that the jury was certain to convict him. He was unshakable and was consistent in relying on his religious beliefs to not take the plea. I resorted to trying to scare him, walking him through all the steps of an

execution, talking with him about how the drugs would burn in his arm and how his mother would suffer watching him die. Though he occasionally became emotional discussing these things, he was completely stuck in his belief that God would save him. I kept telling him that God had sent me to save him, but he could not hear me.

31. During the pendency of this case, my wife was fighting brain cancer. She died in June 2008. I was her primary caregiver, but I managed to put in the hours on this case. I needed the work as an escape.

32. Over the course of our representation, I met with Rejon's mother Reba and his brother and sister several times. Based on these interviews, I was of the opinion that John completely controlled Rejon. I suspected that Rejon was not scared to die, because John told him to.

33. I developed a theory that Guy Luck was laundering money through his businesses, including his restaurant. There was something about all his property and assets that did not add up. Additionally, his passport had many stamps from countries near the old Soviet Bloc. I could not convince the team to let me investigate that angle as much as I would have liked.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States of America on April 25, 2019.

Roy Cooper Jr.

Exhibit 7

Exhibit 7

# TIME LINE FOR REJON TAYLOR

**DATE** FEBRUARY 20, 2006

| 4/6/83 | GA. DOC RECORDS |
|---|---|
| **DATE** | **SOURCE** |

JOHNNY TAYLOR, REJONS FATHER, INCARCERATED FOR THIRD TIME.

**EVENT**

| _09/15/84 | INTERVIEW REBA TAYLOR |
|---|---|
| **DATE** | **SOURCE** |

TAYLOR BORN AT DEKALB MEDICAL CENTER DELIVERED BY DR. MORUSAKHAN OF DECATUR, GEORGIA

**EVENT**

| 2/7/85 | DR. WINSTONS RECORDS |
|---|---|
| **DATE** | **SOURCE** |

TAYLOR TAKEN TO DOCTOR WITH BAD COLD AND HIGH FEVER   GIVEN ADRENALINE SHOT.

**EVENT**

| 12/14/85 | DR. WINSTONS RECORDS |
|---|---|
| **DATE** | **SOURCE** |

TAYLOR TAKEN TO DOCTOR WITH WHEEZING COUGH, DOT# ADMINISTERED.

**EVENT**

| 3/16/85 | DR. WINSTONS RECORDS |
|---|---|



Exhibit 7

**DATE**                                          Source

TAYLOR TAKEN TO DOCTOR AND DPT 3 ADMINISTERED

---

**EVENT**

4/27/85                                          DR. WINSTONS RECORDS

---

**DATE**                                          **SOURCE**

TAYLOR TAKEN TO DOCTOR WITH CONGESTION AND 100+ FEVER/ AMPHICILLIN PRESCRIBED FOR 10 DAYS.

---

**EVENT**

9/6/85                                          DR. WINSTONS RECORDS

---

TAYLOR TAKEN TO DOCTOR WITH INSECT BIT ON RIGHT KNEE AND HAD BEEN CRYING AND PULLING HAIR A LOT.

---

**EVENT**

2/26/87                                          DR. WINSTONS RECORDS

---

**DATE**                                          **SOURCE**

TAYLOR TAKEN TO DOCTOR WITH WHEEZING AND COLD GIVEN DPT3

---

**EVENT**

6/10/92                                          **GA DOC** RECORDS

---

**DATE**                                          **SOURCE**

JOHNNY TAYLOR, REJONS FATHER, RELEASED FROM PRISON RETURNED TO ATLANTA

---

**EVENT**

10/22/97                                          DEKALB COUNTY SCHOOL RECORDS

---



Exhibit 7

| DATE | SOURCE |
| --- | --- |

TAYLOR RECEIVES ONE DAYS DETENTION FOR FAILURE TO FOLLOW INSTRUCTION

**EVENT**

| 12/03/97 | DEKALB COUNTY SCHOOL RECORDS |
| --- | --- |

| DATE | SOURCE |
| --- | --- |

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR CLASSROOM MISBEHAVIOR

**EVENT**

| 12/15/97 | DEKALB COUNTY SCHOOL RECORDS |
| --- | --- |

| DATE | SOURCE |
| --- | --- |

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR FAILURE TO FOLLOW INSTRUCTION

**EVENT**

| 3/30/98 | DEKALB COUNTY SCHOOL RECORDS |
| --- | --- |

| DATE | SOURCE |
| --- | --- |

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR FAILURE TO FOLLOW INSTRUCTION

**EVENT**

| 5/11/98 | DEKALB COUNTY SCHOOL RECORDS |
| --- | --- |

| DATE | SOURCE |
| --- | --- |

TAYLOR RECEIVES OUT OF SCHOOL SUSPENSION FOR THREATENING SCHOOL PERSONNEL, PUSHED STUDENT INTO MRS. GRUBER TWICE.

**EVENT**

| 5/26/98 | DEKALB COUNTY SCHOOL RECORDS |
| --- | --- |



Exhibit 7

**DATE**                                    **SOURCE**

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR CLASSROOM BEHAVIOR.

---

**EVENT**


8/12/98                                    **GA DOC RECORDS**

---

**DATE**                                    **SOURCE**

JOHNNY TAYLOR, REJONS FATHER, SENT TO PRISON FOR ARMED ROBBERY.

---

**EVENT**


9/18/98                                    **DEKALB COUNTY SCHOOL RECORDS**

---

**DATE**                                    **SOURCE**

TAYLOR SUSPENDED FROM BUS FOR 3 DAYS

---

**EVENT**


10/4/98                                    **DEKALB COUNTY SCHOOL RECORDS**

---

**DATE**                                    **SOURCE**

TAYLOR WARNED AND COUNSELED ABOUT BUS MISCONDUCT

---

**EVENT**


10/6/98                                    **DEKALB COUNTY SCHOOL RECORDS**

---

**DATE**                                    **SOURCE**

TAYLOR RECEIVES 3 DAYS DETENTION FOR DISRESPECTING SCHOOL

---

**EVENT**


10/20/98                                   **DEKALB COUNTY SCHOOL RECORDS**

---



Exhibit 7

**DATE**                                    **SOURCE**

TAYLOR RECEIVES OUT OF SCHOOL SUSPENSION FOR FIGHTING

---

**EVENT**

11/06/98                                    DEKALB COUNTY SCHOOL RECORDS

---

**DATE**                                    **SOURCE**

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR MISCONDUCT ON THE BUS.

---

**EVENT**

1/8/99                                      DEKALB COUNTY SCHOOL RECORDS

---

**DATE**                                    **SOURCE**

TAYLOR PLACED ON OUR OF SCHOOL SUSPENSION FOR THROWING FOOD IN CAFETERIA

---

**EVENT**

3/16/99                                     DEKALB COUNTY SCHOOL RECORDS

---

**DATE**                                    **SOURCE**

TAYLOR RECEIVED THREE DAYS DETENTIONS FOR REFUSING TO FOLLOW INSTRUCTIONS

---

**EVENT**

3/30/99                                     DEKALB COUNTY SCHOOL RECORDS

---

**DATE**                                    **SOURCE**

TAYLOR RECEIVES THREE DAY SUSPENSION FOR REFUSING TO SIT DOWN WHEN TOLD

---

**EVENT**

5/25/99                                     DEKALB COUNTY SCHOOL RECORDS

Exhibit 7

| DATE | SOURCE |
|---|---|

TAYLOR RECEIVES THREE DAY SUSPENSION FOR FAILURE TO FOLLOW INSTRUCTION

**EVENT**

| 6/7/99 | DEKALB COUNTY SCHOOL RECORDS |
|---|---|

| DATE | SOURCE |
|---|---|

TAYLOR RECEIVES WARNING AND COUNSELING FOR WRITING ON TABLE

**EVENT**

| 11/1/99 | DEKALB COUNTY SCHOOL RECORDS |
|---|---|

| DATE | SOURCE |
|---|---|

TAYLOR RECEIVES IN SCHOOL SUSPENSION FOR DISRESPECT TO SCHOOL

**EVENT**

| 12/2/99 | DEKALB COUNTY SCHOOL RECORDS |
|---|---|

| DATE | SOURCE |
|---|---|

TAYLOR RECEIVES OUT OF SCHOOL SUSPENSION FOR CUTTING CLASS

**EVENT**

| 1/13/00 | DEKALB COUNTY SCHOOL RECORDS |
|---|---|

| DATE | SOURCE |
|---|---|

TAYLOR RECEIVES OUT OF SCHOOL SUSPENSION FOR REFUSING TO STOP TALKING IN CLASS

**EVENT**

| 12/16/04 | DEKALB COUNTY SCHOOL RECORDS |
|---|---|



Exhibit 7

**DATE**                  **SOURCE**

TAYLOR CERTIFIED NOT "SPECIAL EDUCATION STUDENT" BY VELINDA K BAILEY, EXECUTIVE DIRECTOR PROGRAM

---

**EVENT**

_8/13/01                  DEKALB COUNTY SCHOOL RECORDS

---

**DATE**                  **SOURCE**
__SUBJECT QUITE MCNAIR HIGH SCHOOL TO ATTEND ANOTHER SCHOOL.

---

**EVENT**

10/1/01                  ATLANTA PUBLIC SCHOOL RECORDS

---

**DATE**                  **SOURCE**

TAYLOR ATTEMPTS TO ENTER G. W. CARVER HIGH COMPREHENSIVE HIGH SCHOOL IN ATLANTA

---

**EVENT**

11/7/02                  DEKALB COUNTY PD BOOKING REPORT

---

**DATE**                  **SOURCE**

REJON TAYLOR ARRESTED USING ROBERT WESTLAKE DATA

---

**EVENT**

8/22/.3                  DEKALB COUNTY PROBATE COURT

---

**DATE**                  **SOURCE**

TEMPORARY ORDER OF ADMINISTRATION FILED BY STEPHANIE BELCHER

---

**EVENT**



Exhibit 7

| 9/2/03 | DEKALB COUNTY PROBATE COURT |
|---|---|
| DATE | SOURCE |

STEPHANIE BELCHERS ATTORNEY DAVID POWELL WITHDRAWS

EVENT

| 2/27/04 | DEKALB COUNTY PROBATE COURT |
|---|---|

BELCHER SUBMITS INVENTORY OF ESTATE

EVENT

| 3/3/05 | DEKALB COUNTY PROBATE COURT |
|---|---|
| DATE | SOURCE |

PERMANENT ADMINISTRATION BY MARIE FRANCE FABRE

EVENT

| 3/28/05 | DEKALB COUNTY PROBATE COURT |
|---|---|
| DATE | SOURCE |

CAVEATS ISSUED

EVENT

| 2/9/06 | DEKALB COUNTY PROBATE COURT |
|---|---|
| DATE | SOURCE |

CONSENT ORDER FOR EXTENSION OF TIME FOR ESTATE ADMINISTRATION (LUCK)